12/18/2018 5:33 PM
18CV57494

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| STEVEN A.W. DE JARAY, PERIENNE DE JARAY, and DARRELL R. OSWALD,<br><br>Plaintiffs,<br><br>v.<br><br>LATTICE SEMICONDUCTOR CORPORATION, an Oregon-headquartered Delaware corporation, and JOHN and JANE DOES 1–20,<br><br>Defendants. | Case No.<br><br>**PLAINTIFFS' COMPLAINT**<br>  Violation of the Lanham Act (False Advertising)<br>  Negligence<br>  Fraud<br><br>Filing Fee: $1,111 per ORS 21.160(1)(e) & ORS 21.105(2)<br><br>NOT SUBJECT TO MANDATORY ARBITRATION<br><br>**Money damages prayed for in an amount no less than $138,295,118**<br><br>**JURY TRIAL DEMANDED** |

COME NOW Plaintiffs Steven A.W. de Jaray and Perienne A.S. de Jaray, father and daughter (together, the "de Jarays"), and Darrell R. Oswald (collectively, "Plaintiffs"), by and through the undersigned counsel, for their Complaint hereby allege as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.     Formerly a successful tech-manufacturing entrepreneur for decades, Plaintiff Steven A.W. de Jaray is now a man without country.  He was left with no choice but to give up his lawful North American residency due to the events that form the basis of this lawsuit.  He now lives on a boat, travelling from port to port, never staying anywhere too long.

PLAINTIFFS' COMPLAINT - 1 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

2.     Similarly, Plaintiff Perienne A.S. de Jaray was an executive working with Mr. de Jaray.  Today, she resides in British Columbia, Canada.  But she is forced to move, regularly, because of the facts herein described, whereby she lost her home and lawful U.S. residency.

3.     Plaintiff Darrell R. Oswald is a long-time close personal friend of Mr. de Jaray.  Mr. Oswald is a Canadian investment advisor, Chartered Financial Analyst, and Chartered Accountant.  He was an active director of one of Mr. de Jaray's businesses and an investor in two of Mr. de Jaray's other companies.  As a result of the facts described herein, Mr. Oswald was damaged financially, professionally, and personally.

4.     Defendant Lattice Semiconductor Corporation ("Lattice") is a Delaware corporation with its principal place of business in Portland, Oregon.  Lattice is registered to do business in Oregon, has an office in Portland, Oregon, and conducts regular and substantial business activity in Multnomah County.

5.     Defendants John and Jane Does 1–20 (together with Lattice, "Defendants") are currently unknown to Plaintiffs.  But upon information and belief, Plaintiffs anticipate that discovery will yield the identities of certain persons who individually participated with other Defendants to engage in the misconduct underlying this complaint.  Alternatively, Plaintiffs anticipate discovery will yield facts that will tend to show certain Lattice officers, described herein, will be directly liable to Plaintiffs along within Lattice, justifying their joinder as Defendants through an amendment to this Complaint, relating back to this filing's date.  Either way, Plaintiffs anticipate they will have been residents of and/or regularly working in Oregon at all relevant times.

6.     This Court has personal jurisdiction over Defendants pursuant to ORCP 4 A(4), 4 C, and 4 L.  Defendants are engaged in substantial and not isolated activities in Oregon, and Defendants committed acts or omissions in Oregon that gave rise to injuries to Plaintiffs.

PLAINTIFFS' COMPLAINT - 2 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

7.    Venue is proper pursuant to ORS 14.080(2).  Defendants reside in Multnomah County, where they conduct regular, sustained business activity, have offices for the transaction of business, and/or otherwise reside.  This Court has subject matter jurisdiction under ORS 14.030.

## STATEMENT OF FACTS

**a)  Introductory overview.**

8.    This is a claim for the recovery of Plaintiffs' reputations and fortunes, sundered by Lattice's false advertising, negligence, and/or fraud.  Lattice conducted itself with a blatant disregard to the damages that would be caused to the companies, individuals, and investors that would be impacted by Lattice's misconduct.  As described in further detail below, Mr. de Jaray was the founder and principle beneficial shareholder of advanced electronics manufacturing businesses with significant long-established production operations in the United States, Canada, and Hong Kong.  Ms. de Jaray was an up-and-coming executive at one of Mr. de Jaray's companies, with substantial vested equity options in that business.  Mr. Oswald, a long-time family friend of the de Jarays, invested heavily in and became an active director of one of Mr. de Jaray's businesses.  Plaintiffs purchased integrated circuits (microchips) from Lattice.  Lattice knew of Plaintiffs' routine exports of the integrated circuits to Hong Kong.  Nothing in purchasing the integrated circuits suggested they were export controlled.  But, as Plaintiffs only recently learned: (A) Lattice privately took the position that its integrated circuits *were* export controlled; and (B) Lattice propagated that position in private communications with government investigators.  The de Jarays' companies and achievements were destroyed, as a result, after the de Jarays were wrongly accused by the Canadian and United States governments of illegally exporting the integrated circuits.  The aggressive investigations that followed cost Plaintiffs dearly.  All of that

PLAINTIFFS' COMPLAINT - 3 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

1    could have been avoided if Lattice had just been forthright and honest in its communications with

2    and representations made to Plaintiffs and government authorities.

3    **b) Plaintiffs' businesses were thriving prior to Lattice's misconduct.**

4        9.    Mr. de Jaray built and sold numerous companies over his career.  In 2008, he lived

5    in West Vancouver, Canada, as the founder and principle shareholder of, *inter alia*, Apex-Micro

6    Manufacturing Corporation, as well as its corporate family and affiliated entities such as and

7    including without limitation American Micro-Fuel Device Corporation and other businesses and

8    entities (collectively, "Apex").

9        10.    Having  graduated  with  a  B.A.  in  International  Business  from  Pepperdine

10   University, Ms. de Jaray was an Executive Vice President of Operations at Apex, with substantial

11   valuable vested options to buy Apex equity.

12       11.    Ms. de Jaray lived in Bellingham, Washington.  From 2005 through 2009, she was

13   setting up the Washington facilities to take over all production operations from the Canadian

14   parent-company.  She was responsible for a staff of more than 80 employees (plus interns studying

15   for their Masters degrees from Western Washington University), a 24-hour-a-day production

16   schedule, and an American enterprise that had achieved over tens of millions in annual revenue.

17       12.    After receiving his Chartered Accountancy designation from a large internationally

18   recognized accounting firm, Mr. Oswald had worked for over 20 years in the investment industry.

19   For the prior 15 years he worked at one of Canada's preeminent investment management firms

20   where for the last 10 years he had been the managing partner of one of the firm's operating

21   divisions and a member of the operating committee.

22

23

PLAINTIFFS' COMPLAINT - 4 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

Notice of Removal
Exhibit A, Page 4 of 27

13.    In 2008, Mr. Oswald lived in Vancouver, British Columbia.    That year Mr. Oswald's firm was acquired and he took on the role of co-president of one of the newly formed companies.

14.    Around that time, Mr. Oswald invested a large sum of money to acquire a large minority stake in Apex, along with certain corporate governance rights, privileges, and duties.

15.    Mr. Oswald became an active Apex director and Plaintiffs anticipated Mr. Oswald's engagement with Apex and the de Jarays' businesses more generally would grow substantially.

16.    From its inception through 2007, Apex had grown to employ over 250 people.  By the end of 2008, Apex had achieved a peak consolidated annual revenue of approximately US$39 million.  Apex was on track to post record earnings for the 2009 fiscal year.

17.    Apex manufactured bespoke circuit boards and custom (non-commoditized) components for its clients' electronic end-products, principally in the telecommunications, medical, automotive, aerospace, and industrial fields.

18.    As manufacturers and businesspersons, Plaintiffs' reputations and long-term commercial relationships were pivotal to the success of their businesses.

19.    Apex customers directly and indirectly included mega companies in a variety of industries including large publicly traded companies, large government agencies, and others.

20.    A wholly owned Apex subsidiary in Washington dealt with excess inventories of electronics components that customers, for whatever reason (product updates, obsolescence, etc.), no longer needed.

21.    Apex's corporate family routinely shipped raw components to and from Canada, the United States, and Hong Kong, including certain integrated circuits manufactured by Lattice.

PLAINTIFFS' COMPLAINT - 5 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

1

**c)  The Seized Goods.**

2        22.      In the normal course of its business, on Friday, December 19, 2008, two Apex

3   packages were retrieved by a large international delivery services company in Delta, BC for

4   shipment to an Apex subsidiary in Kowloon, Hong Kong.  Both waybills described the contents

5   as "printed circuit board assembly."  The packages contained certain Lattice-manufactured

6   programmable logic devices identified as ispLSI 1048C/883 and GAL22V10/883, part numbers

7   5962-9558701MXC and 5962-8984106LA (collectively referred to as the "Seized Goods").

8        23.      Lattice had sold the Seized Goods to Mr. de Jaray and Plaintiffs' companies on the

9   basis of certain marketing materials (in particular, data sheets) that could not lead a reasonable

10  buyer to determine the Seized Goods would be qualified to be export controlled for any reason or

11  otherwise subject to legal uncertainties.

12       24.      The Seized Goods were soon-to-be-obsolete components from 1989.  They were

13  common off-the-shelf components, readily available at the time for purchase globally.   In

14  particular, the Seized Goods were readily available in the Hong Kong and greater Chinese markets.

15       25.      On Monday, December 22, 2008, the delivery company quarantined the Seized

16  Goods at a warehouse at the Vancouver International Airport in Canada.  The delivery company

17  then reported the Seized Goods to the Canada Border Services Agency ("CBSA").

18       26.      CBSA Officers determined, upon inspection, that the Seized Goods might be export

19  controlled under the Canadian Export and Import Permits Act ("EIPA"), and thus could need a

20  permit from the Canadian Department of Foreign Affairs and International Trade ("DFAIT").

21       27.      The seizure set off parallel investigations by Canadian and U.S. authorities,

22  including the Federal Bureau of Investigations ("FBI"), into the de Jarays and Apex.

23

PLAINTIFFS' COMPLAINT - 6 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

**d)  United States and Canadian regulations concerning integrated circuits.**

28.     While generally most products in the global market do not implicate export controls, there are export control laws regulating trade, *inter alia*, in certain dual military/civilian use goods and technologies, including integrated circuits (microchips) that feature certain specific capabilities.   These laws are generally substantially the same across mature industrialized democratic countries like and including the United States and Canada.

29.     In the United States, if an integrated circuit is rated by the manufacturer to operate at certain parameters described in the Commerce Control List ("CCL"), then the integrated circuit may implicate an Export Control Classification Number ("ECCN").   If the integrated circuit implicates an ECCN, then a license may be required from the U.S. Department of Commerce, Bureau of Industry and Security ("BIS") to export it.

30.     Congruently, Canada's ECL is its parity to the CCL, as applicable here.  The ECL describes parameters of products that may not be exported to certain states without a permit from the office of the Trade Controls Bureau of the Canadian Department of Foreign Affairs, Trade and Development ("DFATD").  DFAIT is the former name of what is, today, DFATD.

31.     Under U.S. and Canadian regulations, in relevant part, an integrated circuit is export controlled (and not to be exported without licensure to a broad range of states, like China) if the manufacturer designates the integrated circuit as:  "Rated for operation over the entire *ambient* temperature range from 218 K (–55°C) to 398 K (+125°C)."  15 C.F.R. § 774 Sup. No. 1, Cat. 3 (CCL ECCN 3A001.a.2.c); Canadian ECL Section 3.A.1.a.2.c (emphasis added).  That is, if an integrated circuit is so rated, it is ambient temperature controlled for export (hereinafter referred to as "export controlled").

---

PLAINTIFFS' COMPLAINT - 7 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

e)  **A brief explanation of relevant aspects of microelectronics engineering.**

32.    Ambient temperature ($T_A$) and case temperature ($T_C$) are two types of temperature measurements used in electronic product design.  Each is a completely distinct engineering parameter, involving different measurement data, influences, and locations.  They are common industry standards and are readily distinguishable and utilized by those who work in the industry.

33.    "Ambient temperature" ($T_A$) is the surrounding temperature of the atmosphere in which the integrated circuit operates or is intended to operate (the temperature of the integrated circuit's climate or environment, rather than the temperature of the integrated circuit itself).

34.    "Case temperature" ($T_C$) is the temperature of the integrated circuit's casing during operation, while electricity (creating heat) flows through the semiconductor insulated by the case.

35.    The diagram below describes a simple integrated circuit:



36.    The red rectangle in the center is the actual semiconductor (generally, silicon).  The semiconductor is mounted to a bonding pad (orange) and housed inside a molded plastic or ceramic protective case (grey).  Inside, bonding wires (black) connect the semiconductor (red) to pins (blue).  The external pins are soldered onto a circuit board.  To operate, electricity flows from the circuit board, through the pins and the bonding wires, and into and out of the semiconductor, which

PLAINTIFFS' COMPLAINT - 8 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

1  is electrically insulated by the case.  Each item has a distinct and different temperature

2  measurement.

3       37.    Too high a temperature will destroy an integrated circuit.  When the integrated

4  circuit operates, the temperature of the semiconductor rises due to the flow of electricity.  The

5  temperature of the case ($T_C$) rises, too (considerably).  The precise measurable difference between

6  the case temperature ($T_C$) and the ambient temperature ($T_A$) will vary depending on a variety of

7  factors (materials, cooling systems, etc.).  But the case temperature ($T_C$), by definition measured

8  at operation, is *always* higher than the ambient temperature ($T_A$), often by dozens of degrees.

9       38.    "Rated for operation" over a certain type of temperature range means that the

10  manufacturer warrants the integrated circuit for use within that temperature range for a period of

11  time, without degradation.  This is distinct from an integrated circuit merely having survived a test.

12       39.    Thus, the case temperature ($T_C$) *rating* must *necessarily* be higher than the ambient

13  temperature ($T_A$) *rating*, without exception.

14  **f)  Lattice deceptively marketed its integrated circuits.**

15       40.    Integrated circuit manufacturers, such as Lattice, indicate whether an integrated

16  circuit is "rated for operation" over types of temperature ranges.  These ratings are generally set,

17  specified, and published in manufacturers' data sheets.

18       41.    Integrated circuit manufacturers, such as Lattice, use data sheets as marketing

19  materials, publishing them broadly to the market, to be relied upon by customers (buyers) to

20  ascertain the particular integrated circuit's specifications and temperature type and range ratings.

21       42.    Customers (including exporters), such as Plaintiffs, reasonably rely on (and are

22  entitled to reply on) these data sheets when determining whether an integrated circuit is export

23  controlled.

PLAINTIFFS' COMPLAINT - 9 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

43.    Thus, Lattice was and/or should have been well aware of its integrated circuits' ambient and case temperature range ratings, including with respect to the Seized Goods.

44.    Unbeknownst to Plaintiffs, Lattice believed, knew, and/or took the position (*inter alia*, in private communications with government officials, investigators, and others) that the Seized Goods were considered *ambient* temperature ($T_A$) rated to operate across the entire range of $-55^\circ C$ to $+125^\circ C$ implicating export controls and/or otherwise subject to legal uncertainties.

45.    In its data sheets for the Seized Goods, Lattice failed to offer any facts or warnings that would lead Plaintiffs or **any** other reasonable exporters to conclude the Seized Goods were export controlled or otherwise subject to any legal uncertainties, or that there were government officials who believed the Seized Goods were export controlled.

46.    Lattice advertised in its data sheets that the Seized Goods were "case temperature" ($T_C$) rated to operate from $-55^\circ C$ to $+125^\circ C$.  Those data sheets expressly disclaimed functional operation of the Seized Goods at or above a case temperatures ($T_C$) of $+125^\circ C$, stating that such operation "may cause permanent damage to the device."

47.    By necessary implication, the data sheets thus reflected that the Seized Goods could not be ambient temperature ($T_A$) rated from $-55^\circ C$ to $+125^\circ C$ because a maximum ambient temperature ($T_A$) rating is necessarily lower than a maximum case temperatures ($T_C$) rating.

48.    In the voluminous multi-million dollar course of dealings between Plaintiffs and Lattice spanning May 2005 to January 2009, Plaintiffs enjoyed a progressive professional vendor-relationship with Lattice while reasonably relying on Lattice's published data sheets concerning the Seized Goods and other integrated circuits.

PLAINTIFFS' COMPLAINT - 10 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

49.     With respect to information relating to temperature ranges and export controls, Lattice never updated the data sheets on which Plaintiffs relied in purchasing the Seized Goods from Lattice for all those years.

50.     On March 28, 2006, Lattice's Chief Financial Officer, Jan Johannessen, wrote in an email to Mr. de Jaray's bank seeking support to expand Lattice's vendor relationship with Apex concerning the Seized Goods, and other integrated circuits, by increasing Mr. de Jaray's available credit to the US$1 million level, explaining that "Apex is an important customer to Lattice."

51.     On a June 9, 2006 teleconference, Lattice's Chief Executive Officer, Stephen Skaggs, promised Mr. de Jaray that Lattice would provide (i) special pricing to Apex for integrated circuits (including the Seized Goods) and (ii) technical support for Apex's Hong Kong operations.

52.     Later on June 9, 2006, Lattice's Vice President Ed Markiewicz sent Mr. de Jaray sales terms details and marketing materials.  Lattice's Regional Sales Manager Scott Roberts followed up by phone.

53.     While he was an Oregon-based Lattice employee, Mr. Roberts was responsible for marketing to western Canada.  His job requirements included being familiar with export control laws in the United States and Canada.

54.     Mr. de Jaray also engaged directly with other Lattice personnel, such as Director of Sales Dave Bennett.

55.     Throughout these communications and others, Messrs. Johannessen, Skaggs, Markiewicz, Roberts, Bennett, and other Lattice agents omitted and/or failed to warn Plaintiffs that Lattice believed, knew, and/or took the position that the Seized Goods were export controlled or otherwise subject to any legal uncertainties, or that they knew of any government officials who believed the seized goods were export controlled.

PLAINTIFFS' COMPLAINT - 11 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

56.     For the reasons above, Plaintiffs thus reasonably believed, and were entitled to believe, the Seized Goods were not export controlled or otherwise subject to legal uncertainties, and exported the Seized Goods to the Hong Kong operations without an export permit or license.

57.     But in private communications, previously unbeknownst to Plaintiffs, Lattice affirmatively took the position and/or suggested that the Seized Goods *were* export controlled.

58.     Plaintiffs' reasonable reliance for almost four years on Lattice's representations and published data sheets led to disastrous results for Plaintiffs, ultimately devastating their lives.

**g)  Lattice's deceptive marketing caused destructive government investigations.**

59.     Relying on Lattice's private communications (previously unbeknownst to Plaintiffs), Lattice's deceptive data sheets, and/or other of Lattice's communications, the Canadian and U.S. governments took the position that the Seized Goods were export controlled.

60.     Based on Lattice's deceptive conduct, government officials conducted investigations into the de Jarays and Apex that severely damaged Plaintiffs.

61.     The governments' investigations specifically and particularly targeted the de Jarays (as opposed to just Apex), as well as Apex, aided by Lattice.

62.     On February 13, 2009, nine armed CBSA officers executed search warrants for Apex's business premises, later joined by four more CBSA officers, and interviewed Apex employees regarding the criminal allegations of export violations.

63.     Simultaneously, seven armed CBSA officers and three West Vancouver police officers with black vans and dogs executed a search warrant at Mr. de Jaray's home in his small tightly-knit community.  They searched for more than four hours in full view of the Eagle Harbour Yacht Club, of which Mr. de Jaray was a longstanding member.

---

PLAINTIFFS' COMPLAINT - 12 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

64.    The follow-on community fears and rumors humiliated and profoundly embarrassed and affected Mr. de Jaray in all of his relationships, both personal and professional.

65.    Government officials proceeded to contact top-level key customers and vendors of Apex, including large publicly traded companies and Lattice.  As a result, key contracts were canceled.

66.    Government officials interrogated Plaintiffs' current and former Apex employees numerous times, scaring most of them into leaving for fear of being connected to alleged terrorism.

67.    Following the initial investigative contact by CBSA and the details CBSA provided relying on information from Lattice, on May 29, 2009, Apex's longstanding bank, the Bank of Montreal ("BOM") placed Apex into receivership and forced a liquidation sale of approximately US$12 million of operating assets for some US$30 thousand.

68.    On June 17, 2009 the British Columbia Supreme Court granted BOM's June 12, 2009 petition for Apex's bankruptcy petition and declared Apex bankrupt.

69.    In July 2009, Apex's remaining assets were auctioned off in the course of bankruptcy proceedings.

70.    In September and October 2009, the Canadian government issued multiple production orders concerning the de Jarays and Apex, requiring BOM and the HSBC Bank Canada ("HSBC") to produce voluminous banking records relating to Apex and other companies.

71.    For decades prior to the production orders, Mr. de Jaray had enjoyed significant multi-operational relationships with BOM and HSBC, which considered Mr. de Jaray a premium corporate and personal customer.  Soon after, they set about closing Mr. de Jaray's accounts and refused to lend him further funds, crippling Apex's financing capabilities.

PLAINTIFFS' COMPLAINT - 13 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

72.     On October 6, 2009, CBSA confirmed by email to Lattice's Corporate Compliance Manager Kirstin Wolfe and General Counsel Byron Milstead that CBSA sought Lattice's voluntary cooperation to:  (A) Authenticate the governments' belief that the Seized Goods were export controlled; (B) Procure Lattice's continuing assurances that the Seized Goods were export controlled; and (C) Uncover a "multi-layered scheme" of unlawful exporting.

73.     Lattice voluntarily cooperated with government authorities in the wrongful investigations and prosecutions and even asked for a financial reward.  Lattice was in regular contact with investigative and prosecutorial government officials and supported their efforts.

74.     During this time and otherwise between June 2005 and August 2011, Lattice was well aware of the government authorities' investigations, but Lattice did not disabuse government officials of the notion that the Seized Goods were export controlled.

75.     During 2010, Lattice discontinued sales of the Seized Goods.

76.     On April 29, 2010, the CBSA charged the de Jarays with violating export control laws.  The charges carried a maximum prison sentence of 10 years and large financial penalties.

77.     On the morning of May 5, 2010, armed CBSA officers seized Ms. de Jaray at a neighborhood gas station in a shopping center.  The officers screamed at her, causing her to sob from fear.  One officer shoved an indictment into her hand and departed, leaving her weeping, in pain, holding her pregnant abdomen, and leaning in support against the side of her car.

78.     Ms. de Jaray was five-months pregnant at the time and had been caring for her ailing mother following chemotherapeutic treatment for advancing breast cancer.

79.     The confrontation immediately caused Ms. de Jaray shooting pains and the onset of early contractions.  Rushed to emergency care, the doctors were afraid Ms. de Jaray was going

PLAINTIFFS' COMPLAINT - 14 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

1    into premature labor, far too premature for her child to survive.  Tests indicated the baby had gone

2    into severe prenatal stress.  After hospitalization and treatment, she and the baby stabilized.

3         80.    On May 28, 2010, government officials issued a press release broadcasting the

4    criminal charges against the de Jarays (the "Press Release").  The Press Release was immediately

5    available worldwide and publicized on the internet, television, and newspaper publications.

6         81.    The Press Release emphasized the maximum sentence that could be imposed.  In

7    essence, the Press Release falsely branded the de Jarays to be the equivalent of terrorists or

8    international arms traders.  At a minimum, the Press Release gave the appearance that the Seized

9    Goods were dangerous goods and posed threats to international peace and security.

10        82.    U.S. authorities conducted an aggressive open-ended investigation into the de

11   Jarays and Apex, *inter alia*, evaluating potential criminal charges.

12        83.    Canadian prosecutors later dropped their charges against the de Jarays in August

13   2011.

14        84.    U.S. authorities continued their own investigation of the de Jarays until November

15   2013, when the case finally abruptly concluded with no charges being brought against Plaintiffs.

16        85.    In November 2011, Mr. de Jaray brought suit in Canada against the Attorney

17   General of Canada for its investigation.  Mr. de Jaray settled that suit on November 22, 2013 when

18   he had received assurances from CBSA President Luc Portelance that his organization would

19   change and improve as a result of the ordeal, along with a handshake and Mr. Portelance's

20   personal, informal apology in open Federal Canadian court before Mr. Justice Simon Noël.

21        86.    In April 2016, Ms. de Jaray brought a similar suit in the State of Washington against

22   Canadian authorities.  The case was dismissed in January 2017 due to sovereign immunity.  She

23   is currently prosecuting that aspect of her case through the Canadian justice system.

PLAINTIFFS' COMPLAINT - 15 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

Notice of Removal
Exhibit A, Page 15 of 27

**h) The devastating impact of the government investigations would never have occurred, had Lattice been forthright in its commercial communications.**

87.     Although Mr. de Jaray and his wife of 31 years had separated prior to the execution of the search warrants, the fact that the warrants had been executed inhibited their ongoing efforts to reconcile, which Mr. de Jaray dearly sought.  However, his wife refused to see or speak to him after the news of the wrongful prosecution.  She herself was embarrassed and humiliated.

88.     During the summer of 2010, Mr. de Jaray's wife (the mother of Ms. de Jaray) suffered a recurrence of cancer.  Her cancer had previously remitted in 2006.  But it returned and she succumbed to it in December, 2010, while the charges were still outstanding.  She died never knowing of the innocence of her daughter and husband, a fact which still haunts the de Jarays.

89.     During 2009, Mr. de Jaray came to accept that his career as an electronics manufacturer in an industry dependent upon trust and integrity had been permanently destroyed. To attempt to build a new life and career, he used his modest savings in an attempt to establish a winery under the brand name Footstone Jive California Street Winery in Jacksonville, Oregon, which was formally incorporated in February 2010.

90.     When news media publicized the charges against the de Jarays later in 2010, the Jacksonville City Council refused to issue Mr. de Jaray a license for Footstone, causing it to shut down.

91.     Because of Lattice's misconduct, the local community in Oregon would not accept Mr. de Jaray as resident.

92.     Mr. de Jaray resettled to Hong Kong in October, 2011.  There, he established Portrait Winery Company Limited and invested as much as he could in the winery.

PLAINTIFFS' COMPLAINT - 16 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

93.     But the news and rumors of Mr. de Jaray being a terrorist made it to Hong Kong. By the end of May 2012, all his wholesale orders were abruptly cancelled as the news and rumors spread, causing Portrait to fail, and forcing Mr. de Jaray to leave Honk Kong in 2013.

94.     Mr. de Jaray moved to Indonesia in May 2013.  But in August 2013, aggressive government investigative tactics forced Mr. de Jaray to flee to Vancouver, Canada.

95.     But because of Lattice's misconduct, the local community in British Columbia would not accept Mr. de Jaray as a resident.  So in February 2014, Mr. de Jaray again resettled, this time in Puerto Vallarta, Mexico.

96.     Mr. de Jaray had no choice but to forever leave behind the multi-million dollar family home he had built in 1999 in Canada and all that he had achieved there.

97.     Due to his wrongful reputation as a terrorist, Mr. de Jaray's employees of 30 years at Allanco International Environmental Products Ltd. feared for their livelihoods by being associated with Mr. de Jaray.  The employees threatened to quit unless Mr. de Jaray immediately sold his equity.  To save the business from failing and ensure nobody else lost their jobs, considering the hundreds who already had, Mr. de Jaray was induced to sell his interest in Allanco International Environmental Products at a substantial discount to the employees in October, 2014.

98.     In Mexico, Mr. de Jaray tried to help a small school, Pasitos de Luz.  But when the school learned of the wrongful reputation that Lattice's misconduct had caused Mr. de Jaray to have, the school refused to be associated with him.  He left again in June 2015.  Most of his remaining personal and sentimental belongings are still stranded in storage in Mexico.

99.     After leaving Mexico, Mr. de Jaray started living on a boat.  Lattice has made Mr. de Jaray a *persona non grata*.  Mr. de Jaray explored resettling in Grenada, Greece, and other

PLAINTIFFS' COMPLAINT - 17 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

places, but Lattice's misconduct has resulted in an inescapable false reputation as a terrorist. Lattice's misconduct brought the destruction of Mr. de Jaray's reputation and professional life.

### i) Lattice's misconduct poisoned Mr. Oswald's relationship with Mr. de Jaray and ruined his significant dollar investment.

100.    The fallout from the accusations and investigations into Apex and the de Jarays resulting from Lattice's misconduct caused significant harm to Mr. Oswald.

101.    When Mr. Oswald acquired his significant minority stake in Apex, it was planned that he would take on certain official corporate duties and oversight responsibilities, as an active director.

102.    Prior to the execution of the search warrants, Plaintiffs had discussed Mr. Oswald taking on a larger role at Apex, with the view that at some point he would be part of the executive team.  Plaintiffs had contemplated Mr. Oswald leaving his lucrative investment practice to work full time at Apex.

103.    But as Lattice's misconduct bore fruit, initially in the form of Apex being put into receivership and subsequently through the laying of charges against the de Jarays as potential terrorists and international arms traders, Mr. Oswald's personal and professional reputation as well as his investments in the companies were put at risk.

104.    Mr. Oswald was shocked and appalled by the investigations into and the resultant accusations against the de Jarays and Apex.

105.    Believing the accusations to be true, Mr. Oswald rebuked the de Jarays and Apex and broke off all personal and professional ties with his long-time dear friend, Mr. de Jaray.

106.    Not only was Mr. Oswald's sizeable investment in Apex essentially worthless, it became a significant negative element in his life.

PLAINTIFFS' COMPLAINT - 18 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

107.    Mr. Oswald, a respected professional investment manager and leader in his firm, was now associated with a substantial investment in an entity and with persons accused, disparaged, and held out to the public as engaging in terrorism and international arms trading.

108.    As a matter of professional ethics, Mr. Oswald disclosed the unbelievable developments to his employer.  This situation was deeply embarrassing and troubling both personally and professionally.

109.    Thus, Lattice's misconduct significantly negatively impacted Mr. Oswald's professional and personal life, in addition to destroying his significant investment in Apex.

**j)  Ms. de Jaray was forced to leave the United States.**

110.    Ms. de Jaray had a multiple-year L1A Visa as a U.S. employer that allowed her to live and work freely in the United States.  But because of Lattice's misconduct, she was stopped, searched, and interrogated when she crossed the border coming home to Washington after visiting Canada.  At each crossing, she was taken into an interrogation room by U.S. armed border guards, held in isolation, and forced to answer questions for hours about the investigations.  Ms. de Jaray was not permitted to speak to her family or an attorney at these repeated interrogations.

111.    During one particularly terrifying border crossing, U.S. border guards seized Ms. de Jaray in front of her then one-year-old daughter, who was traveling with her to California, where Ms. de Jaray had attended college.  Ms. de Jaray was terrified by the threats of arrest and imprisonment, and she was terrified by the thought of having to leave her children without their mother.

112.    As a result of her reputation as a terrorist, the product of Lattice's misconduct, Ms. de Jaray eventually lost her home to foreclosure in Washington and L1A Visa, which had allowed

PLAINTIFFS' COMPLAINT - 19 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

her to live and work in the United States, her home.  To protect her family, Ms. de Jaray has been essentially forced to move every year as a result of her wrongful reputation.

**k) Plaintiffs recently learned Lattice believed, knew, and/or took the position the Seized Goods were export controlled and/or otherwise subject to legal uncertainties.**

113.   Except those respecting the Seized Goods, over a 30-year career and the manufacture (and associated raw materials procurement) of hundreds of millions of dollars of products, Mr. de Jaray has never seen a data sheet that was inconsistent with a manufacturer's belief, knowledge, and/or position concerning whether the underlying product was export controlled or otherwise subject to legal uncertainties.

114.   Plaintiffs thus reasonably believed that Lattice believed, knew, and took the position that the Seized Goods were not export controlled, consistent with Lattice's data sheets.

115.   As part of Ms. de Jaray's 2016–17 litigation against Canada and Canadian officials, Freedom of Information Act ("FOIA") requests were made on the U.S. Department of Homeland Security, BIS and FBI in 2016.

116.   Upon receiving documents in response to one of the FOIA requests in September 2017, Plaintiffs were shocked to learn that Lattice's former Regional Sales Manager Roberts falsely stated to U.S. investigators on December 20, 2012, *inter alia*, that he had asked Mr. de Jaray "if he was aware the Lattice products were 'military grade parts' and were export controlled."

117.   This conversation never took place.  However, this is the first time that Plaintiffs learned that Lattice believed, knew, and/or took the position that the Seized Goods were export controlled or otherwise subject to legal uncertainties or that Lattice represented such to any government authorities.

PLAINTIFFS' COMPLAINT - 20 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

118.    Plaintiffs were further shocked to learn of an email dated December 28, 2012 to U.S. federal investigators from Mr. Roberts falsely stating "Mr. de Jaray understood completely that these parts were controlled." The email falsely stated Mr. de Jaray was informed by Mr. Roberts about "the export restrictions" which applied to the Seized Goods, as "Military Grade" integrated circuits. Questioned by U.S. investigators about how Mr. de Jaray reacted to the assertion that the integrated circuits were export controlled, Mr. Roberts alleged, Mr. de Jaray "was not surprised. He was aware of such restrictions/controls." Again, this conversation between Mr. de Jaray and Mr. Roberts never took place.

119.    Simply put, had Lattice informed Plaintiffs that Lattice believed, knew, and/or took the position that the Seized Goods were export controlled or otherwise subject to legal uncertainties, or in the alternative, warned Plaintiffs that Lattice knew of government officials who believed the Seized Goods were export controlled, notwithstanding the plain language in the data sheets, as Mr. Roberts alleged Mr. de Jaray was informed, Plaintiffs would have taken the normal precautions with which they were capable of and familiar to properly ensure they obtained licensure for exporting or not purchased the Seized Goods for export.

120.    Until the FOIA disclosure, Plaintiffs had no reasonable basis whatsoever to believe, that Lattice believed, knew, and/or took the position that the Seized Goods were export controlled or otherwise subject to legal uncertainties.

121.    To the contrary, for years after the charges against Plaintiffs were dropped, Plaintiffs believed that the investigations that destroyed Plaintiffs' businesses, fortunes, relationships, and reputations had been the sole fault of certain government officials' negligence.

PLAINTIFFS' COMPLAINT - 21 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

1

## CLAIMS FOR RELIEF

2

**a) Count I: Violation of the Lanham Act, 15 U.S.C. §1125(a)(1) (False Advertising)**

3

122.    Plaintiffs reallege and incorporate by reference paragraphs 1–121.

4

123.    In Lattice's advertisements, in particular the Seized Goods' data sheets, Lattice

5

made false omissions of material fact about the Seized Goods.  They presented the Seized Goods'

6

temperature rating in case temperature ($T_C$) range, not ambient temperature ($T_A$) range.  They then

7

failed to advise or otherwise communicate to customers (including Plaintiffs) that Lattice believed,

8

knew, and/or took the position that the Seized Goods were export controlled or otherwise subject

9

to legal uncertainties, or that Lattice knew of government officials who believed the Seized Goods

10

were rated for operation over the entire ambient temperature ($T_A$) range of –55ºC to +125ºC and/or

11

otherwise export controlled, notwithstanding that was scientifically irreconcilable with a published

12

case temperature ($T_C$) range rating of –55ºC to +125ºC.

13

124.    Because an ambient temperature ($T_A$) range rating of –55ºC to +125ºC is

14

scientifically irreconcilable with a case temperature ($T_C$) range rating of –55ºC to +125ºC, Lattice's

15

data sheets for the Seized Goods were literally false or, in the alternative, materially misleading.

16

125.    These advertisements actually deceived or had the tendency to deceive a substantial

17

segment of the audience into believing that Lattice did *not* believe, know, and/or take the position

18

that the Seized Goods were export controlled or otherwise subject to legal uncertainties, when in

19

fact Lattice *did* take that position in private communications with government officials and

20

investigators.  Indeed, Plaintiffs were deceived by Lattice.

21

126.    This deception was material.  Plaintiffs would have procured licensure or made

22

different purchasing decisions, but for Lattice's false advertising.

23

127.    Lattice caused the Seized Goods to enter interstate commerce.

PLAINTIFFS' COMPLAINT - 22 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

128.    Plaintiffs have been injured as a result of the false advertising by a lessening of the goodwill which its products enjoyed with the buying public.  In particular, had Lattice not falsely advertised, Plaintiffs would not have been wrapped up in multiple years of criminal investigations and prosecution and would not have had their businesses and reputations destroyed as detailed above.  The de Jarays also would not have had to spend significant sums defending themselves. The investigations and prosecution were caused by Lattice's false advertising and, in turn, caused Plaintiffs severe emotional distress and other damages as detailed above.

129.    Plaintiffs have suffered damages as a result of Lattice's false advertising, in an amount no less than $138,295,118.

130.    This case is exceptional, justifying treble damages and attorney fees and costs.

**b) Count II: Negligence**

131.    Plaintiffs reallege and incorporate by reference paragraphs 1–121.

132.    Lattice's advertisements, in particular the Seized Goods' data sheets, failed to advise its customers (including Plaintiffs) that Lattice believed, knew, and/or took the position that the Seized Goods were export controlled or otherwise subject to legal uncertainties causing a foreseeable risk.  This failure subjected Plaintiffs to the foreseeable risk that a government might investigate and/or criminally prosecute Plaintiffs for export control violations.

133.    The risk is to an interest of a kind that the law protects against negligent invasion. The law protects customers (including Plaintiffs) from being subjected to unwarranted investigations and/or prosecutions, which have the potential to destroy peoples' businesses, reputations, fortunes, families, and health.

134.    Lattice's conduct was unreasonable in light of the risk.  Lattice could easily have stated in its data sheets that it believed the Seized Goods were export controlled or otherwise

PLAINTIFFS' COMPLAINT - 23 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

1  subject to legal uncertainties (or articulated facts so reflecting) or disclosed that there were

2  government officials who took that position.

3      135.    Lattice's failure to advise customers (including Plaintiffs) of Lattice's belief,

4  knowledge, and/or position that the Seized Goods were export controlled or otherwise subject to

5  legal uncertainties, and Lattice's failure to otherwise articulate facts to customers (including

6  Plaintiffs) so suggesting or reflecting, caused Plaintiffs harm. Plaintiffs would have procured

7  licensure or not have purchased Lattice's products for the intended purpose of export to Hong

8  Kong if Lattice had not been deceptive in its marketing materials.

9      136.    Had Lattice not acted negligently, Plaintiffs would not have been wrapped up in

10  multiple years of criminal investigations and prosecution and would not have been branded the

11  equivalent of terrorists. Because of the investigations caused by Lattice's negligence, Plaintiffs'

12  reputations have suffered irreparable harm, multiple businesses were destroyed, the de Jarays had

13  to spend significant sums defending themselves, and Plaintiffs suffered severe emotional distress

14  and breakdowns in personal and professional relationships.

15      137.    Plaintiffs also were within the class of persons, and Plaintiffs' injuries were within

16  the general type of potential incidents and injuries, that made Lattice's conduct negligent.

17  Plaintiffs, being Lattice's customers, should have been warned by Lattice that Lattice believed,

18  knew, and/or took the position that the Seized Goods were export controlled or otherwise subject

19  to legal uncertainties.

20      138.    Plaintiffs have suffered damages as a result of Lattice's negligence, in an amount

21  no less than $138,295,118.

22  **c) Count III: Fraud**

23      139.    Plaintiffs reallege and incorporate by reference paragraphs 1–121.

PLAINTIFFS' COMPLAINT - 24 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

140.    Lattice made a representation of fact to customers through its data sheets and other commercial communications concerning the Seized Goods.  Lattice told customers the Seized Goods were case temperature ($T_C$) rated for –55ºC to +125ºC, without providing any facts or other indications that would suggest that the Seized Goods were export controlled or otherwise subject to legal uncertainties.

141.    Lattice's representations of facts on the data sheets and other certain commercial communications concerning the Seized Goods were false and/or misleading.  The case temperature ($T_C$) rating on the data sheets (which a reasonable person would use to conclude that the Seized Goods were not export controlled) were scientifically irreconcilable with an ambient temperature ($T_A$) rating consistent with the Seized Goods being export controlled.  Notwithstanding, Lattice believed, knew, and/or took the position that the Seized Goods were export controlled or otherwise subject to legal uncertainties.

142.    This representation was material.  Plaintiffs would have procured licensure or would not have purchased the Seized Goods for the intended purpose of export to Hong Kong if Lattice had not been deceptive in Lattice's commercial communications, in particular the Seized Goods' data sheets.

143.    Lattice knew the representation was false, misleading, or was inexcusably ignorant of the truth.  Lattice knew and understood the relationship between a case temperature ($T_C$) rating and an ambient temperature ($T_A$) rating.  Lattice knew that it was not disclosing to the marketplace on key advertisements like the Seized Goods' data sheets any facts that would reasonably suggest Lattice believed, knew, and/or took the position that the Seized Goods were export controlled or otherwise subject to legal uncertainties.

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

144.    Lattice intended that the misrepresentations be acted upon in a manner reasonably contemplated in a commercial export marketplace.  Exporting goods that are export controlled is generally more onerous (costly) for the exporter than exporting goods that are not export controlled.  Upon information and belief, Lattice presented the Seized Goods as not being export controlled to entice exporters such as Plaintiffs to buy them for exporting, despite Lattice's belief, knowledge, and/or position that the Seized Goods were export controlled or otherwise subject to legal uncertainties.

145.    Plaintiffs did not know that Lattice believed, knew, and/or took the position that the Seized Goods were export controlled or otherwise subject to legal uncertainties.

146.    Plaintiffs relied on Lattice's data sheets when deciding whether to purchase the Seized Goods and whether to procure licensure.

147.    Plaintiffs had a right to rely on Lattice's data sheets.

148.    Plaintiffs were damaged as a result of their reliance on Lattice's data sheets.  Had Lattice not committed fraud, Plaintiffs would not have been wrapped up in multiple years of criminal investigations and prosecution and would not have been branded the equivalent of terrorists.  Because of the government investigations and prosecution caused by Lattice's fraud, Plaintiffs' reputations have suffered irreparable harm, multiple businesses were destroyed, the de Jarays had to spend significant sums defending themselves, and Plaintiffs suffered severe emotional distress and breakdowns in personal and professional relationships.

149.    Plaintiffs have suffered damages as a result of Lattice's fraud, in an amount no less than $138,295,118.

150.    Plaintiffs reserve the right to amend this Complaint to add punitive damages.

---

PLAINTIFFS' COMPLAINT - 26 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief against Lattice as follows:

(i)    Damages in an amount no less than $138,295,118;

(ii)   Gross-up tax damages to offset the tax consequences, as appropriate, of relief received;

(iii)  Treble damages;

(iv)   Attorney fees and costs;

(v)    Pre and/or post judgment interest, as applicable; and

(vi)   Any other additional relief to which Plaintiffs may be entitled and/or that the Court determines to be just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by a jury of twelve persons.

DATED this 18th day of December, 2018.

Respectfully submitted,

**BAKER & HOSTETLER LLP**

_s/ Curt Roy Hineline_
Curt Roy Hineline, OSB No. 913153
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1101
Facsimile: (206) 624-7317
Email: chineline@bakerlaw.com

_Counsel for Plaintiffs Steven A.W. de Jaray,_
_Perienne A.S. de Jaray, and Darrell R. Oswald_

PLAINTIFFS' COMPLAINT - 27 -

**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Phone: 206.332.1101 | Fax: 206.624.7317

Notice of Removal
Exhibit A, Page 27 of 27