**Nadia H. Dahab,** OSB No. 125630
Email: ndahab@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600

**Philip J. Bezanson** (*pro hac vice*)
phil.bezanson@bracewell.com
**Douglas F. Stewart** (*pro hac vice*)
doug.stewart@bracewell.com
Bracewell LLP
701 Fifth Avenue, Suite 6200
Seattle, WA 98104
Tel:  206-204-6200
Fax:  800-404-3970

**Phillip L. Sampson Jr.** (*pro hac vice*)
Phillip.sampson@bracewell.com
Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Tel:  713-223-2300
Fax:  800-404-3970

*Counsel for Plaintiffs Steven A.W. de Jaray,*
*Perienne de Jaray, and Darrell R. Oswald*

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| STEVEN A.W. DE JARAY, PERIENNE DE JARAY, and DARRELL R. OSWALD,<br><br>               Plaintiffs,<br><br>   v.<br><br>LATTICE SEMICONDUCTOR CORPORATION, an Oregon-headquartered Delaware corporation, and JOHN and JANE DOES 1-20.,<br><br>               Defendants. | Case No. 3:19-cv-00086-SI<br><br>PLAINTIFFS' FIRST AMENDED COMPLAINT<br><br><br><br>JURY TRIAL DEMANDED |

Page 1 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

COME NOW Plaintiffs Steven A.W. de Jaray and Perienne de Jaray, (together, the "de Jarays"), and Darrell R. Oswald (collectively, "Plaintiffs"), by and through the undersigned counsel, and for their First Amended Complaint hereby allege as follows:

## SUMMARY OF CASE

1.     This case involves Lattice Semiconductor Corporation's ("Lattice") failure to disclose material export control-related information about two semiconductor products it sold and delivered to Plaintiffs and their companies in Canada.  The two semiconductor products at issue are designated by Lattice as ispLSI 1048C-50LG/883 (SMD number 5962-9558701MXC) and GAL22V10-15LD/883 (SMD number 5962-8984103LA), a shipment of which was detained and seized by the Canadian Border Services Agency ("CBSA") in December 2008 (collectively, the "Seized Goods").  Lattice admits it believed export permits *were* required to export the Seized Goods from Canada.  *See, e.g.*, Doc. 7 at 1, 22.  But, Lattice never told Plaintiffs that the Seized Goods required a Canadian export permit.  Instead, and to Plaintiffs' substantial detriment, Lattice represented just the opposite to Plaintiffs.  The affirmative representations in Lattice's product data sheets and other documentation for the Seized Goods reflect that no Canadian export permit was required for them.

2.     Plaintiffs reasonably relied on Lattice's product data sheets and other documentation and, consequently, did not seek export permits when attempting to export the Seized Goods from Canada.  As set forth in more detail below, Plaintiff's reasonable reliance on Lattice's product data sheets and documentation resulted in criminal investigations and prosecutions of the de Jarays and significant harms and losses to Plaintiffs.  If Lattice had disclosed to Plaintiffs that it believed a Canadian export permit was required for the Seized Goods, all of Plaintiffs' harms and losses would have been avoided.  Had Lattice disclosed its admitted belief about the Seized Goods' need for Canadian export permits, Plaintiffs would have either obtained the export permits or Plaintiffs would have gone to an alternate manufacturer and purchased equivalent semiconductor products that did not need export permits.

Page 2 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

3.      Within the last two years, Plaintiffs learned about Lattice's previously undisclosed knowledge and belief concerning the Seized Goods' export restrictions.  Plaintiffs file this lawsuit seeking to recover their losses caused by Lattice's non-disclosure and its incomplete and misleading representations about the Seized Goods.

## THE PARTIES

4.      Plaintiff Steven A.W. de Jaray is a citizen of Canada.

5.      Plaintiff Perienne de Jaray is a resident and citizen of Canada.

6.      Plaintiff Darrell R. Oswald is a resident and citizen of Canada.

7.      Plaintiffs have special injuries distinct from other shareholders of Apex.  Plaintiffs' reputations, personal property, other business opportunities, and investments were harmed as a result of Lattice's misconduct.    Moreover, Lattice's conduct created a foreseeable and unreasonable risk of legally cognizable harms to Plaintiffs.

8.      On information and belief, Defendant Lattice is a Delaware corporation with its principal place of business at 5555 NE Moore Ct., Hillsboro, Oregon 97124.  Lattice is registered to do business in Oregon, has an office in Hillsboro, Oregon, and conducts regular and substantial business activity in Multnomah County.  Lattice will be served through its counsel who have appeared in this case.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiffs are citizens of Canada, and Lattice is a citizen of the State of Delaware and the State of Oregon.

10.     The amount in controversy exceeds $75,000, excluding interest and costs. 28 U.S.C. § 1332(a).

11.     This Court also has original jurisdiction as Plaintiffs are asserting a claim under the Lanham Act, 15 U.S.C. § 1051 *et seq*.  This Court also has supplemental jurisdiction over Plaintiffs' other claims under 28 U.S.C. § 1367 because Plaintiffs' other claims are related to and part of the same case or controversy as Plaintiffs' Lanham Act claim.

Page 3 -      **PLAINTIFFS' FIRST AMENDED COMPLAINT**

12.     Lattice is a publicly traded manufacturer of programmable logic devices, including the Seized Goods—the two semiconductor products at issue in this litigation.

13.     Lattice has solicited business in the State of Oregon, transacted business within the State of Oregon, and attempted to derive financial benefit from residents of the State of Oregon.

14.     Lattice is subject to personal jurisdiction in Oregon and in this judicial district.

15.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)-(d) because, at minimum, Lattice committed the acts that are the basis of this action in this judicial district, has done business in this judicial district, regularly does business in this judicial district, and because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## STATEMENT OF FACTS

**Introductory overview**

16.     Mr. de Jaray was the founder and principal beneficial shareholder of an advanced electronics manufacturing businesses with significant long-established production operations in the United States, Canada, and around the world, including Hong Kong.  Mr. de Jaray's businesses included, among others, APEX-Micro Manufacturing Corporation, Apex Micro America Inc., and Caliber Component Solutions Inc. (collectively, "Apex").  Mr. de Jaray's daughter, Ms. de Jaray, was an executive at Apex, with equity and vested equity options in Apex.  She was responsible for a significant staff and an aggressive production schedule.

17.     Mr. Oswald lived in Vancouver, British Columbia, and he became an active Apex director and invested a large sum of money to acquire a significant minority stake in Apex, along with certain corporate governance rights, privileges, Board of Director membership, and operating duties.

18.     Apex manufactured advanced printed circuit boards, electronic assemblies, and custom (non-commoditized) electronics and end-products for its clients' electronic end-products, principally in the telecommunications, medical, automotive, commercial aviation, and industrial

Page 4 -     **PLAINTIFFS' FIRST AMENDED COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

fields.  Apex was an established, award-winning electronics design and manufacturing company, accredited to many production and quality certifications including ISO, QMI, and the Canadian Controlled Goods Directorate.

19.    From its inception through 2007, Apex had grown to employ hundreds of people. By the end of 2008, Apex had achieved a peak consolidated annual revenue of nearly $40 million.

20.    As manufacturers and businesspersons, Plaintiffs' reputations and long-term commercial relationships were pivotal to the sustainability and success of their businesses.

21.    Apex customers directly and indirectly included companies in a variety of industries including publicly traded companies, government agencies, and others.

22.    Apex's corporate family routinely exported, re-exported, and shipped raw goods, production kits, assemblies, and electronic components to and from Canada, the United States, Hong Kong, and many other countries, including certain integrated circuits manufactured and supplied by Lattice and designated by Lattice as being of Philippine origin.

23.    In connection with the manufacturer of Apex products, Plaintiffs purchased readily and publicly available programmable logic devices from multiple suppliers throughout the world, including Lattice.  At various times Plaintiffs purchased products equivalent to the Seized Goods from other suppliers around the world, including from Hong Kong.

24.    Lattice was a global supplier of programmable logic devices to Plaintiffs and their companies beginning in 1999.  From 1999 to 2005, Plaintiffs purchased programmable logic devices from Lattice on the open market through various Lattice global distributors.  From 2005 to 2009, Plaintiffs purchased the programmable logic devices directly from Lattice in the United States.  Lattice knew of Plaintiffs' international operations and routine re-exports of electronic goods and subassemblies—which include Commercial Off the Shelf ("COTS") integrated circuits (like the Seized Goods)—to its operations in Hong Kong.

25.    Lattice provided no notice to Plaintiffs suggesting that the Seized Goods could require a Canadian export permit for re-export to its operations in Hong Kong under the relevant

Page 5 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

United States or Canadian export control regulations.  The Seized Goods' data sheets and other documentation supplied by Lattice to Plaintiffs, reflected that the Seized Goods did not require an export permit for their re-export from Canada.  In reliance on the representations in Lattice's product data sheets and other documents, Plaintiffs did not seek a Canadian re-export permit for the re-export of the Seized Goods.

26.    Plaintiffs recently learned from information obtained through an August 16, 2017 Freedom of Information Act response from the United States government, and from arguments in and documents accompanying Lattice's motion to dismiss (Dkt. Nos. 7, 8) that:  (i) Lattice believed and privately took the position that the Seized Goods required a Canadian export permit; and (ii) Lattice propagated that position in private communications with government investigators without ever putting Plaintiffs on notice that Lattice believed and *still* believes a Canadian export permit for the Seized Goods was required.

27.    Lattice failed to notify Plaintiffs of its belief and position that the Seized Goods required a Canadian export permit, and, therefore, Plaintiffs did not seek or obtain an export permit for the Seized Goods.  As a direct result of Lattice's non-disclosure and misconduct, the absence of a Canadian export permit for the Seized Goods led to investigations and criminal accusations by both the United States and Canadian governments against the de Jarays for illegal exportation of the Seized Goods from Canada.  Those criminal investigations and accusations resulted in substantial and significant personal and financial losses to all three Plaintiffs.

**A brief explanation of relevant aspects of microelectronics engineering**

28.    Ambient temperature ($T_A$) and case temperature ($T_C$) are two fundamental types of temperature parameters used in electronic product design.  Each is a completely distinct engineering parameter, involving different measures of data, influences, and locations.  They are common industry standards and are readily distinguishable.

Page 6 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

29.    "Ambient temperature" ($T_A$) is the surrounding temperature of the atmosphere in which the integrated circuit operates or is intended to operate (the temperature of the integrated circuit's climate or environment, rather than the temperature of the integrated circuit itself).

30.    "Case temperature" ($T_C$) is the temperature of the integrated circuit's casing during operation, while electricity (creating heat) flows through the semiconductor insulated by the case.

31.    The diagram below depicts a simple integrated circuit:



32.    The red rectangle in the center is the actual semiconductor (generally, silicon).  The semiconductor is mounted to a bonding pad (orange) and housed inside a molded plastic or ceramic protective case (gray).  Inside, bonding wires (black) connect the semiconductor (red) to pins (blue).  The external pins are soldered onto a circuit board.  To operate, electricity flows from the internal circuit board, through the pins and the bonding wires, and into and out of the internal semiconductor, which is electrically insulated by the case.  Each item has a distinct and different temperature measurement.

33.    Sustained, high temperatures may destroy an integrated circuit.  When the integrated circuit operates, the flow of electricity will increase the temperature of the semiconductor.  The temperature of the case ($T_C$) in which the semiconductor is situated will also rise.  The precise measurable difference between the case temperature ($T_C$) and the ambient temperature ($T_A$) will vary depending on a variety of factors (materials, cooling systems, etc.), but

Page 7 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

a measured case temperature (T$_C$)—by definition measured during operation—is *always* higher than the associated ambient temperature (T$_A$), often by dozens of degrees.

34.    In sum, a maximum case temperature (T$_C$) *rating* for a device's operation is *necessarily* higher than the associated maximum ambient temperature (T$_A$) *rating* for the same device.

**United States and Canadian regulations concerning integrated circuits**

35.    Although most products in the global market do not implicate export and re-export controls, some trade is subject to internationally adopted export and re-export control laws.  For example, certain dual civilian use goods and technologies, including some integrated circuits, may require an export or re-export license or permit, depending on its technical performance parameters and country of destination.  Whether products such as the Seized Goods are described as "dual-use" or "military grade" or other military-type marketing terminology is not determinative of whether a U.S. or Canadian export license or permit is required.[1]

36.    To determine whether an item requires an export permit under the laws of Canada, the product's Export Classification List Number ("ECL Number") must first be determined by matching the item to the description particularized by a unique ECL Number.  An ECL Number is an alpha-numeric code (e.g., 3.A.1) describing the item and indicating the export permit requirements.  If an item does not match a description under an ECL Number, then a Canadian export permit is not required.

---

[1]"Dual-use" items are those having both consumer, commercial, and some military applications. According to the Bureau of Industry and Security ("BIS") of the U.S. Department of Commerce, "[r]elatively few exports of dual-use items require obtaining an export license from BIS prior to shipment." *See* https://www.bis.doc.gov/index.php/licensing/forms-documents/doc_download/9 1-cbc-overview (last accessed Aug. 13, 2019).  Moreover, whether a product is marketed as "dual-use" or "military grade" is not determinative as to whether it requires an export license or permit. The term "military grade" is used for marketing purposes.  In this case, it merely denotes that Lattice subjected its product to self-certified and self-audited product reliability and accelerated life cycle testing.

Page 8 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

37.     All ECL Numbers are listed in the Export Control List of descriptions ("ECL"), which is divided into ten broad categories of everyday products numbered 0–9. Each broad category is further subdivided into five product groups lettered A–E.

38.     By referencing the ECL categories and product groups, one can determine that an ECL Number beginning with 3.A.1 implicates ECL category 3 (electronics) and product group A (systems, equipment, and components). A matching ECL Number identifies that a product may require a Canadian export permit.

39.     These laws are similar across mature, industrialized democratic countries, including the United States and Canada. In the United States, if an integrated circuit is rated by the manufacturer to operate at certain parameters described in the Commerce Control List ("CCL"), then the integrated circuit may implicate an Export Control Classification Number ("ECCN"). If the integrated circuit implicates an ECCN, then a U.S. export license may be required from the U.S. Department of Commerce to export the product from the U.S.

40.     Canada's Export Control List ("ECL") is the Canadian equivalent to the U.S. CCL. The ECL describes the same parameters of products that may not be exported without a permit from the office of the Trade Controls Bureau of the Canadian Department of Foreign Affairs, Trade and Development ("DFATD"—formerly DFAIT). Canadian export permits are obtained through a fairly straightforward application process.

41.     Under relevant U.S. and Canadian regulations, an integrated circuit of U.S. or Canadian origin may, under certain circumstances, require a license or permit for export if the manufacturer of the integrated circuit designates the integrated circuit as, "Rated for operation over the entire *ambient* temperature range from 218 K (–55°C) to 398 K (+125°C)." Canadian ECL Section 3.A.1.a.2.c; 15 C.F.R. § 774 Sup. No. 1, Cat. 3 (CCL ECCN 3A001.a.2.c); (emphasis added). That is, if an integrated circuit is rated by its manufacturer for operation in that ambient temperature range, a license or permit is generally required for its export. With respect to the

Page 9 -     **PLAINTIFFS' FIRST AMENDED COMPLAINT**

Seized Goods, Apex correctly determined that no Canadian export permit was required because the Seized Goods were case temperature—and not ambient temperature—rated.

42.    Lattice's data sheets for the Seized Goods did not include a description, a recommended use, or a rating for operation over the entire *ambient* temperature range of –55°C to +125°C. In fact, Lattice's data sheets did not contain *any* ambient temperature rating for the Seized Goods. The data sheets only represent relevant *case* temperature ranges. Therefore, according to Lattice's representations in its data sheets and other documentation, the Seized Goods did not require a license for Lattice to export them to Canada, and a permit was not required for re-export of the Seized Goods from Canada to Hong Kong. Moreover, the Seized Goods were labeled by Lattice as being of Philippine origin.[2]

**The Seized Goods**

43.    Consistent with a typical supplier-customer relationship, Apex would request and acquire products from Lattice through a formal Purchase Order. Lattice would confirm the availability of the products and confirm pricing for the products to Apex. Lattice would accept the Apex Purchase Orders and the associated terms and conditions. The Apex Purchase Order formed the basis of the parties' contractual relationship.

44.    The Apex Purchase Orders required Lattice to make delivery of the products to Apex in Canada, delivered by Lattice to the Apex factory location in Delta, British Columbia. Lattice prepared the shipping documents for the delivery, including documents for Canadian customs clearance. Lattice also provided signed Certificates of Conformance that affirmed the particular shipped goods were in compliance with the represented reliability testing conditions and their data sheets on the date of shipment. Apex had no direct role in importing Lattice products to Canada, and the shipments Apex received did not contain various Lattice customs documentation, such as any alleged Lattice Commercial Invoices.

---

[2] Goods of Philippine origin generally do not require a U.S. export license and, subsequently, would not require a Canadian export permit to re-export Philippine-made goods from Canada to Hong Kong.

Page 10 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

45.     Once in Canada, Apex would sometimes re-export the Lattice products to an Apex facility in Hong Kong.   Lattice was aware that Apex re-exported certain Lattice products to Hong Kong.

46.     In the normal course of its business, on or around Friday, December 19, 2008, two Apex packages were detained by the CBSA in Delta, British Columbia, for shipment to an Apex subsidiary in Kowloon, Hong Kong.  Both waybills described the contents as "printed circuit board assembly."  The packages were routine production kits, and contained, among other components, the Seized Goods.

47.     Plaintiffs had purchased the Seized Goods from Lattice based on and in reliance on Lattice's certifications that the goods were in compliance with their data sheets and based on the product specification representations in the Seized Goods' product data sheets.[3]  Those data sheets could not have lead a reasonable buyer to conclude that the Seized Goods required a permit to be re-exported from Canada to Hong Kong.  To the contrary, the technical information set forth in the data sheets confirmed that the integrated circuits did not fall within parameters that would require a Canadian export permit.  Consequently, Plaintiffs did not obtain a Canadian export permit to ship the Seized Goods to Hong Kong.

48.     On or about Monday, December 22, 2008, the Seized Goods were quarantined at a warehouse at the Vancouver International Airport in Canada where officers from CBSA concluded that the Seized Goods may require an export permit under the Canadian Export and Import Permits Act ("EIPA"), and thus could need a permit from DFAIT.   The detainment was part of investigations by Canadian authorities into the de Jarays and Apex, eventually resulting in Canadian criminal charges being brought against the de Jarays.

---

[3] When Lattice delivered programmable logic devices to Apex, a Certificate of Conformance, signed by a Lattice executive under the terms of their quality screening accreditation, was required and was or should have been included with the delivery.  Certificates of Conformance are generally meant to confirm, among other things, that the relevant goods meet the specifications in their data sheets.

Page 11 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

49.    In FOIA responses received on or after August 16, 2017, Plaintiffs learned material details about Lattice's communication with governmental authorities at or around the time of the Seized Goods' detainment and eventual seizure and subsequent investigations.  Plaintiffs also first learned through the FOIA responses that when Lattice sold and delivered the Seized Goods (up to and including December 2008), Lattice believed and took the position that the Seized Goods required a Canadian export permit.  Unfortunately, Lattice never disclosed those critical and material facts to Plaintiffs.  Lattice's material misrepresentations and omissions resulted in the Canadian government taking action against the de Jarays, including executing search warrants against them.  A press release and other reporting of the events essentially portrayed the de Jarays as threats to national security.  These actions caused long-lasting and significant personal and financial harm to Plaintiffs.

**Lattice deceptively marketed its integrated circuits**

50.    Integrated circuit manufacturers, such as Lattice, indicate whether an integrated circuit is "rated for operation" over types of temperature ranges.  These ratings are set, specified, and published in manufacturers' data sheets.

51.    Integrated circuit manufacturers, such as Lattice, use data sheets as global marketing materials, publishing them broadly to the market, to be relied upon by customers (buyers) around the world to ascertain the particular integrated circuit's specifications, including temperature type and range ratings.

52.    Customers around the world, such as Plaintiffs in Canada, reasonably rely on these data sheets when determining whether an integrated circuit requires an export or re-export permit.

53.    Lattice created the data sheets for its products.  It was therefore fully aware of its integrated circuits' ambient temperature range ratings (if any) and/or case temperature range ratings (if any) as described and represented in its data sheets, including the data sheets for the Seized Goods.

Page 12 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

54.     Unbeknownst to Plaintiffs until they received documents from a FOIA request on or after August 16, 2017, Lattice believed, knew, and took the position in private communications with government officials that the Seized Goods required a Canadian export permit for their re-export to Hong Kong.  Lattice's belief and position was contrary to its representations in the Seized Goods' data sheets and other documentation, upon which Plaintiffs relied.

55.     In its data sheets and other documentation for the Seized Goods, Lattice failed to disclose any facts or warnings that would lead Plaintiffs (or any other reasonable exporters) to conclude the Seized Goods required a U.S. export license or a Canadian export permit, or that there were government officials who might believe the Seized Goods required an export control license or permit.

56.     Lattice advertised in its data sheets that the Seized Goods were "case temperature" ($T_C$) rated to operate from –55ºC to +125ºC.  Those data sheets expressly disclaimed functional operation of the Seized Goods at or above a case temperatures ($T_C$) of +125ºC, stating that such operation "may cause permanent damage to the device."  The data sheets had no rating for an operational ambient temperature range.

57.     By necessary implication, and as discussed above, the data sheets and other documentation thus reflected that the Seized Goods *could not* be ambient temperature ($T_A$) rated from –55ºC to +125ºC because a maximum ambient temperature ($T_A$) rating is necessarily lower than a maximum case temperatures ($T_C$) rating.

58.     In the multi-million dollar course of dealings between Apex and Lattice spanning May 2005 to January 2009, Plaintiffs continuously relied on Lattice's published data sheets and certificates of conformance concerning the Seized Goods and other integrated circuits.  Plaintiffs were in frequent contact with Lattice employees, who had ample opportunity to inform or update Plaintiffs as to any export control issues related to the Seized Goods.  Yet, Lattice never notified Plaintiffs of any change or alteration to the representations in the data sheets or certificates of conformance.

Page 13 -   **PLAINTIFFS' FIRST AMENDED COMPLAINT**

59.     Plaintiffs recently discovered Lattice's misrepresentations and omissions are all the more troubling to Plaintiffs because of the perceived closeness of the parties' prior business relationship.  In March of 2006, Lattice's Chief Financial Officer, Jan Johannessen, explained in an email to Mr. de Jaray's bank that "Apex is an important customer to Lattice."  In June 2006, Lattice's Chief Executive Officer, Stephen Skaggs, promised Mr. de Jaray that Lattice would provide (i) special pricing to Apex for integrated circuits (including the Seized Goods) and (ii) technical support for Apex's Hong Kong operations.  Lattice's Vice President Ed Markiewicz also sent Mr. de Jaray sales terms details and marketing materials also describing Apex as a "valued customer," and Lattice's Regional Sales Manager, Scott Roberts, followed up with Mr. de Jaray by phone.  While he was an Oregon-based Lattice employee, Mr. Roberts was apparently responsible for marketing to western Canada.  His job requirements appeared to include being familiar with export control laws in the United States and Canada, and to seek further Lattice executive assistance should there be any uncertainty.  Mr. de Jaray also engaged directly with other Lattice personnel, such as Director of Sales, Dave Barnett.

60.     Throughout these and other communications and relationships, Lattice agents had ample opportunity to tell Plaintiffs the truth about what Lattice believed concerning whether its products required export licenses or permits.  But Lattice chose not to disclose its beliefs.  Lattice flatly omitted disclosures and/or failed to warn Plaintiffs that Lattice believed, knew, and/or took the position that the Seized Goods required an export license or permit, or that Lattice knew government officials might believe the Seized Goods required an export license or permit.

**Lattice's deceptive marketing caused destructive government investigations**

61.     In good faith, reasonable reliance on Lattice's representations in its product data sheets and other documentation, Plaintiffs did not obtain a Canadian export permit for the Seized Goods.  The Canadian government unfortunately took the position that the Seized Goods required a Canadian export permit for shipment from Canada to Hong Kong.  Lattice's misleading, false, and incorrect data sheets and other documents caused Plaintiffs to not obtain a Canadian export

Page 14 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

permit.  Not getting an export permit caused various government investigations and accusations concerning the de Jarays' alleged illegal, military-related exports, essentially wrongfully labeling the de Jarays' as threats to national security.  Those investigations targeted the de Jarays as well as Apex.  And those government investigations and accusations caused severe and permanent harm to Plaintiffs, personally, emotionally, and financially.

62.    On or about February 13, 2009, nine armed CBSA officers executed search warrants for Apex's Canadian business premises.  The officers were later joined by four more CBSA officers.

63.    Simultaneously, seven armed CBSA officers and three West Vancouver police officers executed a search warrant at Mr. de Jaray's home, in full view of his local community.  In its criminal investigation of the de Jarays and Apex, Government officials disrupted Plaintiffs' business by contacting and interrogating key Apex customers and vendors.  Government officials also interrogated current and former Apex employees.

64.    The fallout for Plaintiffs from the criminal investigation and accusations was swift and lasting.  Key Apex customers canceled their contracts, and many concerned Apex employees left the company.    Upon information and belief, this fallout was caused by the criminal investigation and accusations and the resulting questions and uncertainties about whether the de Jarays and Apex were possibly involved in illegal exports or were considered threats to national security.

65.    Further harm caused by Lattice's misleading, false, and incorrect data sheets and other documentation involved Plaintiffs' banking relationships.  For decades prior to the Government investigations and accusations, Mr. de Jaray had enjoyed significant, important, beneficial, multi-operational banking relationships, including relationships with Bank of Montreal ("BOM") and with HSBC Bank Canada ("HSBC").  On or about May 29, 2009, Apex's longstanding bank, BOM, placed Apex into receivership and forced a liquidation sale of Apex's operating assets.  Upon information and belief, the BOM receivership was a result of the negative

Page 15 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

commercial and reputational impact to Apex from the criminal investigation and accusations. In June 2009, the British Columbia Supreme Court granted BOM's petition for Apex's bankruptcy and declared Apex bankrupt. In July 2009, Apex's remaining assets were auctioned off in the course of bankruptcy proceedings.

66.    CBSA also sought the assistance of Lattice in its criminal investigation and prosecution of the de Jarays. On or about October 6, 2009, CBSA confirmed by email to Lattice's Corporate Compliance Manager Kirstin Wolfe and General Counsel Byron Milstead that CBSA sought Lattice's voluntary cooperation to assist in the investigation and prosecution of Apex and Mr. de Jaray, and to uncover a "multi-layered scheme" of unlawful exporting.

67.    Upon information and belief, and based in part on documents obtained in 2017 through a FOIA request, Lattice voluntarily cooperated with government authorities in the investigations and prosecutions. In a May 2010 email, a Lattice executive even wishes the Canadian government "good luck" with its prosecution of the de Jarays. Despite having actual knowledge that the Canadian government was considering prosecuting the de Jarays for export crimes involving its own products, Lattice continued its refusal to disclose to Plaintiffs Lattice's material knowledge and belief that the Seized Goods required an export license or permit. Lattice chose to allow Plaintiffs to continue to rely on Lattice data sheets and other documentation that were false and misleading and that would likely lead to Plaintiffs' actual criminal prosecution.

68.    On or about April 29, 2010, the CBSA charged the de Jarays with violating Canadian export control laws. The charges carried a maximum prison sentence of 10 years and large financial penalties.

69.    On the morning of May 5, 2010, armed CBSA officers seized Ms. de Jaray, who was five months pregnant at the time, at a neighborhood gas station and served her with an indictment.

70.    On May 28, 2010, Canadian government officials issued a press release publicizing the criminal charges against the de Jarays (the "Press Release"). Lattice received advanced notice

Page 16 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

of the Press Release before its publication.  The Press Release was immediately available worldwide and was distributed on the internet, television, and in newspaper publications.

71.    The Press Release discussed and disclosed that criminal charges had been brought against two individuals, Steven de Jaray and Perienne de Jaray.  It references Canadian criminal charges against the de Jarays for "exporting goods or technology subject to export controls, without an export permit," a charge carrying a "maximum punishment of ten years in prison."  The Press Release describes the goods as "electronic chips" that were "dual-use" and had a "significant military application."   And it discusses the purposes served by these types of "critical" prosecutions, such as "[p]reventing the illegal export of goods from Canada," "controlling the export of strategic and dangerous goods," and "prevent[ing] threats to international security."  The Press Release also mentions that Canada supports "prosecution of those who commit criminal offences against Canada's border legislation" as part of its "responsibility to ensure that goods entering the international market from Canada do not pose a threat to international peace and security."

72.    As such, on top of the permanent harm that had already been done by the government investigation and accusations, the impact on Apex's employees and customers, and the impact on Mr. de Jaray's bank relationships, the issuance of the Press Release forever tarnished the de Jarays' personal and business reputations.  The Canadian government had branded them as criminals and illegal exporters of military goods that were a threat to international peace and security.  Lattice's conduct had destructive consequences for several aspects of the de Jarays' lives, including but not limited to subsequent efforts to establish commercial businesses, attempts to integrate into various communities, and the forced sale of various assets.  All this, because Lattice failed and refused to disclose its belief and knowledge that the Seized Goods required a Canadian export permit.

73.    In August 2011, with the permanent harm to the de Jarays having already been done, Canadian prosecutors finally dropped their criminal charges against the de Jarays.

Page 17 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

74.     U.S. authorities conducted their own criminal investigation into the de Jarays and Apex over the Seized Goods.  Based on information and belief, the U.S. investigation continued until November 2013 when the case concluded with no charges being brought against the de Jarays.

75.     In November 2011, Mr. de Jaray brought suit in Canada against the Attorney General of Canada for harm caused by its export-related investigation.  Mr. de Jaray resolved that suit in November 2013.

76.     In April 2016, Ms. de Jaray brought a similar suit in the State of Washington against Canadian authorities.  The case was dismissed in January 2017 because Canada was the proper venue for suit.  She is currently prosecuting her case against Canadian authorities through the Canadian justice system.

### Lattice's misconduct harmed Mr. Oswald's relationship with Mr. de Jaray and damaged his significant dollar investment

77.     The fallout from the accusations and investigations into Apex and the de Jarays resulting from Lattice's misconduct caused significant harm to Mr. Oswald.

78.     When Mr. Oswald acquired his minority stake in Apex, it was planned that he would take on certain official corporate duties and oversight responsibilities, as an active director.

79.     Prior to the execution of the search warrants, Plaintiffs had discussed Mr. Oswald taking on a larger role at Apex, with the view that at some point he would be part of the executive team.  Plaintiffs had contemplated Mr. Oswald leaving his lucrative investment practice to work full time at Apex.

80.     But as Lattice's misconduct bore fruit, initially in the form of Apex being put into receivership and subsequently through the laying of charges against the de Jarays as potential illegal exporters of goods that were a threat to international peace and security, Mr. Oswald's personal and professional reputation as well as his investments in the companies were put at risk.

81.     Mr. Oswald, a respected professional investment manager and leader in his firm, was now associated with a substantial investment in an entity and with persons accused,

Page 18 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

disparaged, and held out to the public as criminals. As a matter of professional ethics, Mr. Oswald disclosed the developments to his employer. This situation was deeply harmful both personally and professionally.

82.    Thus, Lattice's misconduct significantly impacted Mr. Oswald's professional and personal life, in addition to destroying his significant investment in Apex.

**Plaintiffs recently learned Lattice believed, knew, and/or took the position the Seized Goods required an export permit**

83.    Plaintiffs reasonably believed that Lattice believed, knew, and took the position that the Seized Goods did not require a Canadian export permit, consistent with Lattice's data sheets and other documentation. Indeed, because the Seized Goods were case temperature rated, of Philippine-origin, and were being re-exported to Hong Kong, a Canadian export permit was never required.

84.    As part of Ms. de Jaray's 2016–17 litigation against Canada and Canadian officials, FOIA requests were made on the U.S. Department of Homeland Security, BIS and FBI in 2016.

85.    Upon receiving documents in response to one of the FOIA requests on or after August 16, 2017, Plaintiffs learned for the first time that Lattice believed back as early as at least 2006 or 2007 that the Seized Goods were export controlled and required an export license or permit. The FOIA materials reflected that in December 2012, a Lattice employee or former Lattice employee (whose name is redacted from the report) informed U.S. federal investigators about discussions he allegedly had with Steven de Jaray back in 2007 and that the Seized Goods were subject to export restrictions and required a Canadian export permit. Despite the fact that identical products were commonly available throughout the world, the employee reported that "it would be disastrous should [the Seized Goods] be acquired by a country hostile to the US' interest."

86.    The de Jarays adamantly dispute and reject that any such communication between them and a Lattice employee ever took place. Indeed, the de Jarays never believed or understood that the Seized Goods required a Canadian export permit, and nobody from Lattice ever told or

Page 19 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

disclosed to them or Apex that the Seized Goods required an export permit.  However, the U.S. investigatory report first seen by Plaintiffs on or after August 16, 2017 sheds critical light on Lattice's knowledge and belief at the relevant time.  Through that report, Plaintiffs learned for the first time that Lattice believed, knew, and/or took the position that the Seized Goods were export controlled and needed an export permit (and that Lattice had previously made such representations to government authorities).  Plaintiffs did not discover this information until on or after August 16, 2017.  Thus, under the Oregon's discovery rule, August 16, 2017 was the first time Plaintiffs knew, or could have known, that any actions of Lattice caused the harms for which Plaintiffs seek recovery.

87.    Plaintiffs would also point out that in Lattice's motion to dismiss, *see e.g.*, Dkt. 7 at 1, 22, Lattice takes the position that the Seized Goods required a Canadian export permit.  That position is directly contrary to the representations in its data sheets for the Seized Goods, and the first and only time Lattice ever disclosed that position to Plaintiffs was in its motion to dismiss.

88.    Simply put, had Lattice informed Plaintiffs that Lattice—notwithstanding the plain language of its data sheets and other documentation—believed, knew, and/or took the position that the Seized Goods required a Canadian export permit, or warned Plaintiffs that Lattice knew of government officials who believed the Seized Goods required an export permit, Plaintiffs would have either obtained an export license or permit, or not purchased the Seized Goods from Lattice.  Had Lattice made prompt and full disclosure of the material facts, Plaintiffs would not have suffered any of the harm and damages claimed in this lawsuit.

89.    Moreover, during the Canadian government's prosecution of the de Jarays, Mr. de Jaray's counsel reached out to Lattice in July 2011 to confirm whether the Seized Goods were subject to export control laws or otherwise required an export permit.  Through its counsel, Lattice told Mr. de Jaray's counsel that it stood by its data sheets, which, as discussed, described characteristics of the Seized Goods that demonstrated a Canadian export permit was not required. Lattice had confirmed that it stood by its data sheets indicating case temperature range, and the

Page 20 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

Canadian government dropped its prosecution of the de Jarays only days later. Plaintiffs had no reason whatsoever at that point to suspect or to believe that Lattice held the position that the Seized Goods required an export permit. To the contrary, Plaintiffs reasonably believed at that point that Lattice supported Plaintiffs' position that no Canadian export permit was required.

90.    Plaintiffs were therefore unable to and had no reason to discover Lattice's wrongful acts until the U.S. government provided FOIA responses on or after August 16, 2017. Under Oregon law, this is the date on which Plaintiffs discovered or reasonably could have or should have discovered the harms perpetrated by Lattice, and it is therefore the date on which the limitations period began for all of Plaintiffs' claims herein.

91.    Until the FOIA disclosure, Plaintiffs had no reasonable basis whatsoever to discover that Lattice believed, knew, and/or took the position that the Seized Goods needed a Canadian export permit.

92.    To the contrary, for years after the charges against the de Jarays were dropped, Plaintiffs believed that the investigations that destroyed Plaintiffs' businesses, fortunes, relationships, and reputations had been the sole fault of certain government officials' negligence— not an act perpetrated by Lattice. Plaintiffs had no way of knowing that Lattice was to blame.

## COUNT I: VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)
## (FALSE ADVERTISING)

93.    Plaintiffs reallege and incorporate by reference paragraphs 1–92.

94.    In Lattice's advertisements, in particular the Seized Goods' data sheets and other documentation, Lattice made false statements and omissions of material fact about the Seized Goods. It presented the Seized Goods' temperature rating in case temperature ($T_C$) range. It failed to advise or otherwise disclose or communicate to customers (including Plaintiffs) that Lattice believed, knew, and/or took the position that the Seized Goods required an export license or permit, or that Lattice knew of government officials who believed the Seized Goods were rated for operation over the entire ambient temperature ($T_A$) range of –55ºC to +125ºC and/or required an

Page 21 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

export license or permit, notwithstanding that Lattice published the Seized Goods' temperature rating as a case temperature ($T_C$) range rating of –55ºC to +125ºC.

95.     Because an ambient temperature ($T_A$) range rating of –55ºC to +125ºC is scientifically irreconcilable with a case temperature ($T_C$) range rating of –55ºC to +125ºC, Lattice's data sheets and other documentation for the Seized Goods were literally false or, in the alternative, materially misleading as no license or permit is required to export a product from Canada to Hong Kong with a case temperature ($T_C$) range rating of –55ºC to +125ºC.

96.     These advertisements actually deceived or had the tendency to deceive a substantial segment of the audience into believing that Lattice did *not* believe, know, and/or take the position that the Seized Goods required an export license or permit when in fact Lattice *did* have that belief and took that position in private communications with government officials and investigators. Indeed, Plaintiffs were deceived by Lattice.

97.     This deception was material.  Plaintiffs would have procured an export license or permit or made different purchasing decisions, but for Lattice's false advertising.

98.     Lattice caused the Seized Goods to enter interstate commerce.

99.     Plaintiffs have been injured as a result of the false advertising by a lessening of the goodwill which they and their products enjoyed with the buying public.

100.    Plaintiffs have suffered damages as a result of Lattice's false advertising in an amount that exceeds $75,000, excluding interest and costs.

101.    This case is exceptional, justifying treble damages and attorney fees and costs.

## COUNT II:  NEGLIGENCE

102.    Plaintiffs reallege and incorporate by reference paragraphs 1–92.

103.    Lattice's data sheets and other documentation for the Seized Goods failed to advise its customers (including Plaintiffs) that Lattice believed, knew, and/or took the position that the Seized Goods required an export license or permit.  This failure subjected Plaintiffs to the

Page 22 -   **PLAINTIFFS' FIRST AMENDED COMPLAINT**

foreseeable risk that a government might investigate and/or criminally prosecute the de Jarays for violations of export control law.

104.    The risk is to an interest of a kind that the law protects against negligent invasion. The law protects customers (including the de Jarays) from being unnecessarily subjected to investigations, accusations, and/or prosecutions, and related negative publicity and harm to personal and business interests and reputation, which have the potential to destroy peoples' businesses, reputations, fortunes, families, and health.

105.    Lattice's conduct was unreasonable in light of the risk.  Lattice could easily have disclosed and stated in its data sheets and elsewhere that it believed the Seized Goods required an export license or permit (or articulated facts so reflecting) or disclosed that there were government officials who took that position.

106.    Lattice's failure to advise customers (including Plaintiffs) of Lattice's belief, knowledge, and/or position that the Seized Goods required an export license or permit, and Lattice's failure to otherwise articulate facts to customers (including Plaintiffs) so suggesting or reflecting, caused Plaintiffs harm.  Plaintiffs would have procured licensure or would otherwise not have purchased Lattice's products for the intended purpose of export to Hong Kong if Lattice had not been deceptive in its marketing materials.

107.    Because of the accusations and investigations caused by Lattice's negligence, Plaintiffs' reputations have been harmed, multiple businesses were destroyed, the de Jarays had to spend significant sums defending themselves, Plaintiffs suffered severe emotional distress and breakdowns in personal and professional relationships, and Plaintiffs have suffered other personal and financial losses.

108.    Plaintiffs also were within the class of persons, and Plaintiffs' injuries were within the general type of potential incidents and injuries, that made Lattice's conduct negligent. Plaintiffs, being Lattice's important and valued customers, should have been told and warned by

Page 23 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

Lattice that Lattice believed, knew, and/or took the position that the Seized Goods required an export license or permit.

109.    Plaintiffs have suffered damages as a result of Lattice's negligence in an amount that exceeds $75,000, excluding interest and costs.  Plaintiffs reserve the right to amend this Complaint to add claims and requests for punitive or exemplary damages.

## COUNT III:  FRAUD

110.    Plaintiffs reallege and incorporate by reference paragraphs 1–92.

111.    Lattice made representations of fact to customers and Plaintiffs through its data sheets and other commercial communications concerning the Seized Goods.  Lattice represented to customers and Plaintiffs that the Seized Goods were case temperature ($T_C$) rated for –55ºC to +125ºC, without providing any facts or other indications that would suggest that the Seized Goods required an export license or permit.

112.    Lattice's representations of material fact and its material omissions on the data sheets and other commercial communications concerning the Seized Goods were false and/or misleading.  The case temperature ($T_C$) rating on the data sheets (which a reasonable person would use to conclude that the Seized Goods did not require an export license or permit) were scientifically irreconcilable with an ambient temperature ($T_A$) rating consistent with the Seized Goods needing an export license or permit.  However, Plaintiffs recently learned that Lattice actually knew, believed, and/or took the position that the Seized Goods were ambient temperature ($T_A$) rated for –55ºC to +125ºC and required an export license or permit.

113.    Lattice's representations and omissions were material.  Plaintiffs would have procured a license or permit, or would not have purchased the Seized Goods for export to Hong Kong if Lattice had not been deceptive and misleading in its commercial communications, in particular the Seized Goods' data sheets.

114.    Lattice knew its representation were false and misleading, or it was inexcusably ignorant of the truth.  Lattice knew and understood the relationship between a case temperature

Page 24 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

($T_C$) rating and an ambient temperature ($T_A$) rating.  Lattice knew that it was not disclosing to Plaintiffs or the marketplace on key documents and advertisements like the Seized Goods' data sheets any facts that would reasonably suggest Lattice believed, knew, and/or took the position that the Seized Goods were ambient temperature rated and/or required an export license or permit.

115.    Lattice knew and intended that its misrepresentations would be acted upon in a manner reasonably contemplated in a commercial export marketplace.  Exporting or re-exporting goods that require an export license or permit is generally more onerous and costly for the exporter than exporting goods that do not require a license or permit.  Upon information and belief, Lattice presented the Seized Goods as not requiring an export license or permit to entice exporters such as Plaintiffs to make their purchases from Lattice, despite Lattice's actual belief, knowledge, and/or position that the Seized Goods required an export license or permit.

116.    Plaintiffs did not know that Lattice believed, knew, and/or took the position that the Seized Goods required an export license or permit.

117.    Plaintiffs relied on Lattice's data sheets and other documents when deciding whether to purchase the Seized Goods and whether to procure licensure.

118.    Plaintiffs had a right to rely on Lattice's data sheets.

119.    Plaintiffs were damaged as a result of their reliance on Lattice's data sheets and other documents.  Had Lattice not committed fraud, the de Jarays would not have been wrapped up in multiple years of criminal investigations and prosecution and would not have been branded as threats to national security.  Because of the government investigations and prosecution caused by Lattice's fraud, Plaintiffs' reputations have suffered permanent harm, multiple businesses were destroyed, the de Jarays had to spend significant sums defending themselves, Plaintiffs suffered severe emotional distress and breakdowns in personal and professional relationships, and Plaintiffs have suffered other personal and financial losses.

Page 25 -   **PLAINTIFFS' FIRST AMENDED COMPLAINT**

120.    Plaintiffs have suffered damages as a result of Lattice's fraud in an amount that exceeds $75,000, excluding interest and costs.  Plaintiffs reserve the right to amend this Complaint to add claims and requests for punitive or exemplary damages.

**COUNT IV:  BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

121.    Plaintiffs reallege and incorporate by reference paragraphs 1–92.

122.    In Oregon, "every contract contains an implied duty of good faith and fair dealing." *Lorenz v. Deutsche Bank Nat'l Trust Co.*, No. 3:15-cv-680-SI, 2015 WL 5813174, at *5 (D. Or. Oct. 5, 2015) (citing *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1033 (D. Or. 2012)) (Simon, J.).  Lattice had an obligation and duty to tell and disclose to Plaintiffs that Lattice believed and/or took the position and/or told the government that the Seized Goods were ambient temperature rated and/or required an export license or permit for export from Canada to Hong Kong.

123.    The Purchase Orders for the Seized Goods did not provide Lattice with the right to inform government investigators that the Seized Goods required an export license or permit when the data sheets reflected they did not.  Indeed, the data sheets for the Seized Goods did not implicate an ambient temperature range that would require Plaintiffs to obtain an export control license or permit.

124.    Plaintiffs had a reasonable expectation that Lattice would not take a position inconsistent with its own data sheets.  Plaintiffs also had a reasonable expectation that Lattice would not allow government officials to believe the Seized Goods required a license or permit when the data sheets reflected they did not.  Plaintiffs also had a reasonable expectation that Lattice would advise Plaintiffs if in fact the Seized Goods were ambient temperature rated and/or required an export license or permit.  Through the FOIA responses received by Plaintiffs on or after August 16, 2017, Plaintiffs discovered that Lattice took inconsistent positions concerning licensure requirements for the Seized Goods.

Page 26 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

125.    The terms and obligations involved in parties' long-term contractual relationship do not control or implicate their duties to treat each other with good faith and fairness.  Lattice breached its duty to act in good faith and with fairness in handling its contractual dealings with Plaintiffs by, among other things, failing to disclose its own knowledge and belief to Plaintiffs and by providing information and making statements to government investigators that conflicted with information Lattice had disclosed to Plaintiffs concerning the need for export licensure with the Seized Goods.    Lattice knew or should have known that its bad faith conduct and its misrepresentations and omissions of material fact would cause government investigators to implicate the de Jarays and would likely result in criminal prosecution and/or other harms to the de Jarays because individual exporters, not the companies themselves, face individual liability— including jail time—for the failure to follow export control regulations.  Because of its bad faith conduct and its misrepresentations and omissions of material fact, Plaintiffs' businesses, reputations, and livelihoods were permanently damaged.  They suffered significant personal and financial harm.

126.    Plaintiffs have suffered damages as a result of Lattice's breach of its duty of good faith and fair dealing in an amount that exceeds $75,000, excluding interest and costs.  Plaintiffs reserve the right to amend this Complaint to add claims and requests for punitive or exemplary damages.

## COUNT V:  NEGLIGENT MISREPRESENTATION

127.    Plaintiffs reallege and incorporate by reference paragraphs 1–92.

128.    Lattice's material representations and omissions constitute actionable negligent misrepresentations.  Lattice and Plaintiffs had a special relationship because of, at minimum, the business partner and/or supplier relationship between Plaintiffs and Lattice.  Due to this special relationship, Lattice was required to exercise due care in its representations to Plaintiffs.  Lattice further had a duty to not omit material facts.

Page 27 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

129.    Lattice failed to exercise reasonable care by negligently making false representations or omitting material facts.  Specifically, Lattice's data sheets did not state that the Seized Goods were ambient controlled for temperature or required an export license or permit. Lattice also omitted the fact that it knew and believed the Seized Goods needed an export license or permit, and it took the position with government investigators that the Seized Goods required an export license or permit.  By not fully informing Plaintiffs of Lattice's position and belief, Lattice negligently misrepresented the export controlled nature of the Seized Goods, which resulted in the damages complained of in this action.

130.    Plaintiffs reasonably relied on the Lattice's false representations and omissions. Because Plaintiffs were unaware of Lattice's position that the Seized Goods required an export license or permit, Plaintiffs did not seek to obtain a license or permit for the Seized Goods.  As a result, the de Jarays were exposed to criminal liability and government investigations and accusations.

131.    Plaintiffs have suffered damages as a result of Lattice's negligent misrepresentations in an amount that exceeds $75,000, excluding interest and costs.  Plaintiffs reserve the right to amend this Complaint to add claims and requests for punitive or exemplary damages.

## JURY DEMAND

132.    Plaintiffs hereby demand a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief against Lattice as follows:

(i)      General damages;

(ii)     Gross-up tax damages to offset the tax consequences, as appropriate, of relief received;

(iii)    Treble damages;

(iv)     Attorney fees and costs;

Page 28 -    **PLAINTIFFS' FIRST AMENDED COMPLAINT**

(v)      Pre and/or post judgment interest, as applicable; and

(vi)     Any other additional relief to which Plaintiffs may be entitled and/or that the Court determines to be just and equitable.

Dated: September 23, 2019

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

*/s/Nadia H. Dahab*
**Nadia H. Dahab,** OSB No. 125630
209 SW Oak Street, Suite 500
Portland, Oregon  97204
Telephone: (503) 227-1600
Email: ndahab@stollberne.com

**Philip J. Bezanson** (*pro hac vice*)
phil.bezanson@bracewell.com
**Douglas F. Stewart** (*pro hac vice*)
doug.stewart@bracewell.com
Bracewell LLP
701 Fifth Avenue, Suite 6200
Seattle, WA 98104
Tel:  206-204-6200
Fax: 800-404-3970

**Phillip L. Sampson Jr.** (*pro hac vice*)
Phillip.sampson@bracewell.com
Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Tel:  713-223-2300
Fax:  800-404-3970

*Counsel for Plaintiffs Steven A.W. de Jaray, Perienne de Jaray, and Darrell R. Oswald*

**Page 29 -    PLAINTIFFS' FIRST AMENDED COMPLAINT**