**Keil M. Mueller**, OSB No. 085535
kmueller@stollberne.com
**Lydia Anderson-Dana**, OSB No. 166167
landersondana@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600

**Joshua Berman** (*pro hac vice*)
joshua.berman@whitecase.com
**Isaac Glassman** (*pro hac vice*)
isaac.glassman@whitecase.com
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200

*Counsel for Plaintiffs Steven A.W. de Jaray,
Perienne de Jaray, and Darrell R. Oswald*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STEVEN A.W. DE JARAY, PERIENNE DE JARAY, and DARRELL R. OSWALD,<br><br>Plaintiffs,<br><br>v.<br><br>LATTICE SEMICONDUCTOR CORPORATION, an Oregon-headquartered Delaware corporation,<br><br>Defendant. | CASE NO. 3:19-cv-00086-SI<br><br>**DECLARATION OF THOMAS W. ANDRUKONIS** |

I, the undersigned, Thomas W. Andrukonis, hereby declare and state as follows:

1. I am a Managing Director with FTI Consulting's Export Controls, Sanctions, and Trade practice based in Washington, D.C. I specialize in U.S. and foreign export controls and sanction matters, including license application development strategies, export control investigation support, internal compliance program development, the conduct of risk and threat-based assessments, end-use monitoring advisory services, and the development of enhanced due diligence programs.

2. Prior to joining FTI in January 2021, I served 41 years in the Export Administration and Export Enforcement divisions of the Bureau of Industry and Security ("BIS"), United States Department of Commerce, administering and enforcing the Export Control Reform Act and Export Administration Regulations ("EAR"). BIS's mission is to advance U.S. national security, foreign policy, and economic objectives by ensuring an effective export control and treaty compliance system and promoting continued U.S. strategic technology leadership. BIS is led by a Senate approved Under Secretary who reports directly to the Secretary of Commerce.

3. BIS has two major components under the Under Secretary: Export Administration and Export Enforcement. Each of these components is also led by Senate approved appointees. Export Administration is responsible for developing and revising the EAR, processing export licenses, commodity classification requests, participating in multilateral export control regime organizations, and conducting seminars and outreach activities to industry. Export Enforcement is responsible for conducting criminal and administrative investigations under the Export Control Reform Act ("ECRA") and the EAR. It has special agents stationed in approximately 30 major cities across the United States as well as Export Control Officers positioned in six U.S. embassies or consulates overseas.

4. During my career at BIS, I counseled U.S. exporters about the regulatory requirements of the EAR and how they apply to specific company situations. I was a regular speaker for BIS both in the U.S. and overseas on EAR compliance requirements.

5. From 1991 to 2007, I served as the Director of the Office of Enforcement Analysis. In this role, I was responsible for using multiple open and sensitive sources of information to identify violations of the EAR and worked directly with BIS special agents on investigative referrals for further investigation. During this time, I led a staff of 28 export compliance specialists.

6. I understand that the parties disagree about whether Plaintiffs' company, Apex-Micro Manufacturing Corporation ("Apex"), was subject to the United States Export Administrative Regulations (the "EAR"). Assuming Apex was subject to the EAR – and to be clear, it is my belief that it was not because it was based in Canada and the 2ICs were not goods of U.S. origin – the 2ICs would have only required an export license if they were described by an Export Control Classification Number ("ECCN") within the United States Commerce Control List ("CCL"). An export that matches an ECCN may require a destination-based license, depending on the country of ultimate destination.

7. Determining whether an item matches an ECCN within the CCL requires an understanding of the specific technical specifications of the item. From my time at BIS, I can state without equivocation that data sheets are the principal documents for determining export classification (i.e., determining whether a product matches an ECCN), and that BIS relies on data sheets for export classification and advises industry to do the same.

8. A datasheet is prepared by a manufacturer or producer to convey the technical specifications and operating parameters of a particular product. Datasheets are critical for

purchasers, as it allows them to understand how a product is capable of performing and whether a product requires an export license. It is also well known within BIS that customers use data sheets to make decisions about whether to obtain an export license. During my 41 years at BIS, during which time I participated in meetings with hundreds of companies to assist them in classifying their products, I routinely advised them that consumers would (and should) consult product data sheets to determine whether a particular product is captured under an ECCN provision.

9. Determining whether an item matches the description of an ECCN provision within the CCL is not supposed to be complicated. BIS's intent has always been to identify items by specific technical parameters so that the public can compare the technical specifications of their items to those listed in the CCL and easily determine if they are listed and thus controlled for U.S. export.

10. Purchasers are entitled to rely on data sheets for a product's technical performance and export control status. Purchasers are not responsible for conducting their own testing after purchasing a product. In my four decades at BIS, I do not recall a single situation where BIS personnel stated that they expected a purchaser to conduct its own testing or recheck the manufacturer's technical rating of its product, especially when the rating is clearly expressed in the datasheets. To the contrary, the expectation at BIS was that purchasers could rely on the product ratings and characteristics that are published in a datasheet, and that conducting additional inquiries or follow on research was not required.

11. I have reviewed that document titled "Reliability and Quality Assurance", which I understand is a true and correct copy of a Lattice manual that was published in 2003 and continues to be publicly available on Lattice's website. This [manual] states that "Lattice Semiconductor Corp. has a comprehensive program for Quality Sampling to ensure outgoing product meets all

datasheet requirements and customer expectations." *See* Ex. 57.[1] This is not surprising to me in the least. Lattice, like other electronics manufacturers and producers, fully expect that their customers will rely on the specifications set forth in the datasheets.

12. I am aware that Lattice has contended in this litigation that BIS made determinations at various points that the 2ICs were properly classified under ECCN 3A001.a.2.c. BIS does not, however, make independent classification determinations about a manufacturer's products. Nor does BIS conduct its own testing of a manufacturer's products for operation. BIS does not have a laboratory where its engineers or classification experts engage in this exercise. It simply does not have the manpower or resources to do so. Lattice's contentions are factually incorrect.

13. BIS relies on information provided and/or representations made by the manufacturer or producer to reach conclusions about the product's technical characteristics. I am aware that Lattice entered into a settlement agreement with BIS in 2004 based on alleged export violations that Lattice voluntarily disclosed concerning three products (not the 2ICs).[2] BIS would have relied on Lattice's disclosure of export violations in reaching any decision that the three products at issue under the settlement agreement were classified under ECCN 3A001.a.2.c. I cannot think of a single reason – other than error by Lattice – that Lattice would have reported devices that were described in their datasheets and SMDs as case temperature-rated, as ambient temperature-rated devices.

14. Based on my four decades of experience at BIS, the settlement agreement would not have any bearing on the proper classification of the 2ICs because they were not addressed in the settlement agreement. The technical parameters within the 2ICs's datasheets are dispositive,

---

[1] "Ex. __" refers to the exhibits to the declaration of Joshua Berman, filed concurrently herewith. Citations to "-###" are to the last digits of the Bates numbers of the cited exhibit.
[2] *See* Ex. 10.

Page 5 - **DECLARATION OF THOMAS W. ANDRUKONIS**

and they make clear that the 2ICs are not captured by ECCN 3A001.a.2.c because the 2ICs are case temperature rated.

15. BIS does offer to issue an official commodity classification for a producer if the producer specifically requests it and provides supporting documentation. The technical parameters of those items as detailed and described in their data sheets were always the principal documents relied on by BIS for determining EAR commodity classifications.

16. I understand that, in 2012, Lattice's general counsel certified that Lattice had never requested an official commodity classification. *See* Ex. 75. As such, BIS never made any independent classification decision concerning the 2ICs. The only entity that could have rated the 2ICs was Lattice, and Lattice's claim that BIS "rated" the 2ICs – or any microelectronic devices, ever is flat wrong.

\*   \*   \*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7th, 2022.

> */s/ Thomas W. Andrukonis*
> Thomas W. Andrukonis