**Keil M. Mueller**, OSB No. 085535
kmueller@stollberne.com
**Lydia Anderson-Dana**, OSB No. 166167
landersondana@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600

**Joshua Berman** (*pro hac vice*)
joshua.berman@whitecase.com
**Isaac Glassma**n (*pro hac vice*)
isaac.glassman@whitecase.com
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200

*Counsel for Plaintiffs Steven A.W. de Jaray,*
*Perienne de Jaray, and Darrell R. Oswald*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STEVEN A.W. DE JARAY, PERIENNE DE JARAY, and DARRELL R. OSWALD, <br><br> Plaintiffs, <br><br> v. <br><br> LATTICE SEMICONDUCTOR CORPORATION, an Oregon-headquartered Delaware corporation, <br><br> Defendant. | CASE NO. 3:19-cv-00086-SI <br><br> **DECLARATION OF STEVEN A.W. DE JARAY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** |

I, Steven A.W. de Jaray, declare as follows:

1.  I am one of the named Plaintiffs in the above-captioned action, and am above 21 years of age. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would competently testify thereto. This declaration is submitted in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment.[1]

2.  I was the founder, CEO and principal beneficial shareholder of Apex-Micro Manufacturing Corporation, an advanced electronic products design and electronics manufacturing business in British Columbia, Canada, that designed and manufactured electronics and circuit boards for our customers' electronic products, primarily in the medical, automotive, commercial aviation, consumer, industrial, and other fields. I founded Apex-Micro Manufacturing Corporation in 2002, and also was the founder and principal shareholder of the company's various, related business entities and affiliates (collectively "Apex") from 1985.

3.  As part of its electronics business, Apex routinely procured component parts, such as field programmable logic devices ("FPLDs"), a type of semiconductor product, from around the world from approximately 4,000 Apex-qualified vendors. One of Apex's qualified vendors was Lattice Semiconductor Corporation ("Lattice"), which had accounting operations in Oregon, but, to the best of my knowledge, outsourced product manufacturing, supply and packaging to third parties in the Philippines. To the best of my recollection, Apex began purchasing FPLDs from Lattice in or around 2003.

4.  Unlike a bicycle, the performance and characteristics of a semiconductor product are generally not obvious on a visual inspection. As a result, in the electronics

---

[1] All exhibits referenced in my declaration refer to exhibits attached to the Declaration of Joshua

manufacturing business, purchasers rely on procurement documents referred to as datasheets when making purchasing decisions. Datasheets are published by the semiconductor producer, and they set out the semiconductor product's technical and functional specifications and operating electrical characteristics. They also describe the range of temperatures within which the semiconductor product is rated and warrantied to operate. At Apex, we reviewed datasheets before making purchases in order to determine whether a specific part would be compatible with the products we were manufacturing or designing.[2] We also reviewed datasheets before making a purchase to determine whether a semiconductor product was described in the Canadian Export Control List ("ECL").

5. Apex had rigorous product procurement procedures in place to ensure that the datasheets were reviewed before Apex made purchases. Before a purchase order could be generated, personnel in Apex's materials, engineering and/or incoming quality control departments had to review the applicable datasheets to make sure that, among other things, the products were not described in the ECL. As the CEO of Apex, I was certainly not involved in the review of every product datasheet for every transaction. That said, I did review datasheets and other procurement documents from time to time. I am a product development engineer by training, and would take an active role in the design and/or production of certain products for Apex and Apex's customers. In those circumstances, I would review datasheets and other procurement documents because I needed to know whether an electronic component would be suitable for an electronics design, production, or development project that I was working on.

---

Berman.

[2] In fact, the review of datasheet information was necessary for Apex to retain its ISO-9001 accreditation. Ex. 58. Datasheets from vendors were reviewed and archived within Apex so that we could keep track of functional performance metrics for design (as well as warranty) purposes, and also be certain that Apex was not purchasing products described on Canada's Export Control

Page 3 -    DECLARATION OF STEVEN A.W. DE JARAY

6. On December 10, 2008, Apex issued two purchase orders to Lattice for two types of Lattice FPLDs: the GAL22V10-15LD/883 (SMD No. 5962-8984103LA) and the ispLSI 1048C-50LG/883 (SMD No. 5962-9558701MCX) (collectively, the "2ICs"). I reviewed the datasheets and other procurement documents, such as the Standard Microcircuit Drawings ("SMDs"), for the 2ICs before December 10, 2008. In light of the procedures in place at Apex at that time, Apex could not have generated or issued these purchase orders unless personnel in the materials, engineering and/or incoming quality control departments had reviewed and cleared the datasheets and confirmed, among other things, that the 2ICs did not fall within the ECL.

7. I have reviewed the documents that are attached as Exhibits 1 and 2 to the Declaration of Joshua Berman. These documents are, to the best of my knowledge and belief, true and correct copies of the datasheets for the 2ICs. Both datasheets contain Absolute Maximum Ratings and Recommended Operating Conditions that rate the 2ICs over a case temperature range of -55°C to +125°C. *See* Ex. 1 at 3246; Ex. 2 at 1974. Lattice provided a 1-year warranty stating that its products would conform to these datasheet specifications.

8. Apex and I relied on these datasheets, the SMDs, and Lattice's warranty, among other things, to conclude that the 2ICs were not described in the ECL. Specifically, the ECL only describes FPLDs rated for operation over the entire ambient temperature range of -55°C to +125°C. Ex. 6 at 1439. There is no section of the ECL describing FPLDs rated for operation over the entire case temperature range of -55°C to +125°C.

9. Apex and I also relied on the certificates of conformance that Lattice issued for the 2ICs, which certified that the 2ICs conformed to the specifications set forth in the SMDs

List.

Page 4 -   **DECLARATION OF STEVEN A.W. DE JARAY**

with which the 2ICs comply. Ex. 23 and Ex. 24. Like the datasheets, the SMDs state an operating case temperature range of -55°C to +125°C under the Recommended Operating Conditions, and do not state any ambient temperature range. If I had known that Lattice believed that the 2ICs were ambient temperature rated and matched the description of FPLDs described under the ECL, and that it was telling its regulators that the 2ICs were ambient temperature rated, I would have never allowed Apex to purchase them. Instead, Apex would have purchased similar case-temperature-rated FPLDs from another source, as they were readily available from various vendors around the world.

10. I understand that Lattice is now claiming that I knew, or should have known, that the 2ICs were ambient temperature rated because Lattice's "commercial invoices" listed a U.S. export transaction code (which I now understand is an Export Control Classification Number or "ECCN") that corresponds to the U.S. Commerce Control List.

11. First, I have no recollection of ever seeing any such commercial invoices, likely because Apex was billed by Lattice by means of completely separate transactional invoices that Lattice sent to Apex via email. Ex. 27. Second, as a Canadian company subject only to Canada's ECL, I had no knowledge of U.S. export transaction codes like 3A001a.2.c.

12. Even if I had seen the documents Lattice calls commercial invoices, that alpha-numerical code would have meant nothing to me. I have reviewed these same documents in the context of this litigation, and they contain a warranty stating that the devices conform to the specifications in the datasheets, thus confirming that the 2ICs (as I knew) were, and always have been, case temperature-rated. These documents also reference (i) the SMDs, which state an operating case temperature range, and (ii) the certificates of conformance, which certified that the 2ICs conformed to the specifications set forth in the SMDs. It was not until this

Page 5 -   DECLARATION OF STEVEN A.W. DE JARAY

litigation that I became familiar with the U.S. ECCN and other U.S. export transaction codes contained in Lattice's documents titled commercial invoice.

13. Lattice's commercial invoices, if they even were delivered with the 2ICs, which I dispute, would not have been seen by anyone at Apex other than potentially the team at the loading dock that did not have (nor was required to have) any training on, or expertise in, issues related to customs and export control regulations—much less U.S. or any other country's export control regulations. Lattice's contention that, by means of its commercial invoices (which, if provided at all, would have been provided post-purchase), it had notified me that the 2ICs were different than what Lattice represented they were in publicly available datasheets and SMDs, not to mention certificates of conformance, and that Lattice was telling the U.S and/or Canadian governments that the 2ICs were actually *ambient* temperature-rated FPLDs, makes absolutely no sense to me. I have never heard of any electronics components manufacturer controverting its own datasheets and warranty.

14. If Lattice had truly wanted to tell me that it was holding out its garden-variety, case temperature rated devices as ambient temperature rated, there were numerous ways Lattice could have done so. The one thing Lattice would have been required to do—but admits that it never did—was send me a part change notice and/or amended datasheet.

15. On or about December 22, 2008, in reliance on the datasheets, as well as the SMDs and certificates of conformance provided to Apex by Lattice, Apex attempted to export the 2ICs, along with other production inventory, to Hong Kong, China. The shipment was detained by the Canada Border Services Agency, which proceeded to investigate Apex, my daughter, Perienne de Jaray, and me for alleged Canadian export violations. My daughter and I were subsequently indicted in April 2010.

Page 6 -    DECLARATION OF STEVEN A.W. DE JARAY

16. During the entirety of the investigation and prosecution, I genuinely believed that the Canadian authorities had misapprehended the 2ICs' temperature ratings. During the criminal proceedings in Canada, the temperature ratings in the datasheets for the 2ICs were central to my defense. My defense team submitted an expert report stating that the 2ICs stated only a case temperature range, and were not in any way, shape or form ambient temperature rated.

17. I understood that the Canadian government requested an expert report from Lattice. While I did not know it at the time, Michael Gariepy, a Lattice engineer, submitted an expert report on July 29, 2011 to Nils Preshaw, the Canadian prosecutor (the "Gariepy Report"). The Gariepy Report includes the following question and answer:

> 9. Does Lattice market and sell these products as field programmable logic devices designed to properly perform their function over the entire ambient temperature range from 218 K (-55°C) to 398 K (+125°C);
>
> As stated in Questions #6 and 7 above, Lattice tests these field programmable logic devices for operation over the ambient temperature range from -55C to 125C. The products will operate over this entire temperature range.
>
> The operating temperature range designated in the Lattice datasheets for these products is based on case temperature. Case temperature is measured on the top surface of the device package. Our datasheets match the Standard Microcircuit Drawings (SMD), which specify performance over a case temperature range of -55 to +125C.

Ex. 39 at 740.

18. Upon receiving the Gariepy Report affirming the 2ICs' case temperature rating, Canada almost immediately stayed its wrongful prosecution of my daughter and me.

19. I learned about the Gariepy Report in August 2011. I understood it to be the sole reason that the Canadian government dropped its wrongful prosecution.

20. Under the circumstances, it would never have occurred to me to file a lawsuit against Lattice; Lattice had just entered the fray and ended the nightmare of my daughter's and

Page 7 -    DECLARATION OF STEVEN A.W. DE JARAY

my prosecution by simply telling the truth about the 2ICs: they are, were, and always have been, case temperature rated.

21. On May 13, 2013, the Canadian government admitted liability for negligent investigation and malicious prosecution. This cemented my belief that the investigations and prosecution that destroyed my business and life had been the result of negligence by the Canadian government. I had no inkling—and no conceivable way of knowing—that beginning as early as 2004, Lattice had secretly begun re-characterizing to the government goods marketed to me as case temperature rated as ambient temperature rated devices.

22. After the Canadian government dropped the wrongful prosecution, the FBI and U.S. Department of Homeland Security ("DHS") conducted their own investigation for the same alleged Canadian export violations. In October 2013, my counsel at the time, Mark Bartlett, met with the AUSA in the Western District of Washington, Todd Greenberg, who was handling the investigation. Mr. Bartlett gave a presentation to Mr. Greenberg that covered Lattice's datasheets, the Gariepy Report, and the fact that Canada voluntarily dismissed its prosecution and subsequently admitted liability. On November 27, 2013, Mr. Greenberg's office informed Mr. Bartlett that the Department of Justice was closing the investigation.

23. It was not until I reviewed information provided by DHS in response to a FOIA request that my daughter made in connection with her lawsuit against the government of Canada that I learned that, despite the case temperature ratings in its datasheets for the 2ICs, Lattice believed and took the position that the 2ICs required a Canadian export permit.

24. When the FOIA response from DHS arrived in late 2017, my daughter and I learned that an unnamed Lattice employee told DHS and BIS agents that the 2ICs were export controlled. Ex. 63 at 377–79. This Lattice employee, whom I later came to learn was Scott

Roberts—one of Lattice's regional sales managers—also falsely stated that "Mr. Dejaray understood completely that these parts were controlled and that Lattice was very concerned about their legitimate usage and agreed with that perspective." *Id.* at 379.

25.   I, along with my co-Plaintiffs, filed this lawsuit against Lattice on December 18, 2018. Prior to receiving the FOIA disclosure, I would have needed a crystal ball to know that Lattice actually believed and took the inexplicable position that the 2ICs were rated for operation over the entire ambient temperature range of -55C to +125C and thus required a Canadian export permit. Until we received the DHS FOIA response, I truly believed that Canada was negligent and that Lattice had saved the day with the truth and caused the Canadian government to drop the criminal proceeding. I was grateful. It is confounding that Lattice now claims that I somehow should have known from the beginning that Lattice believed that the 2ICs were ambient temperature rated when the datasheets and SMDs, among other things, said otherwise.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of July, 2022, in British Columbia, Canada.

                                                  /s/ *Steven A.W. de Jaray*
                                                  STEVEN A.W. DE JARAY