IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STEVEN A.W. DE JARAY, PERIENNE DE JARAY, DARREL R. OSWALD**, and **APEXMICRO MANUFACTURING CORPORATION**,<br><br>Plaintiffs,<br><br>v.<br><br>**LATTICE SEMICONDUCTOR CORPORATION**,<br><br>Defendant. | Case No. 3:19-cv-86-SI<br><br>**OPINION AND ORDER** |

Timothy S. DeJong, Lydia Anderson-Dana, and Elizabeth K. Bailey, STOLL STOLL BERNE LOKTING & SHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204; Joshua A. Berman, Laura Logsdon, Elizabeth Moore, and Zachary Melvin, PAUL HASTINGS LLP, 200 Park Avenue, New York, NY 10166; and Isaac S. Glassman, Scott T. Weingaertner, and Kimberly Anne Havlin, WHITE & CASE LLP, 1221 Avenue of the Americas, New York, NY 10020. Of Attorneys for Plaintiffs.

Nicholas F. Aldrich, Jr., Scott D. Eads, and Jason A. Wrubleski, SCHWABE, WILLIAMSON & WYATT, PC, 1211 SW 5th Avenue, Suite 1900, Portland, OR 97204; and Derek F. Foran, STEPTOE & JOHNSON LLP, One Market Plaza, Steuart Tower, Suite 1070, San Francisco, CA 94105; James P. Bennett, THE NORTON LAW FIRM PC, 299 Third Street, Suite 200, Oakland, CA 94607. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiffs bring this lawsuit against Lattice Semiconductor Corp. (Lattice), asserting claims arising out of sales transactions between Lattice and Apex-Micro Manufacturing

Corporation (Apex). Before the Court is Lattice's motion for partial summary judgment on Apex's claim for negligence. Lattice argues that Oregon's application of the economic loss doctrine and requirement that a special relationship exist for a plaintiff to recover for purely economic injuries bars Apex's negligence claim. Lattice contends that as a buyer and seller of goods, the parties did not have a special relationship under Oregon law. Plaintiffs respond that under the unique circumstances here, there are genuine disputed issues of fact as to whether Apex and Lattice had a special relationship giving rise to tort liability. For the reasons discussed below, the Court denies Lattice's motion for partial summary judgment.

## STANDARDS

### A. Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

### B. Economic Loss Doctrine

Oregon's economic loss doctrine provides that "one ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property." *Hale v. Groce*, 304 Or. 281, 284 (1987). To recover in negligence for a purely economic loss, a plaintiff must show a "special relationship or [some other] status that imposed a duty on the defendant beyond the common-law negligence standard." *Harris v. Suniga*, 344 Or. 301, 308 (2008).

Under Oregon law, generally a relationship between a buyer and a seller does not create a special relationship allowing for liability in negligence. *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149, 165 (1992) (holding that in arm's length negotiations between sales adversaries, "a negligent misrepresentation is not actionable"). The Oregon Supreme Court has explained:

> Another way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a *special responsibility* toward the other party. This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution.
>
> This special responsibility exists in situations in which one party has hired the other in a professional capacity, as well as in principal-agent and other similar relationships. It also exists in the type of situation described in *Georgetown Realty*, in which one party has relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands. In all those relationships, one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party. That special

>     responsibility carries with it a duty to exercise reasonable care to
>     avoid making negligent misrepresentations.

*Conway v. Pac. Univ.*, 324 Or. 231, 240-41 (1996) (emphasis in original). The Oregon Supreme Court stated in *Conway* that courts "must determine whether the terms of the contract create the *type of relationship* that gives rise to such a tort duty" and reiterated that "an adversary in a sales transaction, . . . does not owe a duty to avoid making negligent representations." *Id.* at 241, 243 (emphasis in original).

The economic loss doctrine applies to "'financial losses to intangibles,' such as lost profits, lost insurance proceeds, attorney's fees, and failed loan transactions." *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 2014 WL 5285475, at *3 (D. Or. Oct. 15, 2014) (quoting *Harris v. Suniga*, 209 Or. App. 410, 418 (2006)). It also "applies to claims for negligence when a plaintiff seeks damages for future impairment of an ongoing business or enterprise." *Key Compounds LLC v. Phasex Corp.*, 2021 WL 3891586, at *7 (D. Or. Aug. 31, 2021) (quotation marks omitted).

"Whether a relationship is special is driven by the facts. The cases establish a functional as opposed to a formal analysis in determining whether the special relationship exists; in other words, the crucial aspect of the relationship is not its name, but the roles that the parties assume in the particular interaction." *Tomlinson v. Metro. Pediatrics, LLC*, 275 Or. App. 658, 683 (2018) (cleaned up). Although this inquiry "is generally one for the trier of fact; if . . . the relevant facts are undisputed, the court may decide the question as a matter of law." *Mead v. Legacy Health Sys.*, 231 Or. App. 451, 462 (2009), *rev'd in part on other grounds by* 352 Or. 267 (2012).

## DISCUSSION

### A. Economic Loss

Lattice argues Apex's negligence claim is foreclosed by Oregon's economic loss doctrine because Lattice and Apex were at all times in an arm's length buyer-seller relationship. Lattice argues that it never undertook to make Apex's export decisions nor did Apex ask Lattice to do so. The parties' relationship was simply that Lattice sold Apex goods.

Lattice points to the purchase orders Apex sent Lattice and the commercial invoices Lattice purports to have sent Apex as the documents creating the relationship between the parties. Lattice argues that these documents did not create a fiduciary relationship or show that Lattice was exercising independent judgment on behalf of Apex. To the contrary, Lattice argues, these documents show that the parties were simply a buyer and a seller—adversaries in sales transactions. Thus, concludes Lattice, under *Onita*, *Conway*, and their progeny, any alleged wrongdoing from this type of relationship is not actionable in negligence.

Plaintiffs respond that the question is not "whether one party, in fact, relinquished control to the other. The focus instead is on whether the *nature of the parties' relationship itself* allowed one party to exercise control in the first party's best interests." *Bennett v. Farmers Ins. Co. of Or.*, 332 Or. 138, 161-62 (2001) (emphasis in original). Plaintiffs argue that Oregon implies a tort duty when the parties' "relationship is of the type that, by its nature, allows one party to exercise judgment on the other party's behalf." *Id.* at 162. Plaintiffs contend that the facts, viewed in their favor and drawing inferences in their favor, create a triable issue whether Lattice exercised judgment on Apex's behalf on the narrow issue for which Apex relied on Lattice.

Plaintiffs describe the longstanding relationship between Apex and Lattice, in which Lattice sold nearly 300,000 semiconductors to Apex worth more than $7.5 million. *See* ECF 298-1 at 2. Plaintiffs also argue that Lattice knew that Apex was a manufacturer who included

Lattice's semiconductors in devices that Apex was producing for, and shipping to, third parties. No party disputes that the semiconductor industry is heavily regulated nor that certain semiconductors, including those that are ambient-temperature rated, may have dangerous or military applications and therefore are export controlled. Plaintiffs argue that Lattice knew the importance of semiconductor manufacturers like Lattice and customers like Apex staying in compliance with export control laws.

A message from Lattice's Chief Executive Officer contained in Lattice's Export Control Manual (ECM) states:

> I am personally committed to integrating export control compliance into our general corporate culture.
>
> * * *
>
> Penalties for violations of U.S. and Singapore export control law may include substantial fines and imprisonment. In addition, violations could cause [Lattice] to lose its export privileges. Since a large percentage of our sales revenue derives from international transactions, any suspension or loss of export privileges would be devastating. Violation of other applicable export control laws could have similar consequences.

ECF 159-4 at 4. In addition, the ECM set out a policy for "Compliance with Export Controls." *Id.* at 6-8. This policy emphasizes that "[i]nterpretation of the requirements of Export Controls can be complex" and "vary significantly in important ways" and thus Lattice's employees "must not make assumptions about the applicability of Export Controls." *Id.* at 7. The policy sets out an approval mechanism and reinforces that "[s]ignificant civil and criminal penalties may apply to companies and individuals committing violations of Export Controls. The Legal Department must be consulted in any case where the proper actions for compliance with Export Controls are not clearly understood and approved." *Id.* at 8.

Plaintiffs also highlight that the ECM describes how the export control classification numbers (ECCN) are assigned, which primarily involves the rated temperature range and includes reliance on the datasheets. *Id.* at 27-28. The ECM explains:

> All devices are classified by temperature grade. "Military" grade devices are rated for the entire ambient temperature range of -55°C to 125°C. . . In no case are any of the commercial, industrial, and extended temperature grade parts rated for the full ambient temperature range of -55 °C to 125 °C. Commercial, industrial, and extended temperature grade devices are therefore assigned an ECCN based on the non-temperature parameters of digital I/0 count, system gate count, equivalent gate count, and toggle frequency. The maximum digital I/O count is usually published in our datasheets. Engineering provides the value to the business unit operations group for entry into our IT systems.

*Id.*

Plaintiffs argue that it is well known in the semiconductor industry that "exporters and manufacturers need only compare the specifications shown on an item's data sheet to the specifications listed in the Commerce Control List to determine whether a part requires a license." *United States v. Zhen Zhou Wu*, 2011 WL 31345, at *10 n.9 (D. Mass. Jan. 4, 2011). Plaintiffs also cite Lattice's export control expert testifying at deposition that the datasheets would "definitely be one piece of information that you would want to look at in order to help identify what—how the item might be classified. That would be one piece of information [that] would be useful." ECF 298-3 at 3 (Depo Tr. 160:10-14); *see also* ECF 196-2 at 5 (Gariepy Depo Tr. 41:9-15) (deposition testimony of Lattice's former Vice President of Corporate and Customer Quality, Michael Gariepy, that Lattice's "customers would expect the product we shipped to meet the specifications listed in the data sheets").

Plaintiffs additionally point out that Lattice participated in the Department of Defense standard microcircuit drawings (SMD) program. An SMD "detail[s] the specific requirements of performance based microcircuits." ECF 160-46 at 53. To participate in this program, a

PAGE 7 – OPINION AND ORDER

manufacturer must provide a certificate of compliance or conformance that ensures the product meets the requirements of the SMD. ECF 160-3 at 16. Any change requires a notification. *Id.* Lattice's SMD identification for the two integrated circuits at issue in this lawsuit are 5962-8984103LA and 5962-9558701MXC. Both of these SMDs are case temperature rated parts. ECF 160-3 at 3, 160-4 at 4.

Lattice requested that purchasers use the SMD number when placing orders. *See, e.g.* ECF 160-1 at 7. On December 10, 2008, Apex ordered the integrated circuits at issue using their SMD numbers. Plaintiffs argue that Lattice exercised independent judgment on behalf of Apex in making representations regarding the characteristics of the integrated circuits, because Lattice was the only entity with knowledge of the characteristics of the integrated circuits and Apex needed to know those characteristics to make correct export decisions. Apex contends it then had a right to rely on (1) the SMD drawings, (2) Lattice's datasheets, and (3) the certificates of compliance sent by Lattice with the integrated circuits when they were shipped, confirming that they conformed to the SMDs. Apex argues those were representations that the circuits were case temperature rated. Thus, Apex determined the integrated circuits were not export controlled. Plaintiffs contend that Apex had no other way of ascertaining the export control status of the integrated circuits, and therefore the nature of the parties' relationship required Lattice to exercise its independent judgment and Apex to rely on Lattice. Plaintiffs contend this type of relationship between manufacturers and buyers is contemplated in the United States' Export Administration Regulations and the Commerce Control List.

Plaintiffs argue that there is an issue of fact whether the nature of Apex's relationship with Lattice, in which Apex must necessarily rely on Lattice for information regarding the export controlled status of the integrated circuits Apex purchases, and Lattice's required conduct under

the SMD program, created the requisite tort duty under Oregon law. Plaintiffs argue that because there was no way for Plaintiffs to know from looking at the circuits it purchased whether they were ambient or case temperature rated, Plaintiffs had to rely on Lattice. And the potential repercussions for incorrect export control decisions were not simply a loss of business income or other economic damage, but prison time and a complete destruction of Apex, which Lattice knew.

Plaintiffs also cite *Oksenholt v. Lederle Labs*, 51 Or. App. 419 (1981). In *Oksenholt*, a doctor relied on the representations of a drug manufacturer and prescribed the drug to a patient. 51 Or. App. at 421. The drug caused the patient significant harm. The Oregon Court of Appeals held:

> A special relationship exists between a doctor and a drug manufacturer. The doctor, in treating and prescribing drugs for patients, must rely on the drug company to inform him about the efficacy and use of various drugs. He expects to be told of any limits on their use and of any known harmful side effects. The court in McEwen made it clear that the doctor has a right to rely on the drug company and that the drug company has a corresponding duty to keep itself and the doctor informed of hazards associated with its prescription drugs. This duty is a necessary one. Doctors are not capable of testing and studying the effects of the various drugs they use; they must rely on the manufacturers. We hold that, because of this reasonable reliance and expectation, a doctor is entitled to protection against foreseeable harm he may suffer because he prescribes a particular drug without full awareness of its potential harm to his patients, where the doctor's lack of awareness is due to a breach of the duty owed to him by the drug's manufacturer.

*Id.* at 425-26.

*Oksenholt* analyzed the negligence claim based on foreseeability, because it was decided before the Oregon Supreme Court clarified Oregon's economic loss doctrine in *Ore-Ida Foods, Inc. v. Indian Head Cattle Co.*, 290 Or. 909 (1981), *Hale v. Groce*, 304 Or. 281 (1987), and *Onita*. The Oregon Court of Appeals discussed whether there was a special relationship between

PAGE 9 – OPINION AND ORDER

the drug manufacturer and the doctor in discussing the contours of the duty to inform owed by the drug manufacturer to the "learned intermediary," the doctor. *Id.* at 424-25. Plaintiffs argue that although *Oksenholt's* discussion was in a different context, the reasoning is equally applicable in the context of a special relationship under the economic loss doctrine.

Plaintiffs argue that, similar to the doctor in *Oksenholt*, Apex could not test the semiconductors to ascertain whether they were case or temperature rated and had to rely on Lattice's datasheets. Plaintiffs contend that this was reasonable reliance that created a special duty under these unique circumstances, despite the manufacturer-purchaser relationship.

Lattice replies that issuing datasheets and participating in the SMD program does not make every semiconductor manufacturer responsible for tort liability to their customers. Lattice emphasizes that Oregon courts repeatedly have rejected claims by purchasers who argued that they relied on sellers for information. *See, e.g.*, *VTech Commc'ns, Inc. v. Robert Half, Inc.*, 190 Or. App. 81, 90 (2003); *Moore Excavating, Inc. v. Consol. Supply Co.*, 186 Or. App. 324, 333-34 (2003); *Gladhart v. Or. Vineyard Supply Co.*, 164 Or. App. 438, (1999), *rev'd on other grounds*, 332 Or. 226 (2001). As the Oregon Court of Appeals emphasized in *Moore Excavating*, however, the key is the distinction "between a plaintiff who relies on representations, as plaintiff did here, and one who is 'placed in a position in which he had a *right* to rely' on representations." *Moore Excavating*, 186 Or. App. at 334 (quoting *Conway*, 324 Or. at 242 n.5) (emphasis in original). The Oregon Supreme Court explained in *Conway*:

> We must emphasize the distinction between Conway's relying upon the dean's misrepresentations and Conway's being placed in a position in which he had a *right* to rely upon Pacific University. In this case, by virtue of its verdict in Conway's favor, the jury found that Conway did, in fact, rely upon the dean's statement that the poor student evaluations "will not be a problem." However, if Conway and the university were not in the type of relationship in which the university had a special responsibility to act in

PAGE 10 – OPINION AND ORDER

>> Conway's behalf, Conway did not have a *right* to rely upon the university to achieve a particular outcome or result in his behalf.

324 Or. at 242 n.5.

Looking at the "agreement" between the parties, there were purchase orders sent by Apex and "commercial invoices" sent by Lattice. The purchase orders referenced the case-temperature rated SMD numbers, which are tied to the case-temperature rated datasheets. The Court previously described the dispute regarding Lattice's "commercial invoices." *De Jaray v. Lattice Semiconductor Corp.*, 2022 WL 4087788, at *4-5 (D. Or. Sept. 6, 2022). These documents were not how Lattice billed Apex for payment but were documents provided to customs, shipping brokers, and sent with the shipment, used for shipping purposes. Thus, Plaintiffs argue that they were not part of the parties' contractual relationship. Additionally, there is no evidence that Apex received any commercial invoices relating to the disputed integrated circuits. Further, of the 97 commercial invoices that Lattice argues were seized by the Canadian government in taking Apex's business records, 74 were redacted versions that did not have a reference to the ECCN and export control notice. In addition, of the 23 that were not redacted, most of them involved different types of products and *all* of them included the acronym "NLR" for "no license required." Plaintiffs also assert that all the invoices contained a second page of terms that included a statement that the devices conformed to their published datasheets. Even assuming the commercial invoices were part of the parties' "agreement," the purchase orders and invoices show not only a buyer-seller relationship but also a regulated industry that required the manufacturer to supply important information relating to export control status.

Lattice and Apex's relationship is not so simple as a party buying plants from a nursery (*Gladstone*) or buying pipe and glue (*Moore Excavating*). Apex purchased semiconductors. Some are export controlled and some are not. Making an incorrect determination about export

control status can have devastating consequences. The contractual relationship between Lattice and Apex shows that it was the type of relationship in which Lattice provided export control information to Apex. Export control status for some parts is based on temperature rating, which is outside the knowledge or control of the purchaser. This is information known only by the manufacturer, and the manufacturer must provide information regarding the characteristics of the semiconductor so that the buyer can make a determination about the export control status of the product the buyer is purchasing. Given the unilateral control Lattice had over this specific type of information, the Court finds that there is at least an issue of fact whether Lattice had a special responsibility to act on Apex's behalf in providing accurate information regarding the characteristics of the disputed integrated circuits and thus whether Apex had a right to rely on Lattice's representations that the microcircuits were case temperature rated. This will be a question for the factfinder.

**B.  Property Loss**

Plaintiffs further argue that at a minimum Apex is entitled to its property loss. Plaintiffs argue that Apex lost its inventory and real property when they were sold by the receiver at a "fire sale." Plaintiffs cite *Key Compounds LLC v. Phasex Corp.*, 2021 WL 3891586 (D. Or. Aug. 31, 2021). *Key Compounds* found property damage sufficient to support a negligence claim when the plaintiffs alleged "that they were deprived of the use of their equipment and property for over a year as a result of Defendants' negligence and that, when their property was returned, it had substantially diminished in value." *Id.* at *8. *Key Compounds* relied on *Lamka v. Keybank*, 250 Or. App. 486 (2012), *abrogated on other grounds by Alfieri v. Solomon*, 358 Or. 383 (2015). In *Lamka*, the Oregon Court of Appeals evaluated allegations that the "plaintiff lost the use and enjoyment of his boat for two years; furthermore, he alleged that the boat, when returned, was

less valuable as a result of someone else's use. Those allegations describe an injury beyond purely economic loss." *Id.* at 494 (quotation marks omitted).

Plaintiffs, however, do not claim a temporary loss of use of inventory or property that was returned in less valuable condition. Plaintiffs claim inventory and property that was sold for less than their actual value. That is purely economic loss. The Court rejects Plaintiffs' argument that they suffered property loss. This argument is moot, however, because the Court has rejected Lattice's motion on Plaintiffs' claimed economic loss.

## CONCLUSION

The Court DENIES Lattice's Motion for Summary Judgment on Apex's Negligence Claim. ECF 294.

**IT IS SO ORDERED**.

DATED this 1st day of November, 2023.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge
