# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**STEVEN A.W. DE JARAY,**
**PERIENNE DE JARAY,**
**DARREL R. OSWALD**, and
**APEX-MICRO MANUFACTURING**
**CORPORATION**,

        Plaintiffs,

    v.

**LATTICE SEMICONDUCTOR**
**CORPORATION**,

        Defendant.

Case No. 3:19-cv-86-SI

**ORDER ON MOTIONS IN LIMINE**

Joshua Berman, Elizabeth A. Moore, Zachary D. Melvin, Laura Logsdon, and Rita A. Fishman, PAUL HASTINGS LLP, 200 Park Avenue, New York, NY 10166; Isaac S. Glassman and Kimberly Anne Havlin, WHITE & CASE LLP, 1221 Avenue of the Americas, New York, NY 10020; Scott T. Weingaertner, GOODWIN PROCTER LLP, 620 Eighth Avenue, New York, NY 10018; and Timothy S. DeJong, Lydia Anderson-Dana, and Elizabeth K. Bailey, STOLL STOLL BERNE LOKTING & SHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204, Of Attorneys for Plaintiffs.

Derek F. Foran, STEPTOE LLP, One Market Plaza, Steuart Tower, Suite 1070, San Francisco, CA 94105; Geoffrey L. Warner, STEPTOE LLP, 633 West Fifth Street, Suite 1900, Los Angeles, CA 90071; Andrew J. Sloniewsky, STEPTOE LLP, 1330 Connecticut Avenue NW, Washington, D.C. 20036; James P. Bennett and Wendy J. Ray, THE NORTON LAW FIRM PC, 299 Third Street, Suite 200, Oakland, CA 94607; and Nicholas F. Aldrich Jr., Scott D. Eads, and Jason A. Wrubleski, SCHWABE, WILLIAMSON & WYATT, PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Both sides have filed motions in limine to exclude from trial certain evidence that the other side seeks to present. This Order first addresses Defendant's Motions in Limine against Plaintiffs' evidence (ECF 331), followed by Plaintiffs' Motions in Limine against Defendant's evidence (ECF 315).

## BACKGROUND

There are four plaintiffs in this lawsuit, consisting of three individuals and one corporation. The three individual plaintiffs are Steven A.W. de Jaray, Perienne de Jaray, and Darrell R. Oswald. From time to time, the Court will refer to these individuals collectively as the "Individual Plaintiffs." The corporate plaintiff is Apex-Micro Manufacturing Corporation, which the Court will refer to simply as "Apex."

Apex was an electronics manufacturing company based in Canada. It designed and manufactured electronic products and sub-assemblies, which it sold to customers for use in commercial, industrial, and consumer products. Steven A.W. de Jaray, whom the Court will refer to as "Mr. de Jaray," was the Chief Executive Officer (CEO) and Chairman of Apex and had an ownership interest in a company that was a shareholder of Apex. Perienne de Jaray, whom the Court will refer to as "Ms. de Jaray," is Mr. de Jaray's daughter. She worked at Apex in 2005. The Court sometimes will refer to Mr. de Jaray and Ms. de Jaray collectively as "the de Jarays." Darrell R. Oswald was a director of Apex and had an ownership interest in a company that was a shareholder of Apex. Apex is no longer in business.

There is one defendant in this lawsuit, Lattice Semiconductor Corporation, which the Court will refer to simply as "Lattice." Lattice is based in Oregon. Among other things, Lattice designs, makes, and sells various semiconductor (or computer) chips, which are also known as "integrated circuits" and are sometimes referred to simply as "ICs." One specialized type of

semiconductor chip (or integrated circuit or IC) that Lattice designed and sold is what is called a "field-programmable logic device." Field-programmable logic devices are sometimes referred to simply as "PLDs."

There are two models, or types, of PLDs that play a central role in this case. The Court will sometimes refer to these two types of PLDs (or these two types of integrated circuits) as the "2ICs." One of these 2ICs was designated by Lattice as "ispLSI 1048C-50LG/883 (SMD 5962-9558701MXC)." The other was designated by Lattice as "GAL22V10-15LD/883 (SMD 5962-8984103LA)." From time to time, the Court or a party may refer to these 2ICs as the "/883 PLDs." Lattice designed these 2ICs, and they were manufactured by or for Lattice in the Philippines.

Some semiconductor chips are export-controlled under the laws of the United States (and Canada), and some are not. If a semiconductor chip is export-controlled, an exporter may be required, under certain circumstances, to obtain an export permit (or license) from the applicable government (United States or Canada), depending on the location from which the product is being shipped. Apex and Lattice disagree over whether these two types (or models) of ICs (that is, the 2ICs, or the /883 PLDs) were export-controlled during the time relevant to this lawsuit. This is one of the questions that will need to be resolved at trial.

In 2003, Apex began buying PLDs from Lattice. At some point, Apex began buying from Lattice the 2ICs (or the /883 PLDs), among other computer chips. In December 2008, after Apex received in Canada a shipment of the 2ICs (or the /883 PLDs) that Apex bought from Lattice, Apex attempted to export these semiconductor chips to Hong Kong without first obtaining an export permit (or license). The Canada Border Services Agency (CBSA) seized, or detained, the shipment of the 2ICs at the Vancouver, British Columbia airport warehouse, believing that the

chips were ultimately destined for mainland China. The Court or the parties may sometimes refer to these 2ICs or the /883 PLDs as the "Seized Goods." Canadian law enforcement authorities also opened a criminal investigation into the de Jarays. About sixteen months later, in April 2010, Canadian law enforcement authorities charged the de Jarays with criminal violations of Canada's Export and Import Permits Act (EIPA) and Canada's Customs Act. In May 2010, the following month, Canadian government officials issued a press release describing the charges against the de Jarays. In August 2011, Canada suspended, or stayed, its criminal prosecution of the de Jarays and later dismissed all charges against Mr. and Ms. de Jaray.

Plaintiffs allege that these actions by the Canadian authorities caused injury to the reputations of the three Individual Plaintiffs (the de Jarays and Mr. Oswald) and caused Apex to lose money and go out of business. Plaintiffs also contend that these damages were caused by Lattice's failure to disclose to Plaintiffs that the 2ICs (or the /883 PLDs) were export-controlled. According to Plaintiffs, Lattice made certain statements, or representations, in Lattice's datasheets and other documentation associated with the 2ICs (or the /883 PLDs), which led Plaintiffs to believe that these semiconductor chips were not export-controlled. Plaintiffs allege that Lattice then "privately" reclassified these integrated circuits as "export-controlled" items, never told Plaintiffs but "secretly" told government agencies in the United States and Canada that they were export-controlled. Lattice denies many of the allegations and denies any liability or wrongdoing. Lattice contends that its documentation did inform Apex that the 2ICs (or the /883 PLDs) were export-controlled, that Apex did not rely on Lattice's documentation when it failed to seek export permits, that Apex was engaged in an intentional scheme to evade export control laws, and that any injuries suffered by Plaintiffs were not caused by Lattice.

In this lawsuit, Plaintiffs assert claims of negligence, negligent misrepresentation, fraud, and breach of the implied covenant of good faith and fair dealing. Specifically, Apex and Mr. de Jaray assert claims of negligence and negligent misrepresentation, all Plaintiffs assert claims of fraud, and Apex asserts a claim of breach of contract, specifically breach of the implied covenant of good faith and fair dealing. In his negligence and negligent misrepresentations claims, Mr. de Jaray seeks compensation for damage to his personal property that was seized by Canadian authorities during their search of his home. In their fraud claims, all three Individual Plaintiffs seek compensation for damage to their reputations, along with punitive damages. In its breach of contract claim, Apex seeks compensation for lost profits. Finally, in its fraud claim, Apex seeks compensation for lost profits, along with punitive damages.

Besides denying Plaintiffs' claims, Lattice asserts certain affirmative defenses. Lattice contends that any claim that Apex or the de Jarays may have is barred, or prohibited, by their own misconduct. Lattice also contends that any claim that any Plaintiff may have arose too long ago and is barred, or prohibited, by the applicable statute of limitations. Plaintiffs have the burden of proving each element of their claims, and Lattice has the burden of proving its affirmative defenses.

## STANDARDS

### A. Motions in Limine

A motion in limine, broadly defined, means "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40, n.2 (1984); *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (stating that a motion in limine is a "procedural mechanism to limit in advance testimony or evidence in a particular area"). As with other motions raised before trial, motions in limine "are useful tools to resolve issues which would otherwise clutter up the trial." *City of*

*Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017) (quotation marks omitted); *see also Luce*, 469 U.S. at 41 n.4 (explaining that a court may rule in limine "pursuant to the district court's inherent authority to manage the course of trials"). Further, "a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court. The district court may change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling." *Pomona*, 866 F.3d at 1070 (quotation marks omitted).

In many instances, however, rulings "should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016) (quotation marks omitted). To exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds." *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1167 (D. Nev. 2014) (quotation marks omitted). Thus, denial of a motion in limine to exclude certain evidence does not mean that all evidence contemplated by the motion will be admitted, only that the court is unable to make a comprehensive ruling to exclude the evidence in advance of trial. *Id.* at 1168.

## B.  Selected Federal Rules of Evidence

### 1.  Rule 104

Rule 104(b) provides that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." A court "may admit the proposed evidence on the condition that the proof be introduced later." Fed. R. Evid. 104(b). This is known as a "conditional" admission of evidence. The Ninth Circuit has explained the rule of conditional relevance:

> This rule provides that where the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. If the foundation

> evidence is sufficient to support a finding of fulfillment of the
> condition the item is admitted. Furthermore, if after all the
> evidence on the issue is in, pro and con, the jury *could* reasonably
> conclude that fulfillment of the condition is not established, the
> evidence is admitted, because the issue is for the jury. Only if the
> evidence is not such as to allow a finding, does the judge withdraw
> the matter from the jury's consideration. Of critical importance
> here, when determining whether the party introducing evidence has
> introduced sufficient evidence to meet Rule 104(b), *the trial court
> neither weighs credibility* nor makes a finding that the party has
> proved the conditional fact by a preponderance of the evidence.
> The court simply examines all the evidence in the case and decides
> whether the jury could reasonably find the conditional fact by a
> preponderance of the evidence.

*United States v. Evans*, 728 F.3d 953, 962 (9th Cir. 2013) (cleaned up) (emphasis in original). In

addition, among other reasons, when "justice so requires," a court may conduct a hearing outside

the presence of the jury on a preliminary question about whether certain evidence is admissible."

Fed. R. Evid. 104(c)(3).

### 2. Rule 401

Evidence is relevant if "it has any tendency to make a fact more or less probable than it

would be without the evidence . . . and the fact is of consequence in determining the action."

Fed. R. Evid. 401(a)-(b). "Relevancy simply requires that the evidence logically advance a

material aspect of the party's case." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188

(9th Cir. 2019) (quotation marks omitted).

### 3. Rule 403

Even if evidence is relevant, it should be excluded if its "probative value is substantially

outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence

is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis,

commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Advisory Committee's Notes on Fed. R. Evid. 403).

### 4. **Rule 408**

Evidence of furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—consideration in compromising or attempting to compromise a claim and statements made during compromise negotiations about the claim are generally prohibited to prove or disprove the validity or amount of the disputed claim. Fed. R. Evid. 408(a).

### 5. **Rule 608**

Except for certain criminal convictions described in Rule 609 of the Federal Rules of Evidence, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). A court, however, "may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness[.]" Fed. R. Evid. 608(b)(1).

### 6. **Rules 801, 802, 803, 804, 805, and 807**

Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay evidence is inadmissible unless otherwise provided for under a federal statute, the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court." Fed. R. Evid. 802. There are many exceptions to the rule against hearsay. Some exceptions apply regardless of whether a declarant is available to testify at trial. Fed. R. Evid. 803. Others apply only if the declarant is unavailable. Fed. R. Evid. 804. "Hearsay within hearsay" is only admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. Finally, there is a residual exception to the rule against hearsay. Fed. R. Evid. 807.

## DISCUSSION

### A.  Defendant's Motions in Limine

#### 1.   Defendant's MIL No. 1 (Communications with Government Authorities)
#### RULING: DENIED (WITH LIMITING INSTRUCTION UPON REQUEST).

Lattice asks the Court to exclude all evidence or argument regarding Lattice's communications with the Canadian and United States governments during any law enforcement investigation into the de Jarays. Lattice argues that its communications are absolutely privileged under federal and state law, are irrelevant, and are excludable under Rule 403. Lattice asserts that Plaintiffs have repeatedly stated that Lattice's communications with government authorities are relevant only to show Lattice's "internal beliefs" that the /883 PLDs (or 2ICs) sold to Apex were export-controlled under ECCN 3A001.a.2.c. Lattice further argues that from 2005 to 2008, Lattice consistently and repeatedly took the position, internally and externally, that its /883 PLDs (or 2ICs) were export controlled under "a.2.c." Thus, according to Lattice, what it internally believed is not a disputed issue. Lattice adds that one of the issues that is in dispute is whether Lattice held this view *only* internally and not did disclose its position to Plaintiffs. Lattice contends that it held this view consistently, both internally and externally, and did communicate this position to Plaintiffs.

In response, Plaintiffs state they seek to present evidence that Lattice was telling government agents that the /883 PLDs (or 2ICs) were "ambient rated," even though Lattice was saying the opposite to Plaintiffs through the datasheets and related documents. According to Plaintiffs, Lattice's assertion that it consistently took the position both internally and externally that its devices were ambient temperature-rated simply is false. Plaintiffs add that when Lattice was asked specific questions by government investigators, Lattice responded that the /883 PLDs (or 2ICs) are case temperature rated. Thus, this matter is in dispute and the testimony is relevant.

Regarding the issue of absolute immunity, the Court will assume without deciding that liability may not be based on statements made to law enforcement authorities conducting an already-initiated investigation and in response to questions asked by law enforcement. According to Plaintiffs, however, that principle is inapplicable here because Plaintiffs seek to introduce Lattice's statements only as evidence of what Lattice believed at the time.

Upon timely request by Lattice, the Court will consider giving a limiting instruction directing the jury that they may only consider Lattice's statements made to law enforcement investigators only as evidence of what Lattice believed at the time it made those statements and for no other purpose. The Court DENIES Defendant's MIL No. 1.

### 2.  Defendant's MIL No. 2 (Mr. de Jaray's Canadian Civil Action and Settlement) RULING: GRANTED IN PART AND DENIED IN PART.

Lattice asks the Court to exclude all evidence or argument relating to a settlement agreement between Mr. de Jaray and the Canadian Attorney General and the Attorney General's related alleged admission of liability. Lattice further asks the Court to exclude all evidence relating to the purported reasons why the Canadian government dropped its criminal prosecution against the de Jarays. Lattice offers three independent and alternative arguments in support of its motion. They relate to (1) Plaintiffs' purported abuse of discovery; (2) Rule 408, and (3) Rule 403.

#### a.  Discovery

Lattice asserts that Plaintiffs withheld from discovery evidence regarding the settlement, the settlement negotiations, and Canada's decision to drop its criminal prosecution of Mr. and Ms. de Jaray. Plaintiffs never produced the final signed settlement agreement, citing alleged confidentiality concerns, notwithstanding the fact that a protective order is in place in this case. Mr. de Jaray also refused during his deposition to answer questions regarding the settlement.

According to Lattice, Plaintiffs also refused to produce any information regarding their discussions with the Canadian government during which, Plaintiffs contend, the government admitted liability. This includes discussions concerning Mr. de Jaray's mediation with the Canadian government regarding Mr. de Jaray's lawsuit against the Canadian government alleging negligent prosecution.

In the Ninth Circuit, when a party invokes a privilege to avoid responding to discovery demands, the party cannot later use that withheld evidence at trial. *See Columbia Pictures Indus., Inc. v. Krypton Broad. of Birmingham, Inc*., 259 F.3d 1186, 1196 (9th Cir. 2001) (precluding witness from testifying at trial on matters the witness previously claimed were privileged); *Swan v. Miss Beau Monde, Inc*., 566 F. Supp. 3d 1048, 1066-67 (D. Or. 2021) (stating that a party may not use confidentiality and privilege as both a sword and a shield); *see also Roman v. MSL Capital, LLC*, 2019 WL 1449499, at *6 (C.D. Cal. Mar. 29, 2019) (granting motion in limine to exclude all testimony and documents not produced in response to discovery requests).

Plaintiffs respond by stating that they did not improperly withhold any discovery. According to Plaintiffs, the only documents in their possession, custody, or control that they did not produce were confidential mediation statements, which Plaintiffs contend are privileged under Canadian, Oregon, and federal law and the final, signed settlement agreement that Canada explicitly instructed Plaintiffs not to produce. Plaintiffs add that they told Lattice that they would produce these documents if Lattice sought and obtained an order from this Court compelling disclosure. Lattice, however, never requested such an order or filed a motion to compel. Plaintiffs add that they have otherwise produced all responsive communications in their possession, custody, or control, including documents held by Mr. de Jaray's counsel in Canada, including settlement communications. Plaintiffs further state that they even produced drafts of

the settlement agreement.[1] Because Lattice never moved to compel or otherwise sought any assistance from this Court and because Plaintiffs told Lattice that they would not oppose any such motion, this is not a situation of confidentiality or privilege being used as both a sword and a shield. Thus, the Court will not preclude Plaintiffs' evidence on this basis.

### b. Rule 408

Lattice also contends that Rule 408(a) of the Federal Rules of Evidence bars the admission of evidence regarding any settlement agreement or settlement discussions when offered "to prove or disprove the validity or amount of a *disputed claim*." Fed. R. Evid. 408(a) (emphasis added). According to Lattice, that is what Plaintiffs are trying to do here. Lattice asserts that Plaintiffs intend to argue the Canadian government's decisions to drop its criminal prosecution, enter a settlement with Mr. de Jaray, and "admit liability" refute Lattice's assertion that Plaintiffs' damages were caused by their own misconduct—*i.e.*, Plaintiffs' purported diversion scheme—rather than by any misrepresentations made by Lattice.

Plaintiffs respond that Canada's dropping of its criminal prosecutions did not arise during any settlement discussions. Plaintiffs add that Canada's "admission of liability" also did not arise during any "settlement negotiations" but only in response to Mr. de Jaray's filing of a lawsuit. Plaintiffs further argue that even evidence that is otherwise covered by Rule 408 may be received "for another purpose." Fed. R. Evid. 408(b).

---

[1] Plaintiffs did not obtain the final, signed settlement agreement until March 2022, when it was produced to them after this Court authorized letters rogatory. Plaintiffs, however, did not produce that final, signed agreement to Lattice because, Plaintiffs explain, the Canadian government told them not to do so. Plaintiffs informed Lattice of their concerns but also told Lattice they would not object if Lattice sought an order from this Court compelling production. As noted, Lattice did not move to compel or otherwise seek any assistance from this Court. Plaintiffs add that Lattice has suffered no prejudice because earlier counsel for Plaintiffs, Bracewell LLP, produced a draft of the settlement agreement in 2020, which, Plaintiffs state, is identical to the final settlement agreement other than it being unsigned. *See* ECF 359-5.

Finally, Plaintiffs state that they offer this settlement evidence in support of their claim against Lattice, which is a claim different from the one subject to the negotiations. The text of Rule 408 provides that compromise offers and related negotiations are not admissible "either to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). The meaning of "disputed claim" was thoroughly discussed in a case decided by the Eastern District of New, *Westside Winery, Inc. v. SMT Acquisitions, LLC*, 511 F. Supp. 3d 256 (E.D.N.Y. 2021). In that case, Senior District Judge Denis R. Hurley explained:

> The term "disputed claim" refers to the claim subject to the settlement negotiations offered for admission. "[I]t is well established that 'Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, not some other claim.'" *Williams v. Regus Mgmt. Grp., LLC*, 2012 WL 1890384, at *3 (S.D.N.Y. May 15, 2012) (quoting *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1293-94 (6th Cir. 1997)) (emphasis added).

> Accordingly, Rule 408 expressly permits admitting settlement negotiations "offered for another purpose." Offering settlement negotiations "for another purpose" includes offering them in a claim different from the one subject to the negotiations. *See Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d. Cir. 1989) ("Evidence of an offer to compromise, though otherwise barred by Rule 408, can fall outside the Rule if it is offered . . . for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle" (emphasis added)). As one well-respected treatise puts it:

>> Perhaps the largest group of [Rule 408 'another purpose'] precedents involves the use of compromise evidence where the compromise agreement is the basis for the claim rather than circumstantial evidence of the validity of the claim being compromised. For example, if suit is brought for breach of a settlement contract, Rule 408 does not prevent the plaintiff from proving the agreement.

> 23 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5314 (2d. ed. 2020) (emphasis added) (footnotes omitted).

In case there was any doubt, the House Judiciary Committee notes to the 2006 amendment to Rule 408 cited favorably *Cates v. Morgan Portable Building Corp.*, 780 F.2d 683 (7th Cir. 1985). *See* Fed. R. Evid. 408 committee notes to 2006 amendment. The *Cates* Court held that Rule 408

> provides that statements made in settlement negotiations are not admissible to establish a party's liability, or damages, in the dispute that was the subject of the negotiation. Nothing [defendant] said or agreed to in the negotiations that culminated in the execution of the [settlement] stipulation in September 1973 could have been used to establish its liability for the breach of contract that occurred in September 1970 or to fix its damages for that breach.... Obviously a settlement agreement is admissible to prove the parties' undertakings in the agreement, should it be argued that a party broke the agreement.

*Cates*, 780 F.2d at 691 (emphasis added). *Cates's* holding accords with Rule 408's cardinal policy consideration favoring the compromise and settlement of disputes.

> *The policy behind Rule 408 is best understood to reflect the wisdom that settlement negotiations proceed from a desire to end a case, not from a concession that the case is lost—hence the prohibition against their admission in the case the negotiations were meant to settle.*

*Westside Winery*, 511 F. Supp. 3d at 265-66 (emphasis added).

The Court follows the reasoning expressed in *Westside Winery*. Because the dispute between Plaintiffs and Lattice is not the same dispute that Mr. de Jaray settled with Canada, Rule 408 does not bar the evidence being offered.

### c.  Rule 403

Finally, Lattice argues that any probative value that may come from the evidence of at issue in Defendant's MIL No. 2 would be greatly outweighed by the risk of unfairly misleading or confusing the jury. Lattice argues that if the jury were informed of the fact of the Canadian settlement or purported "admission of liability," there is a substantial risk that the jury

improperly would conclude that there is no merit to Lattice's assertion that Plaintiffs attempted secretly to sell Lattice's /883 PLDs (or 2ICs) despite knowing that they were subject to export control.

Plaintiffs respond that they should be allowed to present evidence of: (1) the reasons Canada dropped its criminal prosecution; (2) that Canada admitted liability to Mr. de Jaray; and (3) the existence of a settlement agreement between Canada and Mr. de Jaray. According to Plaintiffs, Canada dismissed its prosecution of the de Jarays on August 4, 2011, less than a week after it received the Gariepy Report. Mr. de Jaray then initiated a civil lawsuit against Canada asserting a claim for negligent prosecution on November 3, 2011. (Trial Ex. 178.) On May 13, 2013, counsel for the Canadian Department of Justice sent a letter to Mr. de Jaray's counsel stating, "I have instructions to admit liability in this matter." (Trial Ex. 99.) The parties then began settlement discussions and, on November 20 and November 21, 2013, participated in a confidential mediation under the auspices of the Canadian Federal Court, and the parties reached a settlement on November 21, 2013. Further, Plaintiffs explain that Lattice has asserted affirmative defenses based on the doctrines of unclean hands and *in pari delicto*, arguing that Plaintiffs were engaged in a wrongful diversion scheme. Plaintiffs seeks to present this evidence to rebut these affirmative defenses.

### i.  Canada's Dropping of Criminal Charges

At trial, the jury will learn that Mr. and Ms. de Jaray were arrested by Canadian law enforcement authorities and charged with violations of Canada's export control laws. It would be unfair to Plaintiffs for the jury not to learn that Canada dismissed those charges, including the timing of that dismissal in relation to the Gariepy Report. To this extent, the Court denies Lattice's motion.

It is unclear to the Court, however, precisely what parties mean when they refer to the "reasons" why Canada dropped its prosecution. As just explained, Plaintiffs may present evidence relating to the Gariepy Report and its temporal relation to Canada's dismissal of criminal charges. If Plaintiffs seek to present any other evidence purporting to explain why Canada dismissed the criminal charges against Mr. and Ms. de Jaray, Plaintiffs must first present that evidence to the Court outside the presence of the jury. The Court may then hold a Rule 104 hearing.

### ii. Canada's Purported "Admission" and Settlement of Civil Claim

Evidence of Canada's purported admission of liability and its decision to settle Mr. de Jaray's civil claim raise different issues under Rule 403 than the fact that Canada declined to continue its criminal prosecution. Here, the Court must begin its analysis under Rule 403 with an assessment of the probative value of this evidence.

In the letter from the Canadian Department of Justice dated May 13, 2013, signed by Senior Counsel Deborah J. Strachan, Ms. Strachan begins:

> This is to confirm my email correspondence of May 7, 2013 during which I advised you that I have instructions to admit liability in this matter.

Trial Ex. 99. Plaintiffs, however, have not listed Ms. Strachan on their witness list. Nor have Plaintiffs listed Ms. Strachan's email correspondence of May 7, 2013 as a trial exhibit. Thus, there is no clarity on precisely what Canada will be admitting liability about, and any statement providing that clarity would likely be in the form of inadmissible hearsay.

Further, the Court has reviewed the unsigned copy of the purported settlement agreement. ECF 359-5 (which also does not appear on Plaintiff's trial exhibit list). Nothing in this document indicates any "admission of liability." Instead, it provides only that Canada will pay Mr. de Jaray a specified sum and that this settlement will resolve Mr. de Jaray's civil claim against Canada. It

also confirms that the criminal charges brought against Mr. de Jaray were stayed on August 4, 2011, and "resolved by a settlement agreement reached on November 21, 2013." *Id*. at 8. There is no further explanation for why the criminal charges were dropped or what "admission of liability" was purportedly made by Canada. Similarly, Mr. de Jaray's civil claim (Trial Ex. 178) does not provide clarity on these points. Indeed, it makes allegations relating to both the criminal charges and to the issuance of the press release. Further, as the *Westside Winery* decision explains, "settlement negotiations proceed from a desire to end a case, not from a concession that the case is lost." *Westside Winery*, 511 F. Supp. 3d at 266. Thus, based on the record currently before the Court, the probative value of the proffered evidence is slight because there is no clarity on what was the purported "admission of liability" or the reasons for settling the civil action.

On the other side of the equation, there is a substantial risk of confusing the jury, unfair prejudice, and even wasting time (for example, exploring why Canada settled a civil lawsuit that Mr. de Jaray brought against Canada but Lattice did not settle this action that Plaintiffs brought against Lattice). Whether Lattice's affirmative defenses have merit (which is Lattice's burden to prove) should be decided by the jury based on the party's evidence, not based on speculation on why Canada decided to settle Mr. de Jaray's civil claim and about what, if anything, Canada admitted liability.

The Court GRANTS IN PART AND DENIES IN PART Defendant's MIL No. 2.

### 3.  Defendant's MIL No. 3 ("Rated for Operation")

**RULING: GRANTED IN PART.**

Lattice asks the Court to exclude all evidence or argument suggesting that the phrase "rated for operation" as used in the U.S. Commerce Control List (CCL) means something other than "designed" for operation, as decided by the Ninth Circuit in *United States v. Yi-Chi Shih*, 73

F.4th 1077 (9th Cir. 2023). Specifically, Lattice asks the Court to preclude Plaintiffs from presenting evidence (including through expert witness testimony) that "rated for operation" refers *only* to a manufacturer's public specifications. As Lattice expressly stated in its Reply, however, "Lattice does not dispute that a manufacturer's datasheets may be relevant evidence to consider when assessing the 'design' of the product." ECF 418 at 8.

In response, Plaintiffs assert that they have never argued that "rated for operation" refers only to a manufacturer's public specifications. Instead, Plaintiffs contend that Lattice included temperature ratings in its datasheets, that doing so is typical in the semiconductor industry, and that purchasers are entitled to rely on published temperature ratings.

The Court will not allow any party to provide a definition to the jury that is contrary to law. Thus, no party may argue that under the relevant regulations "rated for operation" means anything other than "designed for operation." The Court, however, will allow Plaintiffs to present evidence that Lattice included temperature ratings in its datasheets, that doing so is typical in the semiconductor industry, and that purchasers are entitled to rely on published temperature ratings when making decisions regarding whether to seek an export control permit. To this extent, the Court GRANTS IN PART Defendant's MIL No. 3.

### 4. Defendant's MIL No. 4 (Whether the /883 PLDS are Export Controlled) RULING: DENIED.

Lattice asks the Court to exclude all evidence or argument suggesting that the /883 PLDs (or, the 2ICs), including the Seized Goods, are *not* export-controlled under U.S. law. According to Lattice, the United States Department of Commerce has determined that the Seized Goods were expert-controlled under ECCN 3A001.a.2.c of the U.S. Commerce Control List (CCL). (Trial Exs. 563 and 572.) Lattice relies on the Ninth Circuit's decision in *United States v. Spawr Optical Res., Inc.*, 864 F.2d 1467, 1472-73 (9th Cir. 1988), among other authorities.

In response, Plaintiffs note that the Court has already rejected Lattice's argument that *Spawr* applies and is preclusive on this point. *See* ECF 293 at 8-9 (laying out "several aspects here that are distinguishable from *Spawr*" and denying Lattice's request to file a motion for summary judgment). The Court DENIES Defendant's MIL No. 4.

### 5. Defendant's MIL No. 5 (2017 Canyon Bridge Acquisition)
### RULING: GRANTED.

Lattice asks the Court to exclude all evidence or argument concerning the potential acquisition of Lattice in 2017 by a private equity fund called "Canyon Bridge." Lattice argues that the proposed acquisition was being considered years after the relevant events in this case and six years after Lattice had discontinued selling military-grade PLDs. Lattice adds that it had stopped selling—or, in the jargon of the industry, had "EOL'd" (mean, "end-of-life'd")— military products in 2011. According to Lattice, this evidence should be excluded as irrelevant or, alternatively, as confusing and unfairly prejudicial under Rule 403.

In response, Plaintiffs state that in November 2016, Lattice and Canyon Bridge announced a definitive agreement under which Canyon Bridge would acquire all outstanding shares of Lattice. The Agreement and Plan of Merger appended a Company Disclosure Letter that was provided by Lattice. (Trial Ex. 54.) Section 3.13(d) of the Company Disclosure Letter includes a list of U.S. Export Control Classification Numbers (ECCNs) by Product Family as of September 2016. Section 3.13(d) lists the product families for the 2ICs most at issue here: GAL (for the GAL22V10-15LD/883) and ispLSI 1000 (for the ispLSI 1048C-50LG/883). For both the GAL and ispLSI 1000 families, Lattice lists an ECCN of EAR99, which means that the products are subject to the Export Administration Regulations but do not need an export license and are not subject to U.S. ECCN 3A001.a.2.c. According to Plaintiffs, that is contrary to the position that Lattice is taking in this lawsuit.

Plaintiffs also note that Lattice argues, citing the deposition testimony of Darin Billerbeck, that Section 3.13(d) does not refer to the GAL and ispLSI "military-grade" products, but only the commercial and industrial products from the same product family. Plaintiffs add that before Mr. Billerbeck gave that testimony, counsel for Lattice made a lengthy speaking objection in which he stated on the record that Section 3.13(d) only refers to the commercial versions of the GAL and ispLSI 1000 products, even though nothing on the face of Section 3.13(d) makes this distinction. Plaintiffs also state that Mr. Billerbeck then testified that the GAL22V10-15LD/883 and ispLSI 1048C-50LG/883 products had been EOL'd (*i.e.*, discontinued) in 2011, which meant that this 2016 document could not be referring to the "military" versions of these products. Plaintiffs also state that Lattice had EOL'd the commercial versions of these products before 2016 too. From this, Plaintiffs conclude that Mr. Billerbeck's attempt to explain away the inclusion of EAR99 in Lattice's disclosure falls flat.

The Court concludes that the proffered evidence regarding the 2016 announcement and disclosure letter with Canyon Bridge are too far afield from the much earlier events directly at issue in this lawsuit. The Court finds that the minimal probative value of this evidence is substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time. The Court excludes this evidence under Rule 403 and GRANTS Defendant's MIL No. 5.

### 6.  Defendant's MIL No. 6 (Chitron Electronics)
**RULING: GRANTED.**

Lattice moves to exclude all argument and evidence regarding the criminal prosecution and ultimate acquittal of two executives of Chitron Electronics, Inc. (Chitron), who were charged in a United States federal court with violating U.S. export control laws. Plaintiffs previously raised this issue in support of their Lanham Act claim, which no longer is in this lawsuit. Plaintiffs previously alleged that the indictment of the two Chitron executives was another

instance of Lattice customers being misled by Lattice's datasheets. According to Lattice, this evidence should be excluded as irrelevant or as confusing and unfairly prejudicial under Rule 403.

In response, Plaintiffs acknowledge that the jury verdict sheet from the *Chitron* trial does not explain why the executives who were prosecuted for purchasing and exporting Lattice "military-grade" products without an export license were acquitted but argue that verdict forms rarely explain a jury's reasoning for an acquittal in a criminal case. Plaintiffs state that Lattice sent prosecutors in the *Chitron* case a list of ECCNs for Lattice products purchased by Chitron in December 2008. (Trial Ex. 111.) Lattice then sent that same list to BIS in January 2009. *Id*. The list enumerates an ECCN of 3A001.a.2.c.—*i.e*., rated for operation over an ambient temperature range—for various products, including one of the 2ICs (*see* Row 10). According to Plaintiffs, this communication is an example of Lattice telling government officials that the 2ICs were ambient rated, during the same period when Apex and the de Jarays were being investigated, despite Lattice's datasheets showing only case temperature ratings. Plaintiffs further assert that this communication is relevant to Plaintiffs' fraud and negligence claims because it shows Lattice's "pattern" of making representations inconsistent with its datasheets, which bears on Lattice's "state of mind."

The Court concludes that the proffered evidence regarding the criminal prosecution and ultimate acquittal of the two Chitron executives has minimal, if any, probative value and any probative value it may have is substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time. The Court excludes this evidence under Rule 403 and GRANTS Defendant's MIL No. 6. Plaintiffs, however, may ask knowledgeable Lattice witnesses whether Lattice consistently represented after 2004 that the products most at issue in

this case (*i.e.*, the 2ICs) were regulated under ECCN 3A001.a.2.c. If a knowledgeable Lattice witness denies this, the Court will allow Plaintiffs to seek reconsideration of this ruling.

### 7.   Defendant's MIL No. 7 (Emotional Distress Damages)
**RULING: GRANTED.**

Lattice moves to preclude the Individual Defendants from seeking emotional distress damages. According to Lattice, "[e]very claim in Plaintiffs' complaint is predicated on a single theory of liability: that Lattice harmed Plaintiffs by misrepresenting certain specifications in the /883 PLDs datasheets on which Plaintiffs relied." ECF 331 at 19. Lattice adds that the Individual Plaintiffs, and especially Ms. de Jaray, seek damages for "severe" emotional harm resulting from their alleged reliance on the datasheets. Regarding Ms. de Jaray, Lattice notes that Plaintiffs' exhibit list includes a psychiatric "Patient Profile" as well as other medical records and a medication history. Trial Exs. 243 and 245. Regarding Mr. de Jaray, Lattice states that Plaintiffs' lay witness list discloses he intends to testify about the "humiliation" he endured, his loss of personal and familial relationships, and other emotional harms suffered, including those associated with being prosecuted and the prospect of imprisonment. Lattice argues that emotional distress damages are unavailable for the claims that will be presented to the jury.

In response, Plaintiffs rely upon *Emmert v. Clackamas County*, 2015 WL 4077239, at *17 (D. Or. May 12, 2015) ("The Oregon Supreme Court has awarded non-economic damages based on allegations of fraud."), *report and recommendation adopted as modified*, 2015 WL 4078780 (D. Or. July 1, 2015) (citing *Williams v. Philip Morris Inc*., 344 Or. 45, 49 (2008)), and *Miller v. J-M Manufacturing Co*., 2008 WL 356932, at *3 (D. Or. Feb. 7, 2008) ("A prevailing plaintiff in a tort action in Oregon is entitled to recover both non-economic and economic damages."). Plaintiffs also cite *Staley v. Taylor*, 165 Or. App. 256 (2000), in which the Oregon Court of Appeals observed that there are four categories of cases in which a plaintiff may

recover emotional distress damages in the absence of physical injury, one of which is "intentional torts." *Id.* at 264-65. Plaintiffs acknowledge that fraud is not one of the intentional torts explicitly listed in *Staley* but note that at least one recent case declined to dismiss a fraudulent misrepresentation claim for emotional distress damages even though there was no allegation of physical injury. *See Butters v. Travelers Indem. Co.*, 2023 WL 2988763, at *21 (D. Or. Jan. 23, 2023) (denying motion to dismiss when the plaintiff's allegations suggested that the defendant's misrepresentations "resulted in unwarranted and baseless fraud and SIU investigations and caused him non-economic damages"), *report and recommendation adopted as modified*, 2023 WL 3559472 (D. Or. May 18, 2023).

Plaintiffs add that under Oregon law, a fraud claim permits the recovery of all damages that are "a direct and necessary result of defendant's acts or omissions*." Oksenholt v. Lederle Lab'ys*, 294 Or. 213, 223 (1982). Plaintiffs also note that Oregon law separately permits the recovery of emotional distress damages without physical injury under exceptional circumstances, including where there is intentional misconduct by a person in a position of responsibility and with knowledge that it would cause "grave distress." *Hammond v. Cent. Lane Commc'ns Ctr.*, 312 Or. 17, 22 (1991). Plaintiffs further state that in *Mooney v. Johnson Cattle Co.*, 291 Or. 709, 717-18 (1981), the Oregon Supreme Court allowed the plaintiff to seek emotional distress damages in an interference with contract claim where those damages were the natural and probable consequence of the defendant's wrongful conduct.

On July 5, 2023, the Court ruled that fraud is the only claim that may be presented to the jury by all three Individual Plaintiffs. The Court held that none of the Individual Plaintiffs were in a special relationship with Lattice, thereby precluding negligence and negligent misrepresentation theories by the Individual Plaintiffs to recover economic loss. The Court,

however, did allow Mr. de Jaray's negligence and negligent misrepresentation theories to

proceed but only to recover for physical damage to his personal property that was seized by

Canadian law enforcement officers when they executed a search warrant at Mr. de Jaray's home.

Further, the Court ruled that Ms. de Jaray could not seek emotional distress damages under a

negligence theory because she did not previously allege physical harm and it was too late to add

that allegation well after the close of discovery. Finally, although the Court found that none of

the Plaintiffs presented a genuine issue for trial on whether Lattice *intended* to defraud them,

there was a genuine issue for trial on whether Lattice acted in reckless disregard of whether its

statements were true or false or made them with knowledge that it lacked sufficient information

to justify its statements. Thus, the Court allowed Plaintiffs' fraud claim to proceed but only on

that narrow basis. ECF 277.

The question now before the Court is whether, under Oregon law, the Individual

Plaintiffs may ask the jury to award emotional distress damages solely on their claim of fraud,

which has been restricted to a theory of recklessness, rather than intentional misrepresentation, in

this case involving the commercial sale of goods to a business. This issue is more nuanced than

is reflected in the written arguments of either side. For the reasons explained below, the Court

holds that no Individual Plaintiff may recover emotional distress (or non-economic) damages

under the facts alleged in this case.

The starting point for this analysis is a recent decision from the Oregon Supreme Court.

In *Moody v. Oregon Community Credit Union*, 371 Or. 772 (2023), the Oregon Supreme Court

summarized the state of the law on recovery of emotional distress damages as follows:

> Generally, . . . people do not have a legally protected interest in
> being free from emotional distress, and, to date, this court has
> permitted common-law tort claims for emotional distress damages
> only in the following three circumstances: (1) when the defendant

> also physically injures the plaintiff; (2) when the defendant
> intentionally causes the emotional distress; or (3) when the
> defendant "negligently causes foreseeable, serious emotional
> distress and also infringes some other legally protected interest."

*Id.* at 784 (quoting *Philibert v. Kluser*, 360 Or. 698, 702 (2016)). Indeed, this has been

recognized as the law in Oregon for more than forty years.

In 2016, the Oregon Supreme Court explained:

> In *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or. 543,
> 558-61, 652 P.2d 318 (1982), we mapped the landscape of cases
> addressing claims for emotional distress damages and explained
> the framework that guides recovery for those injuries. Oregon
> allows plaintiffs to recover damages for emotional distress when
> they are physically injured . . . and when the defendant acted
> intentionally. At issue here is a third basis recognized in *Norwest*
> for recovery of damages for emotional distress: when a defendant
> negligently causes foreseeable, serious emotional distress and also
> infringes some other legally protected interest.

*Philibert*, 360 Or. at 702.

Regarding the second category, *i.e.*, when the defendant intentionally causes the

emotional distress, Oregon law has permitted the recovery of emotional distress damages in

cases proving the following intentional torts: intentional infliction of severe emotional distress;[2]

invasion of privacy;[3] conversion (when there is aggravating conduct on the part of the

---

[2] *See McGanty v. Staudenraus*, 321 Or. 532, 543-44 (1995).

[3] *See Anderson v. Fisher Broad. Cos.*, 300 Or. 452, 469 (1986).

defendant);[4] assault and battery;[5] defamation;[6] and wrongful initiation of a civil proceeding or malicious prosecution.[7] Notably, no Oregon appellate decision has ever approved the recovery of emotional distress damages for a fraud claim, especially in a business-to-business commercial context.

In 1978, the Oregon Supreme Court expressly noted that compensatory damages in an action for fraud are limited to a plaintiff's *pecuniary* loss. The court stated:

> It is well established in this state that, in an action for fraud, plaintiff's recovery is *limited* to that measured by the "out-of-pocket" rule unless the actionable misrepresentation was a warranty of value, in which case plaintiff could recover under the "benefit-of-the-bargain" rule.

*Galego v. Knudsen*, 281 Or. 43, 51 (1978) (emphasis added).

Moreover, the Oregon Supreme Court's statement in *Galego* is entirely consistent with: (1) the Restatement (Second) of Torts; (2) one of the leading treatises on the law of torts; and (3) the case law found in many other states. Section 525 of the Restatement (Second) of Torts provides:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit *for pecuniary loss* caused to him by his justifiable reliance upon the misrepresentation.

---

[4] *See Fredeen v. Stride*, 269 Or. 369, 373 (1974); *Douglas v. Humble Oil & Ref. Co.*, 251 Or. 310, 312-13, 317 (1968) ("Mental suffering is not compensable in the ordinary trespass or conversion action" but may be recoverable when the plaintiff's home was "ransacked and left in disorder" by the defendant who also removed some of the plaintiff's personal property, including records of a personal nature).

[5] *See Lamb v. Woodry*, 154 Or. 30, 43 (1936).

[6] *See Wheeler v. Green*, 286 Or. 99, 124 (1979).

[7] *See Lee v. Mitchell*, 152 Or. App. 159, 180 (1998).

*Id.* (emphasis added). Section 549 of the Restatement (Second) of Torts similarly describes the measure of damages for fraudulent misrepresentation as limited to pecuniary loss.

In addition, one of the leading treatises, DOBBS' LAW OF TORTS, explains:

> *Emotional harm damages.* Emotional harm damages are not ordinarily recoverable in a misrepresentation action based on commercial dealings such as ordinary purchases of property, although they might be recovered when misrepresentation is an operative fact in some other cause of action and in cases where the fraud invades personal rights such as those recognized in insurance bad faith claims. Emotional harm damages might also be recoverable if the defendant's misrepresentation also amounted to the independent tort of intentional infliction of emotional distress.

Dan B. Dobbs, *et al.*, THE LAW OF TORTS § 689 (2d ed.) (footnotes omitted) (collecting cases).[8]

Further, a recent law review note explains: "At least seventeen (and as many as nineteen) states limit recovery in fraud cases to pecuniary damages, awarding monetary compensation only for measurable economic losses." Jonathan G. Lester, *The True Benefit of the Bargain: How Emotional Distress Damages Make Fraud Victims Whole*, 62 B.C. L. REV. 703, 719 (2021). Among those seventeen states, the author includes Oregon and cites *Staley* with the following parenthetical description: "holding that the plaintiff's claim did not fit within the state's permitted categories for emotional distress recovery in the absence of physical injury." *Id.* at 719 n.118.

In response to Lattice's motion, Plaintiff cites both *Staley* and *Emmert*. In *Staley*, the plaintiff alleged, among other things, breach of express contract, breach of implied contract, and

---

[8] Section 689 of *Dobbs* ends with this sentence: "And where punitive damages awards are made, they may represent in part unacknowledged damages for emotional distress." That, however, is not allowed under Oregon law. *See* Oregon UCJI 75.02 ("A jury may award punitive damages to punish misconduct and deter similar misconduct from occurring in the future."); *see also* Ninth Circuit Model Jury Instr. (Civil) No. 5.5 ("The purposes of punitive damages are to punish a defendant and to deter similar acts in the future. Punitive damages may not be awarded to compensate a plaintiff.").

fraud. The plaintiff's dispute with the defendants in that case centered on how the defendants' house blocked the ocean view from the plaintiff's house. The defendants previously had made several statements to the plaintiff that when they built a house on their empty lot, they would not block the plaintiff's view. *Id*. at 258. According to the plaintiff, she was "distressed by the fact the defendants blocked her view at all." *Staley*, 165 Or. App. at 265. Addressing the availability of emotional distress damages, the Oregon Court of Appeals stated:

> Even if plaintiff would otherwise be able to recover emotional distress damages, *a point on which we express no opinion*, there was no evidence from which the jury reasonably could determine the emotional distress damages that defendants' fraud caused. The trial court correctly granted defendants' motion for judgment notwithstanding the verdict on plaintiff's fraud claim.

*Id*. (emphasis added). Thus, *Staley* does not assist Plaintiffs' position.

Plaintiffs also cite *Emmert*, in which a U.S. Magistrate Judge stated: "The Oregon Supreme Court has awarded non-economic damages based on allegations of fraud." 2015 WL 4077239, at *17. In full context, however, the court's discussion in *Emmert* reads:

> *Absent physical injury*, recovery of damages for mental distress is allowed where there is an independent basis of liability in certain cases, such as in certain intentional torts. *Meyer* does not stand for the proposition that non-economic damages are never recoverable under an intentional tort claim as a matter of law. In fact, the Oregon Supreme Court has awarded non-economic damages based on allegations of fraud. *See, e.g., Williams v. Philip Morris Inc*., 344 Or. 45, 49 (2008).

*Id.* (emphasis added). The *Williams* case, however, cited by the *Emmert* court involved a lawsuit brought by the personal representative of Mr. Williams, who was a smoker who died of lung cancer. His personal representative sued the tobacco company Philip Morris Inc. for fraudulently and negligently causing the death of Mr. Williams. Because *Williams* fits cleanly within the *first* category discussed by *Moody*, namely emotional distress that accompanies physical injury, neither *Emmert* nor *Williams* shed light on the question now before the Court.

Similarly, in *Butters*, the Court declined to dismiss the plaintiffs' claims against his fire insurance company, alleging breach of contract, intentional infliction of emotional distress, and fraud. Plaintiffs here quote in part the following statement from that case: "Plaintiff's allegations also suggest that Defendant's alleged misrepresentations resulted in unwarranted and baseless fraud and SIU investigations and caused him non-economic damages." *See Butters*, 2023 WL 2988763, at *21. Immediately following this statement quoted by Plaintiffs, however, the court in *Butters* simply noted that in *Staley*,  the Oregon Court of Appeals expressed "no opinion" on whether a plaintiff could recover emotional distress damages for fraud without physical injury. *Id.*

Further, in *Oksenholt*, although the court made the broad statement that Plaintiffs quote above, that comment was *dicta*. The focus of the court's discussion there was whether the plaintiff in that case, a physician, could recover the amount he paid in settlement to a patient who sued the physician for malpractice after the physician relied on the false statements of the defendant pharmaceutical company when prescribing that company's drug to his patient, who then suffered permanent vision loss. The court held that the plaintiff physician "may not recover for the cost of the settlement because that would essentially be a recovery in indemnity." *Oksenholt*, 294 Or. at 223. Accordingly, the *Oksenholt* case does not assist Plaintiffs here.

Returning to the three categories of cases in which a plaintiff may recover emotional distress damages in a tort claim, as expressly stated by the Oregon Supreme Court in *Moody*, *Philibert*, and *Norwest*, this case does *not* involve physical injury to a plaintiff (the first category) or a defendant causing emotional distress while also infringing another legally protected interest (the third category). Thus, the only category that might be possibly relevant is the second category, which is when a defendant intentionally causes emotional distress. No Oregon

appellate case, however, has allowed recovery of emotional distress damages in such a claim for fraud. Indeed, it would be difficult to imagine a case in which a person who was defrauded did not suffer emotional distress, thus turning every claim of fraud into a vehicle to recover emotional distress damages. In any event, the Court concludes, as the Oregon Supreme Court stated in *Galego*, that compensatory damages in a claim for fraud, at least in a commercial context that does not involve either accompanying physical injury or injury to another protected interest, is limited to pecuniary damages, especially when the fraud claim is based on the mental state of recklessness. Accordingly, the Court grants Defendant's MIL No. 7 and will preclude all evidence and argument relating to any Individual Plaintiff's alleged emotional distress.

### 8. Defendant's MIL No. 8 (Parts Change Notices)

**RULING: GRANTED.**

Lattice moves to exclude all argument and evidence regarding any suggestion that U.S. government regulations for the Standard Microcircuit Drawings (SMD) procurement program required Lattice to issue a Parts Change Notice (PCN) to customers in 2004 notifying customers, including Plaintiffs, that Lattice had recharacterized its PLDs as ambient temperature rated. In Plaintiffs' Trial Memorandum (ECF 318), Plaintiffs state that in 2004, Lattice sent a letter to its sales agents advising them that Lattice had recharacterized its MIL-STD-883-compliant PLDs as ambient temperature rated. ECF 159-33 at 059–61. According to Lattice, however, the U.S. Department of Defense standard that governs PCNs, MIL-PRF-38535, provides that PCNs are only required to be issued if a manufacturer has made a change to a product that affects "form, fit, or function." Trial Ex. 13 MIL-PRF-38535F, eff. 2004); Trial Ex. 7; Trial Ex. 14 MIL-PRF-38535H, eff. March 2007) (deleting "prior to the release of the affected product). Lattice further argues that the parties agree that the devices themselves did not change. Thus,

Lattice concludes, Plaintiffs should not be permitted to mislead the jury into believing that a PCN was required.

In response, Plaintiffs state that they should be permitted to present evidence that Lattice could have (or should have) issued a PCN in 2004 when it re-rated the 2ICs as ambient temperature PLDs. Plaintiffs argue that before 2004, Lattice did not classify the 2ICs as ECCN 3A001.a.2.c. Starting in 2004, however, Lattice began internally classifying the 2ICs under ECCN 3A001.a.2.c. According to Plaintiffs, this is a change to the thermal characteristics of the product, *i.e.*, the function of the product. Plaintiffs contend that under MIL-PRF-38535F, Lattice should have issued a notification, such as a PCN, and amended its datasheets to alert its customers that it would be classifying the 2ICs as ambient temperature rated PLDs on a going-forward basis. *See* Trial Ex. 7 (MIL-PRF-38535F) at § 3.3.4 ("The manufacturer shall have a system that shall include procedures for notification of change that affects form, fit, and function, to all known acquiring activities.")

Among other things, Lattice replies that, as Plaintiffs acknowledge, the 2ICs (or, the /883 PLDs) did not "did not change one iota during the relevant time period." ECF 418, at 15, quoting ECF 358, at 24. Under either version of the Military Standard, MIL-PRF-38535H (effective March 2007) or MIL-PRF-38535F (effective "in" 2004), § 3.3.4 addresses "Change control procedures," not classification decisions. That provision requires manufacturers of military-grade semiconductors to "have a system that shall include procedures for notification of change that affects form, fit, and function." This relates to "design methodology changes," "fabrication process changes," "assembly process changes," "package changes," and "test facility changes." The provision does not concern charges merely to classifications under the CCL. Plaintiffs may not argue otherwise. The Court, however, will not preclude Plaintiffs from arguing that nothing

precluded Lattice in 2004 (or later) from notifying its customers that Lattice had recharacterized its MIL STD 883-compliant PLDs as ambient temperature rated, just as Lattice notified its own sales agents of that change.

### 9. Defendant's MIL No. 9 (Alleged Lost Stock Value and Legal Fees)

Lattice moves to exclude all references to damages in the form of alleged lost stock value and legal fees. The Court will address each item separately.

**RULING: DENIED IN PART AND DEFERRED IN PART.**

### a. Lost Stock Value

**RULING: DENIED.**

In the Court's Opinion and Order dated July 5, 2023 (ECF 277), the Court noted that the Individual Plaintiffs cannot recover for injuries to corporate entities, finding that they cannot pursue damages for injuries to Apex, AMFD, and Footstone Jive. Lattice contends that, notwithstanding this ruling, the Individual Plaintiffs will try to introduce evidence to support recovery of corporate damages. In Plaintiffs' Trial Memorandum (ECF 318), Plaintiffs state that Lattice "destroyed" Apex and that Apex was Steve de Jaray's "life's work" and a "meaningful asset" to Darrell Oswald causing him to lose his "investment." In addition, in their witness statements (ECF 313), Plaintiffs state that Lattice's actions caused Steve de Jaray to be unable to start other businesses, including wineries, and Ms. De Jaray was unable to obtain a liquor license.

In response, the Individual Plaintiffs affirm that they are not seeking to recover for the lost business value of AMFD, Footstone Jive, or Portrait Winery. Instead, they are seeking to recover for their reputational harms allegedly caused by Lattice. According to the Individual Plaintiffs, there is evidence showing that Mr. de Jaray's wineries failed because he could not escape his tarnished reputation, and the same is true of Ms. de Jaray and the deli that she ran.

Plaintiffs add that they are entitled to testify about the time, money, and resources they invested in these enterprises in attempt to rebuild their lives, only to have them fail when regulators or customers learned of their prior legal troubles. Plaintiffs argue that the amounts that Mr. de Jaray invested in his wineries (as opposed to the lost profits) is a measure of that reputational harm. *See Miller v. Equifax Info. Servs., LLC*, 2014 WL 2178257, at *5 (D. Or. May 23, 2014) (noting that when the plaintiff's damages included "lost reputation," the plaintiff was allowed to "present evidence of these alleged harms at trial"). Plaintiffs further contend that the jury should be allowed to consider whether these investment losses are consequential damages that foreseeably flowed from Lattice's alleged fraud. *See Logan v. Sivers*, 207 Or. App. 231, 245 (Or. Ct. App. 2006) ("Whether damages are foreseeable is a question of fact for the jury."), *aff'd in part, rev'd in part on other grounds*, 343 Or. 339 (2007).

The Court anticipates allowing both sides to present their evidence and arguments on this issue to the extent that this evidence relates to the claims of the Individual Plaintiffs for damage to their reputations. The Court will require Plaintiffs to provide an appropriate causal link, however, and may receive Plaintiffs' evidence of lost stock value only conditionally. *See* Fed. R. Evid. 104(b).

> **b.    Legal Fees**
>
> **RULING: DEFERRED.**

Lattice also seeks to preclude Plaintiffs from recovering legal fees and costs they paid in connection with their defense of the Canadian prosecution. According to Lattice, however, Plaintiffs did not produce law firm invoices as part of their initial disclosures under Fed. R. Civ. P. 26(a)(1)(A)(iii) or in response to Lattice's requests for production. In response, Plaintiffs note that Lattice does not challenge the recoverability of these expenses. Plaintiffs add that they cannot produce what they could not locate after a reasonable search. They argue that even if the

de Jarays cannot substantiate the amount of their legal fees to the penny, the jury is entitled to credit their "commonsense testimony" that they had to retain and pay lawyers substantial sums, about which they will testify, to defend them over the course of two investigations and a lengthy criminal prosecution.

Plaintiffs, however, may not ask the jury to speculate. Nor may they introduce inadmissible hearsay. Thus, before Plaintiffs may present to the jury their evidence of legal fees paid in connection with their defense of the Canadian prosecution, they must inform the Court and Lattice. The Court will then consider outside the presence of the jury whether that evidence is admissible. Fed. R. Civ. P. 104(c)(3). To this extent, the Court defers ruling on this portion of Defendant's MIL No. 9.

### 10. Defendant's MIL No. 10 (Canadian Judicial Findings)

**RULING: DENIED.**

Lattice moves to exclude all argument and evidence *contradicting* what Lattice contends are 17 separately numbered facts, which Lattice asserts were "judicial findings" in Canada made against Mr. de Jaray or Apex. These facts are:

> 1.    Apex was a client of the Bank of Montreal.
>
> 2.    In the period of late 2008 and 2009, the Bank of Montreal became increasingly concerned as deposits to Apex's accounts declined.
>
> 3.    Apex had promised to repay a temporary line of credit issued by the Bank of Montreal but failed to do so.
>
> 4.    The Bank of Montreal required submission of financial statements annually.
>
> 5.    The Bank of Montreal did not receive any financial statements from Apex Canada after the company's year-end in May 2007

6. No year-end financials were received by the Bank of Montreal in May 2008.

7. Only partial in-house financial statements were provided, with the last set prepared in February 2009.

8. As of April 30, 2009, Apex Canada owed the Bank of Montreal over $4 million.

9. In April 2009, the Bank of Montreal appointed a manager from its Special Accounts Management Unit to deal with what appeared to be Apex's increasing liabilities and decreasing bank deposits.

10. As of May 29, 2009, the operations of Apex appeared to be terminated. Apex's Surrey facility had been reduced to a repair shop for the small circuit boards made in the Apex America facility in Ferndale, Washington. Much of the manufacturing equipment had been transferred to the U.S.

11. As of June 5, 2009, Apex had ceased to meet its liabilities generally as they became due.

12. As of June 5, 2009, Apex had failed to pay the monies owing to the Bank of Montreal.

13. As of July 5, 2009, Apex had failed to pay Arrow Electronics Canada Ltd. the approximate sum of $215,873.85 USD.

14. As of July 5, 2009, Apex had failed to pay Future Electronics, Inc. the approximate sum of $301,328.23 USD.

15. Apex sued Global Plastics, claiming Global Plastics was bound by $3.69 million in purchase orders issued to Apex. It was Global Plastics' position that it had elected not to purchase additional product from Apex because of its substandard quality.

16. As of November 30, 2012 Mr. de Jaray and Apex had failed to tender any evidence to substantiate the prospect of success for Apex in proceedings against Global Plastics.

17. S.R. Telecom & Co. S.E.C. went bankrupt sometime prior to November 30, 2012. At the time of its bankruptcy, it owed Apex $1,481,698.40.

Trial Exs. 525 (2009 Decision) and 573 (2012 Decision).

According to Lattice, facts 11-14 were found by The Honourable Mr. Justice Smith in *In the Matter of the Bankruptcy of Apex-Micro Manufacturing Corporation*, Order (B.C.S.C. June 17, 2009), paragraph (a) (the 2009 Decision). Trial Ex. 525. Lattice states that these facts were found in the Order adjudging Apex bankrupt. Also according to Lattice, facts 1-10 and 15-17 were found by The Honourable Madam Justice Loryl D. Russell in her Reasons for Judgment in a case captioned *Bank of Montreal v. Tolo-Pacific Consolidated Indus., Corp*., 2012 BCSC 1785 (B.C.S.C. Nov. 30, 2012) (the 2012 Decision), ¶¶ 16-19, 26, 35, 52, 52, 55, 78(7), 85, 137. Trial Ex. 573. Lattice explains that the 2012 Decision was a related proceeding brought by the Bank of Montreal seeking to foreclose on a piece of property. Mr. de Jaray defended that action by arguing that the Bank of Montreal's appointed receiver in Apex's bankruptcy action acted improvidently. Critical issues in that case included the value of Apex's assets, the state of its affairs as of May 29, 2009, and the value and likelihood of success of the Global Plastics litigation and the possibility of recovery from S.R. Telecom. *Id*. ¶¶ 11-12, 55, 77-78, 85, 109-110, 137.

Lattice argues that "[t]here is no question that bankruptcy proceedings in Canada—a 'sister common law jurisdiction with procedures akin to our own'—are entitled to comity under appropriate circumstances." *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc*., 216 F. Supp. 2d 198, 212 (S.D.N.Y. 2002) (quoting *Clarkson v. Shaheen*, 544 F.2d 624, 630 (2d Cir. 1976)). Lattice adds that under Oregon law, issue preclusion is available if five requirements are met: (1) the issue in the two proceedings is identical; (2) the issue was actually litigated and was essential to a final decision on the merits in the prior proceeding; (3) the party sought to be precluded has had a full and fair opportunity to be heard on that issue; (4) the party sought to be precluded was a party or was in privity with a party to the prior proceeding; and (5)

the prior proceeding was the type of proceeding to which the court will give preclusive effect. *Safeco Ins. Co. v. Laskey*, 162 Or. App. 1, 10 (1999). Lattice asserts that all five requirements are satisfied here. Lattice adds that Plaintiffs are in privity with each other. According to Lattice, when a judgment is entered against, on the one hand, a closely held corporation or, on the other hand, its owners or managers, such judgment has a preclusive effect on the other party or parties. Restatement (Second) of Judgments, § 59(3)(a) ("The judgment in an action by or against the corporation is conclusive upon the holder of its ownership if he actively participated in the action on behalf of the corporation, unless his interests and those of the corporation are so different that he should have opportunity to relitigate the issue."); *Ditton v. Bowerman*, 117 Or. App. 483, 488 (1992) ("Section 59 [of the Restatement] accurately reflects Oregon law."); *Nat'l Ctr. For Conservation & Sci. Policy v. U.S. Forest Serv*., 2007 WL 1880748, at *10 (D. Or. June 28, 2007) (analyzing privity under § 59(3) but concluding its requirements had not been met).

In response, Plaintiffs state that they did not have an opportunity to be heard on the issues presented in the 2009 Decision. According to Lattice, the 2009 Decision itself shows that the only party present at the hearing was counsel for the petitioner, an Apex creditor. Plaintiffs also contend that the issues were not litigated but rather simply read by the petitioner and then accepted. Plaintiffs add that the issues in the 2009 Decision are not identical to the issues in the pending action.

Regarding the 2012 Decision, Plaintiffs acknowledge that there may be some overlap in the issues presented in that proceeding and the pending lawsuit, but they are still not identical. Plaintiffs add that the fact that the court in British Columbia recounted certain aspects of Apex's financial condition in the background section of its judgment does not render the issues identical. Moreover, Lattice has not shown that any of the 14 facts that Lattice has selected from

the 32-page 2012 Decision were "actually litigated" and "essential to a final decision on the merits," as opposed to being merely background or dicta.

The Court anticipates allowing both sides to present their evidence and arguments on this issue.

## B. Plaintiffs' Motions in Limine

### 1. Plaintiffs' MIL No. 1 (Military Grade)

**RULING: DENIED.**

Plaintiffs move to exclude all argument and evidence suggesting that the terms "military grade" or "MIL-STD-883," or that the testing performed by Lattice, means that the 2ICs (or the /883 PLDs) most at issue in this lawsuit were "rated for operation" to an ambient temperature. Plaintiffs argue that the terms "military grade" or "MIL-STD-883" are likely to mislead or confuse the jury. In response, Lattice notes that the evidence will show that both the Canadian and U.S. governments determined that Lattice's 2ICs (/883 PLDs) are export-controlled. Trial Exs. 484 and 577 (Canada 2009); Trial Ex. 563 (U.S. 2004); Trial Ex. 572 (U.S. 2012-2013). Although Plaintiffs point to the fact that the Canadian authorities dismissed their criminal charges that were filed against Mr. and Ms. de Jaray, Lattice asserts that the Canadian prosecutors expressly stated that despite terminating the criminal proceedings, "there were still reasonable grounds to believe that criminal offenses had been committed." Trial Ex. 586, at 24.

Plaintiffs also contend that because Lattice's datasheets refer to a "case" temperature, the PLDs cannot be export-controlled as a matter of law. Lattice responds by noting that under Ninth Circuit precedent, "rated for operation" means "designed for operation," citing *United States v. Yi-Chi Shih*, 73 F.4th 1077, 1092-94 (9th Cir. 2023). Lattice adds that among the many indicators that Lattice's 2ICs (/883 PLDs) were export-controlled were Lattice's repeated statements that

the goods were "military-grade" and processed in "compliance with MIL-STD-883," which Lattice contends is a well-known Department of Defense military standard.

The Court does not believe that the probative value of this evidence will be substantially outweighed by the risk of misleading or confusing the jury. Accordingly, the Court anticipates allowing both sides to present their evidence and arguments on these issues.

### 2.   Plaintiffs' MIL No. 2 (After-the-Fact Evidence)

**RULING: DENIED.**

Plaintiffs move to exclude all argument and evidence that Plaintiffs refer to as "after-the-fact evidence," showing that Bureau of Industry and Security (BIS) determined the 2ICs (/883 PLDs) to be ambient temperature rated. Plaintiffs refer to a 2004 settlement agreement between Lattice and BIS and certain BIS "license determinations" from 2012-2013. Plaintiffs contend that these documents should be excluded from trial. The Court addresses each category separately.

#### a.   2004 Settlement between Lattice and BIS

Regarding the 2004 Settlement, Plaintiffs assert that Lattice's settlement resulted from its voluntary disclosure of potential export violations to BIS but was based solely on data supplied by Lattice itself. According to Plaintiffs, BIS then issued a letter stating that certain Lattice PLDs are classified under ECCN 3A001.a.2.c. Although the letter does not identify the specific types of PLDs to which the letter was referring, Plaintiffs state that discovery in this lawsuit confirmed that they were *not* the 2ICs most at issue. Thus, argue Plaintiffs, Lattice should not be permitted to introduce at trial about a settlement with BIS that covers different products than these 2ICs.

In response, Lattice states that Plaintiffs themselves list the 2004 BIS determination on their exhibit list (Trial Ex. 20) and base their theory of liability as being that Lattice "secretly recharacterized" its 2ICs (/883 PLDs) in 2004. Lattice argues that it should be permitted to explain the reasons for its decision and that the BIS's 2004 determination is relevant for that

explanation. Lattice also responds to Plaintiffs' argument about this case only being about the specific 2ICs that were seized by Canadian authorities (*i.e.*, the Seized Goods). According to Lattice, Plaintiffs link their alleged injuries to the Canadian indictment of the de Jarays, but the de Jarays were not indicted only for failing to have export permits for the specific Seized Goods. According to Lattice, the de Jarays also were accused of violations concerning dozens of shipments of Lattice's /883 PLDs over a three-year period, including shipments of each PLD that was subject to BIS's 2004 determination. Trial Ex. 74. Moreover, Lattice notes that Plaintiffs state that they relied on datasheets "concerning the Seized Goods *and other integrated circuits*" (emphasis added) over the "course of dealings between Apex and Lattice spanning May 2005 to January 2009." Lattice argues that this takes the case beyond just the specific "2ICs" that were seized by Canada.

Moreover, Lattice argues that the 2004 decision is relevant to Lattice's statute of limitations defense. Lattice asserts that no later than October 2013, Plaintiffs had copies of the 2004 BIS determination (Trial Ex. 658), and, according to Lattice, this document shows that Plaintiffs were on notice of Lattice's "internal belief" more than five years before Plaintiffs filed this lawsuit.

The Court does not believe that the probative value of this evidence will be substantially outweighed by the risk of misleading or confusing the jury. Accordingly, the Court anticipates allowing both sides to present their evidence and arguments on these issues.

### b.  BIS 2012-2013 License Determinations

Plaintiffs state that in response to a subpoena issued by Lattice, BIS produced a series of letters from 2012-2013 addressed to federal prosecutors in the United States purporting to show BIS' determination that the 2ICs met the criteria for classification under U.S.

ECCN 3.A.001.a.2.c. Trial Ex. 563 (U.S. 2004); Trial Ex. 572 (U.S. 2012-2013). Plaintiffs assert that, for five alternative reasons, these 2012-2013 letters from BIS should be excluded from trial.

First, Plaintiffs argue that the BIS letters are irrelevant because they were issued nearly a decade after Lattice first described and sold the 2ICs to Apex with a datasheet (and SMDs) that stated a case temperature rating. In addition, Plaintiffs cite *U.S. v. Zhen Zhou Wu*, 711 F.3d 1, 17-20 (1st Cir. 2013), for the proposition that the trial court in that case erred by instructing the jury to accept the government's "after-the-fact determinations" that "phase shifters" were controlled under the United States Munitions List. Second, Plaintiffs assert that Lattice's representations to the United States government in 2012-2013 about the characteristics of the 2ICs contradict the representations that Lattice made to the Canadian government before the Canadian government dropped the criminal prosecution of the de Jarays. Third, Plaintiffs contend that the BIS letters were based exclusively on information that Lattice supplied to BIS and that BIS did not independently test or verify the representations Lattice made. Fourth, Plaintiffs state that the BIS letters stated an irrelevant "legal conclusion." According to Plaintiffs, when the Philippines-origin 2ICs were delivered in Canada to Plaintiffs (who are Canadian citizens), those integrated circuits were no longer subject to the U.S. export regulations. In support, Plaintiff again cite *Zhen Zhou Wu*, 711 F.3d at 17-20. Fifth, Plaintiffs argue that the BIS records are inadmissible hearsay, contending that these records are not admissible as "factual findings" under Fed. R. Evid. 803(8). Plaintiffs cite *Sullivan v. Dollar Tree Stores, Inc*., 623 F.3d 770, 777 (9th Cir. 2010). Plaintiffs add that whether an integrated circuit (or a semiconductor) is properly classified as ECCN 3.A.001.a.2.c is a "pure legal conclusion." Plaintiffs also state that even if that were not a legal conclusion, the "the source of information or other circumstances indicate a lack of trustworthiness" and thus should be excluded under Rule 803(8)(B). Fed. R.

Evid. 803(8)(B). In support of that conclusion, Plaintiffs cite *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 n.11 (1988).

In response, Lattice notes that when Plaintiffs opposed Lattice's motion for leave to file an additional motion for summary judgment, Plaintiffs argued that the export-controlled status of Lattice's 2ICs (/883 PLDs) is "not appropriate for resolution on summary judgment" because "[w]hether BIS made a licensing determination about the 2ICs at all . . . is sharply disputed." In support, Lattice cited ECF 289, at 8. Lattice also disputes Plaintiffs' reliance on the First Circuit's decision in *Zhen Zhou Wu*. According to Lattice, the holding in that case addressed the question of whether BIS determinations were binding, not whether they were *admissible*. The Court agrees.

Lattice also responds to each of Plaintiffs' five points. First, regarding whether BIS determinations are relevant, notwithstanding the fact that they were issued after the de Jarays were indicted, Lattice notes that Plaintiffs plan to argue that the United States chose not to prosecute the de Jarays because U.S. prosecutors concluded that the goods were not export controlled. Lattice states that when BIS issued these determinations, the U.S. investigation was still ongoing, adding that the investigations were why BIS issued the determinations. Lattice contends that it is entitled to refute Plaintiffs' inference that the United States determined that these goods were not export-controlled by pointing to BIS's contrary determinations.

Second, regarding the purported contradictory statements made by Lattice to the Canadian and United States governments, Lattice argues that there is no inconsistency in concluding that a PLD with an extended "case" range listed on its datasheet is controlled under an "ambient temperature" provision. Third, regarding Plaintiffs' inference that Lattice made misrepresentations to BIS in connection with BIS's determinations, Lattice argues that BIS's

determinations were based on the same datasheets on which Plaintiffs allege they relied. Trial Exs. 568 and 571. Thus, according to Lattice, regardless of when BIS made its determinations, those determinations are relevant to show that an informed reader would have understood from Lattice's datasheets that the devices were export-controlled under ECCN 3A0001.a.2.c.

Fourth, Lattice contends that, contrary to Plaintiffs' assertion, Lattice's /883 PLDs were still subject to the U.S. export regulations (*i.e*., the EARs) as the goods passed through Canada en route to Hong Kong. According to Lattice, because each PLD most at issue was "designed" in the United States, this satisfies the EAR's requirement of at least "de minimus levels" of "U.S.-origin technology" to continue to subject the devices to U.S. export regulations even outside of the United States. In support, Lattice cites 15 C.F.R. § 734.3(a)(3)(ii).

Fifth, Lattice responds to Plaintiffs' argument that the BIS determinations are inadmissible hearsay. Lattice argues that the determinations are public records admissible under Fed. R. Evid. 803(8)(A)(i) because they are a record of BIS's activities and show that BIS determined that the 2ICs (Lattice's /883 PLDs) are export-controlled under ECCN 3A001.a.2.c. Lattice adds that because the BIS determinations are admissible under subsection (i), Plaintiffs' contention that the determinations do not reflect "factual findings" under subsection (iii) of Rule 803(8)(A) is irrelevant. According to Lattice, they are admissible regardless of whether BIS's determinations are characterized as "factual" or "legal." Lattice adds that Plaintiffs have provided no basis from which the Court should conclude that the BIS letters are untrustworthy, which is Plaintiffs' burden. Finally, Latttice argues that even if the BIS determinations do not fit within Rule 803(8), they still may be received as non-hearsay to show what a reasonable reader would have understood from Lattice's datasheets, citing *In re Online DVD Antitrust Litig*., 2011

WL 5883772, at *3 (N.D. Cal. Nov. 22, 2011) (stating that a writing offered to show the author's beliefs is not offered for truth of matter asserted, overruling hearsay objection).

The Court agrees with Lattice's evidentiary arguments and anticipates allowing both sides to present their evidence and arguments on these issues.

### 3.  Plaintiffs' MIL No. 3 (Diversion Scheme)

**RULING: DENIED.**

Plaintiffs move to exclude all argument and evidence purporting to show a "diversion scheme" by Plaintiffs. Plaintiffs asserts that "[t]he 2ICs were no more [export] 'controlled' than a can of tennis balls, and the only possible effect of introducing documents showing shipments of the 2ICs to Mingwell, NanCan, or any other company with a presence in Hong Kong or mainland China, would be to smear Plaintiffs." ECF 315 at 13. Thus, Plaintiffs argue, this evidence is both irrelevant and unfairly prejudicial.

In response, Lattice states that the sole premise supporting Plaintiffs' argument, which is that the products most at issue were not export-controlled, is simply wrong, as explained in Lattice's motion to exclude Plaintiffs' expert witness Mr. Andrukonis. But, Lattice, adds, even if they were not, the evidence of Plaintiffs' purported diversion scheme still would be relevant. Lattice explains that this case is based on Plaintiffs' contention that Lattice's datasheets and other documentation supplied by Lattice to Plaintiffs reflected that the Seized Goods did not require an export permit and that in reliance on the representations in Lattice's product datasheets and other documents, Plaintiffs did not seek a Canadian re-export permit. Lattice seeks to introduce evidence of Plaintiffs' purported diversion scheme to rebut Plaintiffs' element of reliance. *See Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282, 296-97 (2013) (stating that a plaintiff's justifiable reliance on the alleged misrepresentation is required for a fraud claim); *Dinicola v. State*, 246 Or. App. 526, 547 (2011) ("reliance is a required element of a negligent

misrepresentation claim") (explaining the holding of *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 159 (1992))). Similarly, Apex's breach of the implied covenant claim requires that Plaintiffs' alleged injuries were caused by the alleged misrepresentation or omission that Plaintiffs allege were a breach of parties' implied covenant of good faith. *See Logan*, 207 Or. App. at 243 ("damages must be caused in fact by breach") (explaining the holding of *Dynapgraphics, Inc. v. U.S. National Bank of Oregon*, 100 Or. App. 108, 112-13 (1990).

Lattice seeks to introduce evidence that it asserts will show that Plaintiffs' conduct demonstrated a definite and firm belief that Lattice's /883 PLDs (or, the 2ICs) were export-controlled and that Plaintiffs sought to evade export control laws. For example, Lattice contends that Plaintiffs misrepresented to Lattice the actual end users (or end purchasers) of the military-grade PLDs, claiming they were intended for aircraft display boards at Boeing. In addition, Mr. de Jaray apparently forged a letter to support that story.

Plaintiffs also allegedly maintained that fiction for years, often referencing some new order of "display boards" or "FAA" issues. All the while, according to Lattice, Plaintiffs were secretly selling Lattice's /883 PLDs at a markup through Hong Kong to entities in mainland China controlled by Simon Wang, to whom Lattice had previously refused to sell. Lattice adds that Plaintiffs intentionally obscured identifying markings on Lattice's packaging and paperwork and "secreted" Lattice's /883 PLDs out of North America in shipments padded with random, obsolete parts. Further, when confronted by Canadian authorities, Plaintiffs said that Lattice's /883 PLDs were "Automotive Temperature Grade -40 to 125 Celsius TA [*i.e.*, 'ambient rated'] Devices," not devices that were "case temperature rated."

Moreover, Lattice argues that this evidence rebuts Plaintiffs' assertion of causation. Plaintiffs contend that their damages all flow from the Canadian indictment of the de Jarays,

which Plaintiffs allege would not have happened had they known the Seized Goods were export-controlled. But the de Jarays were indicted on two counts: (1) exporting goods without a permit; and (2) failing to report commercial goods in excess of $2,000. Trial Ex. 74. Lattice explains that Plaintiffs' theory of causation ignores Count Two, which was based on Plaintiffs' significant undervaluing of their shipments to avoid export searches. According to Lattice, this had nothing to do with "case" or "ambient" temperature ratings.

Finally, Lattice contends that this evidence is relevant to Lattice's affirmative defenses of *in pari delicto* and unclean hands. According to Lattice, Plaintiffs have unclean hands because they defrauded Lattice into doing business with them; repeatedly and persistently lied to Lattice about what they were doing with Lattice's goods; systematically falsified export documentation, including in violation of Canada's Customs Act; continued to dissemble to Lattice and Canadian authorities after they got caught; and sent and attempted to send export-controlled parts to mainland China, through Hong Kong.

The Court believes that this evidence is relevant and admissible and does not believe that the probative value of this evidence will be substantially outweighed by the risk of misleading or confusing the jury. Accordingly, the Court anticipates allowing both sides to present their evidence and arguments on these issues.

### 4. Plaintiffs' MIL No. 4 (Inducement)

### RULING: DENIED.

Plaintiffs move to exclude all argument and evidence purporting to show that Apex induced Lattice to sell Apex the 2ICs (the /883 PLDs) by misrepresenting the identity of Apex's end user, specifically that they were for use in Boeing aircraft display boards. According to Plaintiffs, Lattice only asked Plaintiffs "once" about Apex's end user, and Lattice did not ask about Apex's end-user for the 2ICs that were detained in December 2008 (*i.e.*, the Seized

Goods). Thus, Plaintiffs argue, this evidence is both irrelevant and unfairly prejudicial. Plaintiffs'

argument relates to Trial Exs. 314, 321, 323, 325, 326, and 327.

In response, Lattice states that Plaintiffs affirmatively misrepresented their end user to

Lattice up to and including in connection with its final purchase orders in December 2008.

Lattice adds that it put "Rockwell/Boeing" at the top of every certificate of conformance sent to

Apex because of Apex's representations. Lattice also responds to Plaintiffs' statement that

Plaintiffs' representation about its end user did not pertain to the "2ICs" most at issue by

asserting that Plaintiffs' statement is incorrect. According to Lattice, when Ms. De Jaray falsely

told Lattice's sales agent in 2005 that the PLDs would be used for Boeing aircraft, Ms. De Jaray

was in fact inquiring about one of the "2ICs," specifically SMD No. 5962-9558701MXC. Trial

Ex. 314. Lattice adds that Plaintiffs perpetuated their purported "Boeing/Rockwell deception" by

referencing a "build schedule for displays" when communicating about the December 2008

shipment. Trial Ex. 435, at 2.

The Court believes that this evidence is relevant and admissible and does not believe that

the probative value of this evidence will be substantially outweighed by the risk of misleading or

confusing the jury. Accordingly, the Court anticipates allowing both sides to present their

evidence and arguments on these issues.

### 5. Plaintiffs' MIL No. 5 (Darrell Oswald's Net Worth)
### RULING: DENIED.

Plaintiffs move to exclude all argument and evidence showing Darrell Oswald's (or any

other Individual Plaintiff's) net worth. Plaintiffs argue that this evidence is both irrelevant and

unfairly prejudicial. In response, Lattice explains that Mr. Oswald's testimony that he was able

to liquidate approximately $5 million in investments after the de Jarays were indicted and that he

believes himself to be a "successful" man is relevant to rebut Mr. Oswald's claim for

reputational harm. In support, Lattice cites *Tavoulareas v. Piro*, 93 F.R.D 11, 22 (D.D.C. 1981) (stating that a plaintiffs' salary and income is relevant to rebut a claim of reputational harm).

The Court believes that this evidence is relevant and admissible and does not believe that the probative value of this evidence will be substantially outweighed by the risk of misleading or confusing the jury or causing unfair prejudice. Accordingly, the Court anticipates allowing both sides to present their evidence and arguments on these issues.

### 6.  Plaintiffs' MIL No. 6 (2004 Settlement with British Columbia)
### RULING: DENIED.

Plaintiffs move to exclude all argument and evidence relating to Steven de Jaray's 2004 settlement with the British Columbia Securities Commission (BCSC). According to Plaintiffs, Mr. de Jaray's settlement with the BCSC involved his former company, AimGlobal Technologies Company, Inc. Plaintiffs argue that this evidence is both irrelevant and unfairly prejudicial. In support of their argument, Plaintiffs cite *U.S. Securities & Exchange Commission v. Jensen*, 835 F.3d 1100, 1116 (9th Cir. 2016), for the proposition that "[t]he consent decree was not evidence of culpability, but admitting the settlement into evidence would run the risk of permitting the jurors to succumb to the simplistic reasoning that if the defendant was accused of the conduct, it probably or actually occurred." (cleaned up).

In response, Lattice states that in 2004 the BCSC banned Mr. de Jaray from securities markets for nine years and imposed a $100,000 fine for his securities law violations. Trial Ex. 178 ¶ 18; Trial Ex. 307. Lattice argues that evidence of the settlement and securities ban are relevant for two reasons. First, this evidence rebuts Mr. de Jaray's allegations of reputational harm being caused only by Lattice's conduct. According to Lattice, these sanctions were made public—including in an article published shortly after the Canadian indictment of the de Jarays (Trial Ex. 557) —and remained in effect for several years after the indictment. Lattice seeks to

show that Mr. de Jaray's reputation was already tarnished before the Canadian criminal

investigation and indictment and to the extent his businesses struggled due to his poor reputation,

such losses were not attributable to Lattice (or at least not solely because of Lattice). In support,

Lattice cites *Bularz v. Prudential Insurance Co. of America*, 93 F.3d 372, 378-79 (7th Cir. 1996)

(noting that evidence of compromised reputation is relevant to rebut claimed reputational

damages), and *Munafo v. Metropolitan Transportation Authority*, 2003 WL 21799913, at *24

(E.D.N.Y. Jan. 22, 2003) ("Thus, court have found that where a plaintiff claims reputational

injury, defendants must be permitted to introduce specific evidence that the plaintiff's reputation

has already been compromised." (collecting authorities)).

 Second, Lattice contends that this evidence is relevant to show Mr. de Jaray's character

for untruthfulness. *See* Fed. R. Evid. 608(b)(1). Lattice explains that the BCSC sanctioned

Mr. de Jaray for committing insider trading and submitting misleading securities filings. In his

settlement with the BCSC, Mr. de Jaray admitted that he committed these violations. Trial

Ex. 435. Lattice cites *United States v. Gay*, 967 F.2d 322, 327-28 (9th Cir. 1992) (stating that

evidence of a civil injunction is admissible as impeachment evidence on cross-examination);

*United States v. Parker*, 790 F.3d 550, 558-59 (4th Cir. 2015) (noting that the government

violated its obligations under *Brady v. Maryland* by failing to disclose a witness's SEC

investigation, which would have been probative of untruthfulness under Rule 608(b)).[9]

---

[9] Responding to Plaintiffs' argument under Rule 403 and Plaintiffs' citation of *Jensen*, Lattice notes that in that case, the government sought to introduce evidence of an SEC consent order with a non-testifying third party as probative evidence of the defendant's guilt. *Jensen*, 835 F.3d at 1116. Further, in *Jensen*, that third party had agreed to the entry of a consent order "'[w]ithout admitting or denying the allegations' against him." *Id.* Thus, the probative value in *Jensen* was relatively low and substantially outweighed by the risk of unfair prejudice to the defendant. That is not the situation here. Finally, in their reply, Plaintiffs cite Rule 609 and Rule 404(2) of the Federal Rules of Evidence. In its opposition, however, Lattice cited

The Court believes that this evidence is relevant and admissible and does not believe that the probative value of this evidence will be substantially outweighed by the risk of misleading or confusing the jury or causing unfair prejudice. Accordingly, the Court anticipates allowing both sides to present their evidence and arguments on these issues.

## CONCLUSION

The Court resolves Plaintiffs' Motions in Limine (ECF 315) and Defendant's Motions in Limine (ECF 331) as stated in this Order.

**IT IS SO ORDERED**.

DATED this 16th day of January, 2024.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge

---

Rule 608(b)(1), which is the relevant evidence rule for this motion. Plaintiffs do not even mention that rule in their reply.