IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STEVEN A.W. DE JARAY, PERIENNE DE JARAY, DARRELL R. OSWALD**, and **APEX-MICRO MANUFACTURING CORPORATION**,<br><br>Plaintiffs,<br><br>v.<br><br>**LATTICE SEMICONDUCTOR CORPORATION**,<br><br>Defendant. | Case No. 3:19-cv-86-SI<br><br>**ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE OR LIMIT EXPERT TESTIMONY FROM JUSTIN LEWIS AND THOMAS ANDRUKONIS** |

Joshua Berman, Elizabeth A. Moore, Zachary D. Melvin, Laura Logsdon, and Rita A. Fishman, PAUL HASTINGS LLP, 200 Park Avenue, New York, NY 10166; Isaac S. Glassman and Kimberly Anne Havlin, WHITE & CASE LLP, 1221 Avenue of the Americas, New York, NY 10020; Scott T. Weingaertner, GOODWIN PROCTER LLP, 620 Eighth Avenue, New York, NY 10018; and Timothy S. DeJong, Lydia Anderson-Dana, and Elizabeth K. Bailey, STOLL STOLL BERNE LOKTING & SHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204, Of Attorneys for Plaintiffs.

Derek F. Foran, STEPTOE LLP, One Market Plaza, Steuart Tower, Suite 1070, San Francisco, CA 94105; Geoffrey L. Warner, STEPTOE LLP, 633 West Fifth Street, Suite 1900, Los Angeles, CA 90071; Andrew J. Sloniewsky, STEPTOE LLP, 1330 Connecticut Avenue NW, Washington, D.C. 20036; James P. Bennett and Wendy J. Ray, THE NORTON LAW FIRM PC, 299 Third Street, Suite 200, Oakland, CA 94607; and Nicholas F. Aldrich Jr., Scott D. Eads, and Jason A. Wrubleski, SCHWABE, WILLIAMSON & WYATT, PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Defendant Lattice Semiconductor Corporation (Lattice) has moved to exclude or limit testimony from Plaintiffs' expert witnesses Justin Lewis and Thomas Andrukonis. On January 19, 2024, the Court held a Rule 104 hearing and received testimony from Mr. Lewis and Mr. Andrukonis. The Court also heard oral argument from counsel.[1] The parties are familiar with the background facts in this case.[2] For the reasons explained below, Defendant's motions regarding Mr. Lewis and Mr. Andrukonis are granted in part and denied in part.

## STANDARDS

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the *proponent demonstrates* to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on *sufficient facts* or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a *reliable application* of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added).

---

[1] At the conclusion of the Court's hearing, Defendant orally withdrew Defendant's Motion to Exclude Expert Testimony from John Berg (ECF 324) and Plaintiffs orally withdrew Plaintiffs' Motion to Exclude Expert Testimony from Jennifer Marietta-Westberg and Ryan Fayhee (ECF 309). *See* ECF 442.

[2] For an earlier discussion of relevant background facts, *see* the Court's Order on Motions in Limine, ECF 432 at 2-5.

"Under *Daubert*[3] and its progeny, including *Daubert II*,[4] a district court's inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quotation marks omitted). "[T]he trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id*. at 564 (quotation marks omitted). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id*. at 565 (quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at 564. The judge must "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *City of Pomona*, 750 F.3d at 1043 (quoting *Alaska Rent-A-Car*, 738 F.3d at 969). In short, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id*. at 969-70 (alteration in original) (quoting *Alaska Rent-A-Car*, 738 F.3d at 969-70).

Further, a court must assess an expert's reasoning or methodology, using, when appropriate, criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463-64 (9th Cir. 2014) (en banc). But these factors are "meant to be helpful, not

---

[3] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[4] *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) (*Daubert II*).

PAGE 3 – ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY

definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (quotation marks and footnote citations omitted).

The test "is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 598 F.3d at 564 (quotation marks omitted). "The objective of [*Daubert's* gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 149. When an expert meets the threshold established by FRE 702, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 565. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. *City of Pomona*, 750 F.3d at 1044. "A district court should not make credibility determinations that are reserved for the jury." *Id*.

In *United States v. Holguin*, 51 F.4th 841 (9th Cir. 2022), the Ninth Circuit provided additional guidance for district courts when presented with challenges to the reliability of expert testimony. The court explained:

> [E]ven if not required, it will often be beneficial for district courts to conduct some proceeding, focused on the reliability of expert testimony, such as a *Daubert* hearing or voir dire of proffered expert testimony. Without such proceedings, it may be difficult in many cases for the district court to clearly discern an expert's methodology and to evaluate how that methodology connects to the expert's opinions. When an expert's methodology is directly presented and probed, the district court will be well positioned to make the reliability findings that our cases require, as discussed below. Moreover, such proceedings prevent the jury from hearing potentially prejudicial foundation testimony if the expert's opinions are ultimately excluded.

PAGE 4 – ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY

*Holguin*, 51 F.4th at 853 (citation omitted).

The Ninth Circuit also directed: "Reliability findings must be made 'explicit' on the record – an 'implicit' finding does not suffice." *Id*. The Ninth Circuit continued:

> To carry out its gatekeeping role, a district court must find that an expert's testimony is reliable – an inquiry that focuses not on what the experts say, or their qualifications, but what basis they have for saying it. A district court cannot be silent about reliability when challenged. . . .
>
> For some experts, the relevant reliability concerns may focus upon personal knowledge or experience. In such cases, the inquiry may cover whether the expert's experience supports the expert's conclusions, whether the expert's reasoning is circular, speculative, or otherwise flawed, or whether the expert's reasoning is adequately explained.

*Id*. at 854-55 (quotation marks and citations omitted). The court also noted: "The Rules Advisory Committee has explicitly recognized that the application of extensive experience is a method that can reliably support expert testimony." *Id*. at 855 (quotation marks omitted).

## DISCUSSION

**A. Defendant's Motion to Exclude Expert Testimony from Justin Lewis**

Plaintiffs offer Justin Lewis as an expert witness with more than 20 years of experience in financial auditing, forensic accounting, and damages-related work. Mr. Lewis is a Certified Public Accountant in California and has performed expert damage assessments in more than 200 matters. He performs valuation and compliance reviews both inside and outside the litigation context. Defendant does not challenge the expertise or qualifications of Mr. Lewis.

In his report dated May 20, 2022, Mr. Lewis defines "Apex" as collectively including Apex-Micro Manufacturing Corporation, Apex Micro America, Inc., and Caliber Component

Solutions Inc.[5] He also states that Steven de Jaray founded and operated American Micro-Fuel Device Corporation (AMFD or RideMaxx), Anchors Alpine Promotions (Tolo-Pacific Consolidated industries), Footstone Jive Winery, and Portrait Winery. Regarding Perienne de Jaray, Mr. Lewis states that she worked at Apex and RideMaxx. Regarding Darrell Oswald, Mr. Lewis states that he became an Apex director and invested $4 million (in Canadian dollars) to acquire a 35% minority stake in Apex. Relevant to the pending motion, Mr. Lewis states that he has calculated Plaintiffs' damages in the following two categories: (1) "Apex's" lost business value; and (2) Perienne de Jaray's lost "Apex" earnings. ECF 316 at 123.[6] Lattice challenges Mr. Lewis's opinions in both categories.

### 1. Lattice's Arguments Regarding "Apex's" Lost Business Value

Lattice first argues that Mr. Lewis improperly conflates the damages allegedly suffered by Plaintiff Apex Canada with the damages alleged suffered by its separately incorporated and wholly owned subsidiaries, including Apex America. Lattice also contends that Mr. Lewis uncritically, and thus improperly, relies on the income projections provided by Steven de Jaray and Darrell Oswald. The Court will discuss each objection in turn.

---

[5] The only business entity that is a Plaintiff in this lawsuit is Apex-Micro Manufacturing Corporation. In discussing Mr. Lewis's expert testimony and Defendant's related motion, the parties and Mr. Lewis often refer to Apex-Micro Manufacturing Corporation as "Apex Canada" and refer to Apex Micro America, Inc. as "Apex America." The Court will do the same.

[6] In his report dated May 20, 2022, Mr. Lewis also states that he calculated Plaintiffs' damages in the following additional four categories: RideMaxx Lost Business Value; Footstone Winery (Oregon) Lost Business Value; Portrait Winery (Hong Kong) Lost Business Value; and Disgorgement of Lattice's Profits. Based on the Court's rulings that came after Mr. Lewis prepared this report, these additional categories of damages are no longer relevant in this case and will not be presented at trial. Mr. Lewis also calculated Plaintiffs' prejudgment interest. Defendant objected to Mr. Lewis testifying before the jury about prejudgment interest, and the Court agrees. If applicable, that will be a matter for the Court after the trial has concluded.

### a. Whether Mr. Lewis Improperly Conflates Apex Canada and Its Subsidiaries

Lattice argues that Mr. Lewis does not calculate damages for Apex Canada, the only corporate plaintiff in this case. Rather, Mr. Lewis collectively defines "Apex" in his valuation of "Apex's lost business value" to include three separate business entities: Apex Canada, Apex America, and Caliber Component Solutions, Inc. Lattice is correct; that is how Mr. Lewis defines "Apex." ECF 325 at 9.[7] Lattice argues that a parent company may not recover damages incurred by its subsidiaries. Lattice also contends that "[t]he very documents Mr. Lewis himself cites show that Mr. Lewis has improperly commingled purported lost revenue, costs, and profits between these entities." *Id*. at 15.

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003); *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 625 (1983) (describing principle of corporate separateness as "an almost indispensable aspect of the public corporation" (internal quotation omitted)). A plaintiff "must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Franchise Tax Bd. v. Alcan Aluminum Ltd*., 493 U.S. 331, 336 (1989) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Applying this principle, courts have uniformly held that a parent company lacks standing to pursue claims for injuries suffered by its subsidiaries and is instead limited to pursuing claims "direct and independent of the injuries" that it has itself suffered. *See id*. at 333; *see also Virginia Sur. Co. v. Northrop Grumman Corp*., 144 F.3d 1243, 1246 (9th Cir. 1998) (concluding that a

---

[7] Mr. Lewis testified that he did not include any income or revenue from Caliber Component Solutions, Inc. in his calculation of "Apex's" lost business value, and Defendant presented no evidence to the contrary. Accordingly, the Court will disregard that entity in this discussion.

PAGE 7 – ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY

parent company alleged "a direct and independent injury" sufficient to support standing and was not merely complaining of injuries to its subsidiary); *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595-96 (9th Cir. 1983) (holding that a parent corporation "has no standing" to complain of injuries suffered by subsidiary); *Sovereign Asset Mgmt., Inc. v. Health Net Life Ins. Co.*, 2019 WL 4640397, at *3-*4 (C.D. Cal. Sept. 10, 2019) (same).

The Court accepts these legal propositions. Mr. Lewis, however, explains that his calculation of Apex Canada's damages does not improperly include any damages suffered by Apex America, notwithstanding how he defined "Apex." As Mr. Lewis explains, based on his discussions with Mr. de Jaray and Mr. Oswald and his review of the contemporaneous financial documents, Apex America was simply a manufacturing operation used by Apex Canada, and all revenues and income from goods made by Apex America flowed directly to Apex Canada. Mr. Lewis assumed and concluded that Apex America was a "cost center" and had no profits, and thus no profits to lose. According to Mr. Lewis, only Apex Canada suffered damages, not Apex America. The Court will attentively listen at trial to learn whether Mr. Lewis's factual assumptions are supported by admissible evidence.

Mr. Lewis also explains that he employed the Income Approach (also known as the "Discounted Cash Flow Approach") to calculating Apex's damages. *See also* ECF 316 at 123 (Lewis Report at 10). Using this approach, Mr. Lewis "projected Apex future sales, expenses, profits and cash flows." *Id*. at 131 (Lewis Report at 18). From these figures, Mr. Lewis developed two models, which he labeled "Apex Plan" and "Downside Case." *Id*. at 148 (Lewis Report at 35). In his Apex Plan model, Mr. Lewis used a discount rate of 28% and derived a lost enterprise value of $83 million. *Id*. In his Downside Case model, Mr. Lewis used a discount rate of 27% and derived a lost enterprise value of $39 million. *Id*.

In the application of an Income Approach, future projected revenues (both gross and net) are among the most important inputs (along with the selection of an appropriate discount rate, which Defendant does not challenge in its pending motion).[8] Appendix D to Mr. Lewis's report shows his projected gross revenues by customer. *Id*. at 234. Lattice correctly observes that a company called "Allsop" provides the largest projected revenues in Mr. Lewis's model, totaling $82 million. *Id*. Lattice also observes that RideMaxx is projected to provide $35 million in revenues. *Id*. Lattice then notes that Plaintiffs' Trial Ex. 287 is a draft unsigned contract between Allsop and Apex America, not Apex Canada. Lattice also notes that Mr. Lewis's own report describes RideMaxx as another name for AMFD, which is an entity distinct from Apex Canada. ECF 316 at 120 (Lewis Report at 7).

During his Rule 104 testimony, Mr. Lewis explained that, based on his discussions with Mr. de Jaray and Mr. Oswald, Apex Canada was going to be the entity that would earn and receive the revenues from Allsop, notwithstanding what is shown on the unsigned draft agreement reflected in Plaintiffs' Trial Ex. 287. Mr. Lewis also testified that, again based on his discussions with Mr. de Jaray and Mr. Oswald, Apex Canada was the entity that would earn and receive the revenues from the sale of RideMaxx products, which would simply be manufactured by either Apex America or AMFD. Mr. Lewis also noted that there were records of invoicing to Allsop from Apex Canada and accounts receivables due to Apex Canada from Allsop. If the facts presented at trial are consistent with Mr. Lewis's explanations, there would not be any violation of the legal rule that a corporate plaintiff may not recover for damages suffered by a wholly

---

[8] For purposes of the pending motion, Defendant does not challenge either Mr. Lewis's general methodology of using an Income Approach or his selection of his two discount rates. Defendant challenges only Mr. Lewis's application of that methodology, specifically whether his factual assumptions are adequately supported.

owned corporate subsidiary, and Mr. Lewis's methodology on this point would be sufficiently reliable to be admissible.

### b. Whether Mr. Lewis Relies on Improper Projections

Lattices also argues that "while presented under the guise of a 'discounted cash flow' (DCF) analysis and littered with professional-sounding terms like 'terminal value' and 'depreciation,' Mr. Lewis's damages numbers for 'Apex' (as he defines it) it are at bottom a credulous, wholesale adoption and repackaging of revenue 'projections' provided to him by Mr. de Jaray in May 2022—just days before Mr. Lewis submitted his report—which had recently been created for the purpose of this litigation." ECF 325 at 9. Lattice adds that Mr. Lewis did nothing to validate Mr. de Jaray's income projections. Thus, Lattice challenges the reliability of the income (or revenue) projections used by Mr. Lewis, which are a key component of his Income (or Discounted Cash Flow) Approach.

"The first key to a reliable DCF [discounted cash flow] analysis is the availability of reliable projections of future expected cash flows, preferably derived from contemporaneous management projections prepared in the ordinary course of business." *In re Appraisal of Petsmart, Inc.*, 2017 WL 2303599, at *32 (Del. Ch. May 26, 2017). "[A] court should exclude expert valuation testimony if the expert bases his analysis on an inappropriate set of cash flow projections, did not consider market values, and cannot explain the unreasonable implications of his analysis." *In re Iridium Operating LLC*, 373 B.R. 283, 350 (Bankr. S.D.N.Y. 2007).

As with Lattice's first objection, the Court accepts these legal propositions. During his Rule 104 testimony, Mr. Lewis explained that over the course of several months, totaling approximately 20 hours, he spoke with Mr. de Jaray and Mr. Oswald to develop, refine, and validate the revenue projections that he used in his Income Approach. He adds that he and his team requested and examined documents relating to the various customers from which the

PAGE 10 – ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY

projected revenues would be expected and evaluated them against various market data. These customers and the projected revenues from each customer are identified in Appendix D to Mr. Lewis's Report. ECF 316 at 234. During Defendant's cross-examination of Mr. Lewis during his Rule 104 testimony, Defendant raised many serious questions about the reliability of the projections that Mr. Lewis used, but based on Mr. Lewis's testimony during that hearing, the Court concludes that Mr. Lewis successfully crossed the threshold into the realm of admissible expert opinion. He says that he spoke with knowledgeable persons and reviewed relevant documents to confirm what he was told. He testified that if there was no contemporaneous evidentiary support, he did not include a customer in the projections. As previously noted, the role of the Court at this stage is to determine "not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 598 F.3d at 564. The Court will listen carefully to the facts presented at trial, but if they are as Mr. Lewis describes, then the determination of Apex's lost business value will belong to the jury and not to the Court.

For the reasons explained above, the Court denies Lattice's motion to exclude the testimony of Mr. Lewis as it relates to his opinion regarding the lost business value of Plaintiff Apex (*i.e.*, Apex Canada). The Court, of course, may revisit this issue either at trial after all evidence has been presented or even after trial, if necessary and appropriate.

**2. Lattice's Arguments Regarding Perienne de Jaray's Lost "Apex" Earnings**

In his Report, Mr. Lewis states that he "received tax documents that identify payments made to Perienne de Jaray in 2008." ECF 316 at 150 (Lewis Report at 37).[9] He notes that in 2008, Ms. de Jaray received $36,183 (in Canadian dollars) for gross wages from Plaintiff

---

[9] The Court notes that the parties have stipulated that Ms. de Jaray is the daughter of Mr. de Jaray and "worked in the quotations department of Apex in 2005, and as an executive of one of Apex [Canada]'s subsidiaries until 2009." ECF 422 at 2.

Apex Canada, which Mr. Lewis converted to $34,163 in U.S. dollars. *Id*. He then increased these wages each year based only on an Annual CPI index applicable to the Seattle-Tacoma-Bellevue, Washington region and derived "lost wages and/or other earnings" through May 20, 2022, in the total amount of $518,238. *Id*. Thus, after adjusting for an exchange rate, Mr. Lewis provides merely a mathematical calculation of the sum of $34,163 per year, increased annually by a standard inflation index, over a period that is slightly less than 14 years. This is the entirety of Mr. Lewis's expert opinion regarding Ms. De Jaray's alleged lost wages.

Although it is a defendant's burden to prove the affirmative defense of mitigation of damages, a plaintiff seeking lost wages must show that it is reasonable for a factfinder to conclude that the plaintiff would have continued to work during the period for which the plaintiff seeks lost wages. That is simply part of a plaintiff's burden of proving damages without undue speculation. Here, Mr. Lewis provides no basis and cites no evidence for why it would be reasonable to assume that but for Defendant's allegedly wrongful conduct Ms. de Jaray would have continued to work and earn $34,163 (in 2008 dollars) plus annual adjustments for inflation *for the next 14 years*.[10]

Defendant argues that such a duration for lost wages is speculative and must be excluded. In support, Defendant cites *Payan v. Los Angeles Community College District*, 2019 WL 8163479 (C.D. Cal. June 13, 2019). In that case, the district court held that the Los Angeles Community College District (LACCD) discriminated against the plaintiffs by failing to provide them with meaningful access to certain course materials in violation of Section 504 of the Rehabilitation Act, which protects students with disabilities. *Payan*, 2019 WL 8163479,. at *1.

---

[10] Plaintiffs offer no evidence that Ms. de Jaray intended and reasonably expected to be employed for the next 14 years. *See* ECF 313 at 8-10 (Plaintiffs' Lay Witness List, Statement of Perienne de Jaray).

The defendant moved in limine to exclude certain testimony from the plaintiffs' damages expert. The plaintiffs sought to call at trial a "vocational expert" who: (1) assessed the plaintiffs' professional work experience; (2) prepared a vocational assessment report to determine the plaintiffs' vocational abilities, knowledge, and skills; and (3) analyzed the plaintiffs' vocational outlook in conjunction with growth projections, available job openings, and salary levels for positions in the plaintiffs' desired fields of employment. *Id.*, at *2. The plaintiffs' expert assumed a two-year wage loss figure. In granting the defendant's motion in limine, the Court explained:

> [T]o support Mr. Growick's assumption of a two-year wage loss figure, Mr. Growick would have to conclude that the degree of alleged discrimination faced by Plaintiffs has caused Plaintiffs to complete their degrees two years later than they would in the absence of such discrimination. Such a conclusion about the educational repercussions stemming from disability discrimination appears to be outside of Mr. Growick's expertise and is unsubstantiated by Mr. Growick's expert report.

*Id.*, at *3. The court added:

> [T]he issue with Mr. Growick's opinions is not about the "weight" to be attributed to his factual underpinnings but about whether Mr. Growick should be permitted to assume facts outside of the scope of his expertise in reaching his conclusion.
>
> To illustrate, had Mr. Growick assumed that Plaintiffs suffered three years of lost wages as a result of LACCD's alleged discrimination, such a conclusion would be equally unfounded, because *no factual support exists in Mr. Growick's report for any conclusion regarding the duration of delay* in Plaintiffs' completion of their education at LACC directly attributable LACCD's alleged disability discrimination.

*Id*. at *4 (emphasis added).

The same problem is present here. There is simply no factual support identified in Mr. Lewis's Report for any assumption that Ms. de Jaray would have continued to be unemployed *for 14 years*. In his deposition, however, Mr. Lewis partially attempted to fill this gap. He was asked whether he "worked with occupational therapists or experts to determine the

PAGE 13 – ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY

employability of the . . . person claiming wage loss." He answered: "I think in this situation I was asked to assume the reputational harm continues to follow her and renders her *unemployable*." ECF 326-4 at 31 (Dep. of J. Lewis at 305:19-21) (emphasis added). Mr. Lewis does not hold himself out as an expert in employability. As he explained, he was simply asked to *assume* that Ms. de Jaray remained unemployable for the entire 14-year duration lasting from 2008 through 2022. There is, however, no evidence in the record that supports any such assumption. Indeed, all criminal charges were dismissed and "resolved by a settlement agreement reached on November 21, 2013." ECF 359-5 at 8.[11]

Finally, rather than present evidence about Ms. de Jaray's general unemployability for a 14-year duration, Plaintiffs state that "Ms. de Jaray will testify that, upon graduating Pepperdine University in 2005, she began working at Apex *with the intention of taking over the business from her father when he retired*." ECF 313 at 8 (emphasis added). To the extent that this is offered as evidence that but for Defendant's alleged wrongful conduct, Ms. de Jaray would have remained employed by Apex, and perhaps even become as officer or owner, this too is legally insufficient. In *Sawmill Products, Inc. v. Town of Cicero, Cook County, Illinois*, 477 F. Supp. 636 (N.D. Ill. 1979), a sawmill products corporation and its officers and shareholders sued a town and others, alleging violations of civil rights statutes. The district court held that although the corporation had standing to sue, the individual plaintiffs did not. *Sawmill Prods.*, 477 F. Supp. at 639. The court explained that the officers and shareholders of the corporation "allege no *direct* personal injury as a result of the defendant's conduct." *Id*. (emphasis added); s*ee also*

---

[11] The Court notes that Plaintiffs have not presented any expert testimony on the issue of Ms. de Jaray's unemployability from a qualified vocational or employability expert, nor have Plaintiffs presented lay evidence any repeated efforts over time by Ms. de Jaray to obtain employment and the reasons why she could not have found employment and even if she wanted to be employed during that entire 14-year duration.

*Program Eng'g, Inc. v. Triangle Publ'ns., Inc.*, 634 F.2d 1188, 1191 (9th Cir. 1980) (holding that a corporation's officer does not have standing to sue under the antitrust laws for harm done to the corporation and that the loss of salary is "merely incidental" to the alleged antitrust violation); *Erlich v. Glasner*, 418 F.2d 226, 229 (9th Cir. 1969) (recognizing "the uniform rule that generally a stockholder may not maintain an action in his own behalf for a wrong done by a third person to the corporation on the theory that such wrong devalued his capital stock").[12]

For the reasons explained above, the Court grants Lattice's motion to exclude the testimony of Mr. Lewis as it relates to his opinion regarding Perienne de Jaray's claim for lost earnings and wages. The Court notes that this is based on legal issues, not any methodological deficiency in Mr. Lewis's analysis.

## B.  Defendant's Motion to Exclude Expert Testimony from Thomas Andrukonis

Plaintiffs offer Thomas Andrukonis as an expert in U.S. and foreign export controls and related sanction matters. Mr. Andrukonis has more than 40 years of experience in export controls and sanctions matters. He has worked in both the Export Administration division and the Export Enforcement division of the U.S. Department of Commerce's Bureau of Industry and Security (BIS) for 41 years, administering and enforcing the Export Control Reform Act and Export Administration Regulations (EARs). Lattice does not challenge the expertise or qualifications of

---

[12] The Court recognizes that Ms. de Jaray has alleged a "direct personal injury" caused by Defendant's alleged fraud. For the reasons discussed elsewhere, however, she may not recover noneconomic damages. *See* ECF 432 at 22-30 (Order on Motions in Limine). Regarding her claim for economic damages, for the reasons discussed above, Ms. de Jaray has not presented sufficient evidence of general unemployability for 14 years or that she even wanted to be employed for the next 14 years. None of that is stated in Plaintiffs' Lay Witness List summary of anticipated testimony. *See* ECF 313 at 8-10. Finally, regarding her loss of salary or other benefits caused by Defendant's allegedly wrongful conduct against *Apex*, those are *indirect*, rather than direct, damages and thus not recoverable by Ms. de Jaray, as discussed above.

Mr. Andrukonis.[13] Instead, Lattice has moved to exclude from trial certain of his opinions and testimony, as follows:

> 1. The phrase "rated for operation" as used in the U.S. Commerce Control List (CCL) refers to a manufacturer's published data sheet specifications.
>
> 2. Because Lattice's datasheets for the seized /883 PLDs refer to a "case temperature" rating, they are not subject to ECCN 3A001.a.2.c governing devices rated for operation over the ambient temperature range of -55 to 125°C.
>
> 3. Lattice's datasheets were "inconsistent" with their own classification of the seized /883 PLDs under ECCN 3A001.a.2.c and were therefore "misleading."
>
> 4. The EARs did not apply to the seized /883 PLDs after they left the United States.
>
> 5. Commercial invoices containing export classification information are "unimportant" to licensing decisions compared to datasheets.
>
> 6. Lattice's datasheets were "not consistent with industry standards."
>
> 7. "Apex's reliance on Lattice's data sheets was reasonable."

The Court will address each point in turn.

---

[13] In its motion, Lattice states that Mr. Andrukonis proposes to give expert testimony in this case "in contravention of Department of Commerce regulations." ECF 323 at 8. Lattice notes that 15 C.F.R. § 15.14(g)(2)(ii) provides: "Former employees offering expert or opinion testimony and those seeking such testimony from former employees, must confer with the General Counsel or appropriate agency counsel to ascertain if the prospective expert or opinion testimony is consistent with this subpart."). *Id.* at 8 n.2. Lattice adds that "Mr. Andrukonis admits that he has never notified anyone at BIS or Commerce that he plans to give testimony directly contrary to their official licensing determinations and maintains that he has no intention of doing so." *Id.* at 8. Plaintiffs did not directly respond to Lattice's comment. Because Lattice has not filed a motion to exclude Mr. Andrukonis on this basis, the Court will not further discuss this issue.

### 1. Whether "Rated for Operation" Means Anything Other than "Designed for Operation"

One of the key disputed issues in this case is whether the 2ICs (or, the /883 PLDs) were export-controlled. The answer to that question likely will depend, at least in part, on how those products were "rated for operation," which is the phrase that is used in the federal regulations, specifically the CCL.[14]

According to Lattice, Mr. Andrukonis will improperly testify to the jury as to the meaning of "rated for operation" because in concluding that the devices were not export controlled under ECCN 3A001.a.2.c,:

> one of the first things Mr. Andrukonis says is that "*[a] 'rating,' as that term is used in the ECCN, is a very specific concept that indicates the recommended operating and warrantied parameters of a product*," and that "export control classification determination is based on a product's rating by the manufacturer." (*Id.* at ¶ 30 (emphasis added); *see also id.* at, *e.g.*, ¶ 24 ("It is the product's operative data sheet **that dictates** whether the product is classified under any ECCN.") (emphasis added), ¶ 28 ("[T]he only entity that could have rated the Semiconductors is Lattice."), ¶ 31 ("[T]he manufacturer establishes and publishes the ratings within which the products are warrantied to operate.")).

ECF 413 at 6 (emphasis in original). At the Rule 104 hearing, Lattice questioned Mr. Andrukonis about whether his opinion is that "rated for operation" refers to the recommended operating conditions under which the manufacturer's warranties would apply.

Under Ninth Circuit precedent, experts are not permitted to opine on questions of statutory construction, expressly including the meaning of "rated for operation" in the CCL. *United States v. Shih*, 73 F.4th 1077, 1093 (9th Cir. 2023). In that case, the Ninth Circuit held that "rated for operation" in the CCL means "designed" for operation. *Id*. at 1092. In addition, it

---

[14] This is either a fact dispute or a dispute that raises a mixed question of fact and law.

is improper for a court to rely on expert witness testimony to construe a statute or regulation, including the CCL. *Id.* (*citing Teva Pharms, USA, Inc. v. Sandoz, Inc*., 574 U.S. 318, 332 (2015) (expert testimony about terms of art "cannot be used to prove the proper or legal construction of any instrument of writing" (cleaned up))). That is because "an expert witness cannot give an opinion as to her legal conclusion," and "instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info. Sys*., 523 F.3d 1051, 1058 (9th Cir. 2008) (quotation marks and emphasis omitted).

During his Rule 104 testimony, however, Mr. Andrukonis agreed that he will not offer to the jury any opinion or testimony that the phrase "rated for operation" in the context of the CCL (or any other context relevant to this lawsuit) means anything other than "designed for operation." To this limited extent, the Court grants this portion of Lattice's motion. Mr. Androkonis may not define or explain "rated for operation" in any way other than as "designed for operation."

### 2. Whether the 2ICs (or, the /883 PLDs) Are Export-Controlled

Mr. Andrukonis has opined that the 2ICs (or, the /883 PLDs) that were seized by the Canadian export authorities, also referred to as the "Seized Goods," were not export-controlled under ECCN 3A001.a.2.c. He bases this opinion largely on the fact that this ECCN refers to "ambient" temperature and the products' datasheets from Lattice refer only to "case" temperature. Lattice argues (and previously argued in its Motion in Limine No. 4) that this issue has already been conclusively determined by the U.S. Department of Commerce and may not be contested at trial. The Court previously denied Lattice's motion based on this argument. *See* ECF 432 (Order on Motions in Limine), at 18-19; *see also* ECF 293 at 7-9 (Order). For the same reasons, the Court denies this portion of Lattice's motion.

### 3. Whether Lattice's Datasheets Are Materially Misleading

Mr. Andrukonis has opined that Lattice's datasheets are materially misleading to the extent that they imply that the 2ICs (or, the /883 PLDs, or the Seized Goods) were not export-controlled, if it turns out that they were export-controlled, as Lattice contends. These are questions for the jury. The Court denies this portion of Lattice's motion.

### 4. Whether U.S. Export Regulations Apply After Goods Leave the United States

Mr. Andrukonis has opined that the U.S. export-regulations do not apply to the 2ICs (or, the /883 PLDs, or the Seized Goods) after they left the United States. He bases this opinion on his earlier opinion that the Seized Goods were *not* export-controlled under ECCN 3A001.a.2.c. During his Rule 104 testimony, however, Mr. Andrukonis conceded that if the Seized Goods were export-controlled under ECCN 3A001.a.2 (including under any subpart) and if Lattice designed these goods (at least in a way that was not *de minimis*), then U.S. export regulations would continue to apply to these goods after they left the United States. Mr. Andrukonis may present this testimony to the jury. To this limited extent, the Court grants in part and denies in part this portion of Lattice's motion.

### 5. Whether Commercial Invoices Are "Unimportant" to Licensing Decisions

Mr. Andrukonis has opined that most companies do not focus on commercial invoices, including Destination Control Statements contained in those invoices, when determining whether a product is export-controlled. These are questions for the jury. The Court denies this portion of Lattice's motion.

### 6. Whether Lattice's Datasheets Are Consistent with Industry Standards

As noted above, Mr. Andrukonis has opined that Lattice's datasheets are materially misleading to the extent they imply that the 2ICs (or, the /883 PLDs, or the Seized Goods) were not export controlled, if it turns out that they were export-controlled, as Lattice contends.

PAGE 19 – ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY

Mr. Andrukonis further contends that if Lattice's datasheets are materially misleading in this way, they would not be consistent with industry standards. In other words, Mr. Anrukonis opines that industry standards do not allow materially misleading datasheets. These are questions for the jury. The Court denies this portion of Lattice's motion.

### 7. Whether Reliance on Datasheets Is Reasonable

Mr. Andrukonis has opined that it is reasonable for companies to rely on datasheets when determining whether a product is export-controlled. Lattice objects that Mr. Andrukonis's testimony on this issue could be construed to imply that, in his opinion, Plaintiffs in fact relied on Lattice's datasheets. Lattice denies that Plaintiffs relied on their datasheets and thus objects to this portion of Mr. Andrukonis's anticipated trial testimony. During his Rule 104 testimony, however, Mr. Andrukonis agreed that he has no opinion about, and will not express or imply any opinion about, whether Plaintiffs in fact relied on Lattice's datasheets. He will restrict his opinion on this point to his conclusion that it would be reasonable for a company to rely on a seller's datasheets when determining whether a product is export-controlled. To this limited extent, the Court grants in part and denies in part this portion of Lattice's motion. Mr. Androkonis may not state or imply that Plaintiffs have in fact relied on Lattice's datasheets.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Defendant's Motion to Exclude Expert Testimony from Thomas Andrukonis (ECF 323) and Defendant's Motion to Exclude Expert Testimony from Justin Lewis (ECF 325).

**IT IS SO ORDERED**.

DATED this 22nd day of January, 2024.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge