**Nika Aldrich**, OSB #160306
Email: naldrich@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Facsimile: 503-796-2900

**Derek F. Foran** (*pro hac vice*)
Email: dforan@steptoe.com
STEPTOE LLP
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: 415-365-6700

(Additional Counsel Shown on Signature Page)

    *Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STEVEN A. W. DE JARAY, PERIENNE DE JARAY, DARRELL R. OSWALD,** and **APEX-MICRO MANUFACTURING CORPORATION**<br><br>    Plaintiffs,<br><br>vs.<br><br>**LATTICE SEMICONDUCTOR CORPORATION**, and **JOHN** and **JANE DOES 1-20**,<br><br>    Defendants. | Case No. 3:19-cv-00086-SI<br><br>**DEFENDANT LATTICE SEMICONDUCTOR CORPORATION'S MOTION TO ADMIT DX-484, 503, 537, 577, 604, 605, 655, AND 657 INTO EVIDENCE** |

LATTICE'S MOTION TO DX-484, 503, 537, 577, 604,
605, 655, AND 657 INTO EVIDENCE

**RULE 7-1 CERTIFICATION**

Counsel for Defendant Lattice Semiconductor Corporation ("Lattice") has conferred in good faith with counsel for Plaintiffs and discussed the admissibility of exhibits at trial, but the parties were unable to resolve their disputes.

**MOTION**

Lattice respectfully moves Exhibits DX-484, 503, 537, 577, 604, 605, 655, and 657 into evidence at trial.

**I.      INTRODUCTION**

Plaintiffs have contended in this case that Lattice's alleged negligence caused the execution of a search warrant on Apex's properties in February 2009, and that Lattice is therefore responsible for damage that was allegedly caused by the publicity following the execution of that search warrant. Plaintiffs have also contended that Lattice caused the April 2010 Canadian indictment of the de Jarays, and are ultimately responsible for the May 2010 press release that reported that indictment.

These assertions are belied by facts that Lattice seeks to admit into evidence. Specifically, on January 26, 2009, before the authorities ever spoke with Lattice, Patrick Liska, BEng., PEng., a Senior Engineering Advisor for the Export Controls Division at the Department of Foreign Affairs and International Trade Canada (DFAIT) issued a report concluding that the two products detained by Canadian authorities "are enumerated on the Export Control List" and therefore subject to export controls. In reaching that conclusion, Mr. Liska relied on Lattice's datasheets—the same datasheets Mr. de Jaray claims he relied on to conclude the PLDs were *not* export controlled—which Mr. Liska attached to his report. That report (the "First Liska Report") is on Lattice's exhibit list as DX-484.

On February 12, 2009, Canada's lead investigator on the case, Kevin Varga, signed an affidavit in support of the search warrant that was executed on Apex and Mr. de Jaray's residence. That affidavit is 101 paragraphs long, and details the extensive investigation in which the Canadian investigators had engaged in the 50 days following the initial detention. (DX-503.)

Page 1 -    LATTICE'S MOTION TO ADMIT DX-484, 503, 537, 577,
            604, 605, 655, AND 657 INTO EVIDENCE

Among many other pieces of evidence Mr. Varga relied on was the First Liska Report. (*Id.* ¶ 49.) Mr. Varga also relied on the fact that there were "inconsistencies" between the information provided by Mr. de Jaray and the actual contents of the detained boxes of Lattice PLDs. (*Id.* ¶¶ 50-58.) In fact, there were not, as Mr. de Jaray represented then and testified in Court today, "55 printed circuit board assembl[ies]" in those boxes, but rather 5100 military-grade PLDs. (*Id.* ¶¶ 57, 60.) In fact, Mr. Varga noted there were only 10 "bare circuit cards" in the box. (*Id.* ¶¶ 60.) Mr. Varga also concluded, after obtaining import information from CBSA, that Apex had imported 5100 PLDs from Lattice with a declared value in excess of $200,000 only a few days prior to the attempted export of the same devices, with a total declared value under $2000. (*Id.* ¶ 79.) As a basis for seeking the search warrant, Mr. Varga relied on the fact that the "value is vastly different from that declared." (*Id.* ¶ 93.) Mr. Varga concluded that Apex was "the main operating entity" in an "exporting scheme." (*Id.* ¶ 90.)

In determining whether Lattice is liable for any harm caused the execution of the search warrant, the jury needs to consider the evidence about what drove the Canadian prosecutors' decision-making, including both the fact that Canada's export classification decision was made based on Lattice's datasheets, and the role of Plaintiffs' falsehoods in that process. Such evidence is critical to the issues of causation and Lattice's *in pari delicto* defense.

The same applies to later aspects of the Canadian government's decision-making process that underlied its ultimate, April 2010 decision to indict Mr. de Jaray. Specifically, on March 16, 2009, Mr. Liska issued a second report, in which he found that a number of Lattice's /883 devices that Apex had re-exported to Hong Kong were subject to the Canadian equivalent of 3A001.a.2.c. That report is on Lattice's exhibit list as DX-577. In support of that analysis, Mr. Liska relied on Lattice's datasheets, which he attached to his report. (*Id.*, p. 2.) Mr. Liska also issued a third report on February 4, 2010, which was subsequently updated on May 6, 2010. That report is on Lattice's exhibit list as DX-655. Mr. Liska again concluded, relying on Lattice's datasheets, that the Lattice PLDs were subject to the Canadian equivalent of 3A001.a.2.c.

Page 2 -   LATTICE'S MOTION TO ADMIT DX-484, 503, 537, 577,
          604, 605, 655, AND 657 INTO EVIDENCE

Mr. Varga also continued his investigation, serving numerous discovery requests on FedEx, UPS, government entities, and banks that serviced Apex and its affiliates. He also interviewed a number of former Apex employees and third parties. He sought information from Boeing, Rockwell, and Pentar/NAT Seattle. Throughout his investigation of Plaintiffs, Officer Varga gathered thousands of pieces of evidence, primarily business records and emails, and maintained them with scrupulous attention to detail. He organized the evidence in various "Binders," which corresponded to the source of the evidence.[1] He also prepared an overarching "Prosecution Report Binder," which contained several Appendices that summarized the vast amount of evidence collected during his investigation. Of particular import to the present lawsuit are Appendices B, D, and E, which lay out in spreadsheet format the de Jarays' export activities, citing to the evidence amassed in the Binders. Those summary charts are on the exhibit list as DX-657, DX-604, and DX-605. For example, DX-657 provides a highly-detailed correlation between Apex's imports of Lattice's PLDs and its exports of those PLDs to Hong Kong, citing to records that were seized at Apex or produced by Lattice, FedEx, and UPS. DX-605 is Mr. Varga's chart showing the discrepancy between the actual value of the PLDs as declared by Lattice, and the declared values of those PLDs on "Caliber's" commercial invoices.

In his investigation, Mr. Varga sought many production orders supported by sworn affidavits, continuously adding to the narrative portion of his affidavits based on the facts he was uncovering during his investigation. The last affidavit he filed before filing the indictment is on the exhibit list as DX-537. That affidavit is 245 paragraphs long, and provides an extensive recounting of the findings of his investigation as of that date. It confirms Mr. Varga's belief

---

[1] For example, "Binder B" contained evidence found on-site at Apex; Binders D and E contained documents obtained by FedEx. Binder F comprised documents obtained from UPS. Binder G contained documents obtained from Lattice, and Binders H & I comprised documents obtained from various banks. Each document in the Binders was individually numbered with the Binder number followed by the document number—i.e., "Exhibit B323."

Page 3 -   LATTICE'S MOTION TO ADMIT DX-484, 503, 537, 577, 604, 605, 655, AND 657 INTO EVIDENCE

"that this scheme was an intentional and sophisticated attempt to evade Canadian export laws." (*Id.* ¶ 244.)

Lattice was not the cause of those findings. Officer Varga reached those conclusions based on Plaintiffs' own misconduct, in addition to the Canadian government's own, independent conclusion—based on Lattice's datasheets—that the /883 PLDs that Plaintiffs were shipping to Hong Kong were subject to export controls. To help the jury understand these facts, Lattice seeks to introduce Officer Varga's affidavits, Officer Varga's Appendices, and Mr. Liska's reports into evidence.

Each of the above-referenced exhibits was produced by the Attorney General of Canada in response to Letters Rogatory issued by this Court. The Attorney General of Canada provided two declarations affirming the authenticity of these records. (DX-675, 587.) Copies of many of these documents were also produced by Plaintiffs out of their own files, having been produced by the Attorney General of Canada as part of the *Stitchcombe* production during Mr. de Jaray's criminal and civil proceedings in Canada. (*Id.*)

## II.    LEGAL STANDARD

### A.    Public Records (FRE 803(8))

Under Rule 803(8), a document is admissible in a civil case if it is a "record or statement of a public office" that sets out: (i) "the office's activities"; (ii) "a matter observed while under a legal duty to report"; or (iii) "factual findings from a legally authorized investigation"; and the opponent does not show a lack of trustworthiness. FRE 803(8)(A)-(B). The burden is on the opponent of the evidence to show that the evidence is not trustworthy. *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992).

To be admissible under subsection (ii), the "matter observed" must be a fact that the public officer personally observed. *Jensen v. EXC, Inc.*, 82 F.4th 835, 846 (9th Cir. 2023). The public officer must also have a legal duty to report the information. As to that issue, "[t]he pertinent question is whether the creation and maintenance of the record at issue is 'appropriate to the function of the' relevant government office, given 'the nature of the responsibilities

assigned to' that office." *United States v. Fryberg*, 854 F.3d 1126, 1131 (9th Cir. 2017) (quoting *United States v. Lopez*, 762 F.3d 852, 862 (9th Cir. 2014)).

Regarding subsection (iii), the Supreme Court has interpreted the phrase "factual findings" as including both statements of fact and conclusions or opinions. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) ("[P]ortions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion."). The conclusion or opinion must be "based on factual investigation." *Id.* at 169.

### B.    Business Records (FRE 803(6))

Under FRE 803(6), a document is admissible as a business record if: (A) "the record was made at or near the time by . . . someone with knowledge"; (B) "the record was kept in the course of a regularly conducted activity of a business"; (C) "making the record was a regular practice of that activity"; (D) these requirements are established by a records custodian or the record is self-authenticating under FRE 902(11) or (12); and (E) "the opponent does not show . . . a lack of trustworthiness." FRE 803(6).

### C.    Summary Charts (FRE 1006)

Under FRE 1006, a party may use "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court" so long as the proponent allows opposing counsel to examine the underlying records. "A proponent of summary evidence must establish that the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011) (quoting *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1516 (9th Cir. 1985)). "The purpose of the rule is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *Id.*

## III.    ANALYSIS

### A.    The Varga Affidavits (DX-503, 537) Should Be Admitted Into Evidence

Officer Kevin Varga's affidavits are admissible as public records under FRE 803(8).

DX-503 is Officer Varga's affidavit filed in support of an application for a search warrant on Apex's business premises, and DX-537 is a similar affidavit filed in support of an application for a document production order. In both affidavits, Officer Varga explains the steps he had taken in his investigation of the de Jarays and the factual bases for his belief that the de Jarays violated export control laws. Those statements are all "factual findings" from a "legally authorized investigation" and therefore admissible under FRE 803(8)(A)(iii). *See Weinstein v. Siemens*, 2010 WL 4825016, at *3-7 (E.D. Mich. Nov. 22, 2010) (admitting police officer affidavits in support of search warrant as public records); *Solarcom, LLC v. Fleet Bus. Credit, LLC*, 2006 WL 8431899, at *5 (N.D. Ga. Feb. 1, 2006) (admitting FBI Agent search warrant affidavit as public record).

Moreover, Officer Varga's affidavits are admissible at least to show that the Canadian authorities indicted the de Jarays as the result of a thorough investigation and investigated them because of their intentional efforts to avoid export control and customs laws, not because of any conduct by Lattice. These affidavits show that the Canadians pursued the investigation of the de Jarays because of the de Jarays' own intentional misconduct, not because of any communication between the Canadian authorities and Lattice, and not because of any distinction between the words "case" or "ambient" in Lattice's datasheets. To the contrary, the Canadian government prosecuted the de Jarays for violating export controls laws *notwithstanding the fact* that the datasheets used the words "case." Further, the affidavits show the strong evidence that the Canadian investigators had in support of their belief that the de Jarays were involved in an export diversion scheme.

### B. The Liska Reports (DX-484, 577, 655) Should be Admitted Into Evidence

Mr. Liska was asked to determine whether certain Lattice /883 PLDs exported by the de Jarays were controlled. In all three reports, Mr. Liska concluded that the /883 PLDs were export-controlled. These reports are admissible because they are public records under FRE 803(8)(A)(iii). Mr. Liska's reports consist of factual observations about the design and capabilities of the /883 PLDs at issue. Thus, these statements are all "factual findings" from a

"legally authorized investigation" and admissible under the public records exception. *See United States v. Midwest Fireworks Mfg. Co.*, 248 F.3d 563, 566-67 (6th Cir. 2001) (affirming admission of agency's laboratory reports concluding that the defendants had imported and distributed fireworks containing "pyrotechnic powder in excess of the amount permitted under" federal regulations).

Moreover, Mr. Liska's reports are admissible to show that, based on the same datasheets at issue in this case, the Canadian authorities readily determined that every single Lattice /883 PLD that the de Jarays exported are controlled under the Canadian equivalent of 3A001.a.2.c. In addition to showing that Lattice is not the source of any alleged harm to Plaintiffs, the reports further show what a reasonable purchaser in the semiconductor industry would understand from Lattice's datasheets. Mr. Liska's reports are separately admissible for this non-hearsay purpose.

### C. Officer Varga's Appendices (DX-604, 605, 657) Should be Admitted Into Evidence

Officer Varga's Appendices (DX-604, 605, 657) summarize hundreds of business records and are therefore admissible summary charts under FRE 1006. *First*, all of the evidence underlying Agent Varga's Appendices is admissible. Officer Varga supported each entry in his Appendices with citations to exhibits in his binder system containing all of the evidence collected in his investigation of the de Jarays. That underlying evidence is the following: Apex purchase orders, Apex commercial invoices, Lattice packing slips, Lattice certificates of conformance, Lattice commercial invoices, Caliber commercial invoices, FedEx waybills, and UPS waybills, all found in Ms. Zhang's "green folder" left near the shredder in the accounting department. This underlying evidence is all admissible as business records or, in the alternative, statements of a party opponent. FRE 803(6); FRE 801(d)(1).

*Second*, Plaintiffs have had an opportunity to review the underlying evidence. In fact, it was Plaintiffs who produced these records to Lattice in April 2022. Accordingly, Plaintiffs have had ample opportunity to inspect both the Appendices and their underlying sources.

*Third*, Agent Varga's Appendices will provide crucial assistance to the jury in

understanding the extensive evidence in this case. Appendix D documents the product number, quantity ordered, import date, export date, unit price, and total shipment value for every delivery of /883 PLDs from Lattice to Apex. (DX-657.) Each entry is supported by at least two separate documents that are clearly identifiable in Officer Varga's Binders. Appendix B is a more simplified chart that lists all of the Lattice /883 PLDs that Plaintiffs ordered, on what date, and in which quantities. (DX-604.) In looking at Appendices B and D, the jury will be able to see that Plaintiffs consistently ordered large quantities of Lattice /883 PLDs and then shipped those goods overseas only days later. The jury will not have time to wade through hundreds of commercial invoices, packing slips, and other documents to see that pattern of conduct on their own.

Appendix E is a table that compares the value that Plaintiffs declared on customs documents accompanying their shipments of Lattice /883 PLDs against the actual value of those goods. (DX-605.) Appendix E shows that, in exporting approximately $3.3 million of Lattice /883 PLDs over a four-year period of time, Plaintiffs declared to customs authorities that they had a total value of approximately $65,000. This is a crucial fact that directly refutes key allegations such as reliance and causation, and provides a complete defense under the doctrine of *in pari delicto*. Plaintiffs have yet to explain why they significantly undervalued each and every shipment of Lattice PLDs—in every instance less than the $2,000 threshold for random export searches. And count two of Plaintiffs' indictment charges Plaintiffs for these repeated violations of the Canadian Customs Act, but again, Plaintiffs fail to explain how Lattice's datasheets have anything to do with that count. Appendix E (DX-605) will allow the jury to understand these key facts without taking on the task of comparing hundreds of shipping records.

Separate from their admissibility under FRE 1006, Officer Varga's Appendices are also admissible as public records because they are "factual findings" from a "legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). Officer Varga created the Appendices as part of his investigation of the de Jarays, and the Appendices record extensive factual information about Plaintiffs' import and export of Lattice /883 PLDs.

Finally, in the alternative, Officer Varga's Appendices are admissible beyond the truth of what they assert, to show that the Canadian authorities investigated and indicted the de Jarays because of their own intentional misconduct and violation of Canadian customs laws, not because of any distinction between "case" and "ambient' temperature in Lattice's datasheets.

Plaintiffs' objections as to authenticity are unfounded. (*See* ECF 436, at 47, 54.) The Appendices and all underlying evidence were produced by Plaintiffs, and thus, are deemed authentic. *See Maljack Prods.*, 81 F.3d at 889 n.12; *Romero*, 673 F. App'x at 647. Moreover, the Canadian Government authenticated both the Appendices and all underlying evidence when it produced the documents in response to Letters Rogatory issued by this Court. The Appendices were part of a "Prosecution Report Binder" identified and authenticated by the Affidavit of Kabo Yan produced by the Attorney General of Canada. [2] (DX-675, at 9.)

## IV.    CONCLUSION

For the foregoing reasons, DX-484, 503, 537, 577, 604, 605, 655, and 657 should be admitted.

Dated this 6th day of February, 2024.

          Respectfully submitted,

          SCHWABE, WILLIAMSON & WYATT, P.C.

By:   *s/ Nika Aldrich*
       Nika Aldrich, OSB #160306
       Scott D. Eads, OSB #910400
       Jason A. Wrubleski, OSB #120524
       Telephone: 503-222-9981
       Facsimile: 503-796-2900

---

[2] The Prosecution Report Binder in which these Appendices are found was produced by Plaintiffs from the files of their attorneys, bearing Bates stamp MARTIN_00004024. The version on the exhibit list was produced by the Attorney General of Canada.

Page 9 -   LATTICE'S MOTION TO ADMIT DX-484, 503, 537, 577, 604, 605, 655, AND 657 INTO EVIDENCE

          Derek F. Foran (*pro hac vice*)
          STEPTOE LLP
          Telephone: 415-365-6700

          Geoffrey L. Warner (*pro hac vice*)
          Email: gwarner@steptoe.com
          STEPTOE LLP
          633 West Fifth Street, Suite 1900
          Los Angeles, CA 90071
          Telephone: 213-439-9421

          Andrew J. Sloniewsky (*pro hac vice*)
          Email: asloniewsky@steptoe.com
          STEPTOE LLP
          1330 Connecticut Avenue, NW
          Washington D.C. 20036
          Telephone:  202-429-6759

          James P. Bennett (*pro hac vice*)
          Email: jbennett@nortonlaw.com
          THE NORTON LAW FIRM PC
          299 Third Street, Suite 200
          Oakland, CA 94607
          Telephone: 510-906-4905

          *Attorneys for Defendant*

Page 10 -   LATTICE'S MOTION TO ADMIT DX-484, 503, 537, 577,
          604, 605, 655, AND 657 INTO EVIDENCE